Herman Franck, Esq. SBN 123476
Elizabeth Betowski, Esq., SBN 245772
Franck & Associates
1750 Prairie City Road, Ste. 130, #254
Folsom, CA 95630
Tel: 916-256-6266
Email: franckhermanlaw88@yahoo.com
Attorneys for Plaintiffs Michael Castagnola;
Michael Castagnola as Trustee of The Michael L. Castagnola
Revocable Trust Agreement dated September 15, 2016;
and Carly Castagnola

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### [San Francisco Division]

| | |
|---|---|
| MICHAEL CASTAGNOLA; MICHAEL CASTAGNOLA AS TRUSTEE OF THE MICHAEL L. CASTAGNOLA REVOCABLE TRUST AGREEMENT DATED SEPTEMBER 15, 2016; CARLY CASTAGNOLA,<br><br>PLAINTIFFS,<br><br>V.<br><br>MARK ADAMS IN HIS CAPACITY AS RECEIVER; ROBERT PITTMAN IN HIS CAPACITY AS SONOMA COUNTY COUNSEL; DIANA GOMEZ, IN HER CAPACITY AS SONOMA DEPUTY COUNTY COUNSEL; MICHAEL KING, IN HIS CAPACITY AS SONOMA DEPUTY COUNTY COUNSEL; COUNTY OF SONOMA; TYRA HARRINGTON IN HER CAPACITY AS MANAGER OF CODE ENFORCEMENT PERMIT SONOMA; SUSAN GORIN IN HER CAPACITY AS SUPERVISOR; DAVID RABBITT IN HIS CAPACITY AS SUPERVISOR; CHRIS COURSEY IN HIS CAPACITY AS SUPERVISOR; JAMES GORE IN HIS CAPACITY AS SUPERVISOR; LYNDA HOPKINS IN HER CAPACITY AS SUPERVISOR; JESSIE CABLK IN HIS CAPACITY AS EMPLOYEE OF PERMIT SONOMA; CALIFORNIA RECEIVERSHIP GROUP INC. A CALIFORNIA CORPORATION; | CASE NO: 25-CV-03624-JD<br><br>**PLAINTIFFS' EXCERPTS OF EXHIBITS TO FIRST AMENDED COMAPLINT; AND FURTHER DOCUMENTS IN SUPPORT OF OPPOSITION TO COUNTY OF SONOMA DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT; REQUEST FOR JUDICIAL NOTICE, FED.R. EVID., RULE 201**<br><br>Date: February 12, 2026<br>Time: 10:00am<br>Courtroom: 11, 19th Floor |

Excerpts of Exhibits to FAC Etc.

0

RECEIVERSHIP FINANCING, LLC, A
CALIFORNIA LIMITED LIABILITY COMPANY;
DOES 1-10

DEFENDANTS.

Plaintiffs Michael Castagnola individually and as Trustee of the Michael L. Castagnola

Revocable Trust Agreement dated September 15, 2016 , and Carly Castagnola herewith submit

this Separate Excerpts of Exhibits to the First Amended Complaint; and Further Documents in

support of their Opposition to the Motions to Dismiss filed by Jessie Cablk, Chris Coursey,

Diana Gomez, James Gore, Susan Gorin, Tyra Harrington, Lynda Hopkins, Michael King,

Robert Pittman, David Rabbitt, County of Sonoma to dismiss the First Amended Complaint; and

Request for Judicial Notice pursuant to Fed.R. Evid., Rule 201 of Attachments I, J, and K and

data in those items:

Attachment K: October 3, 2025 Grant Deed for the sale of 12778 Dupont Road, Sebastopol, CA

95472 for $640,000.00 from Receivership Financing, LLC to Blake Scott Azcarate Bascherini

and Vanessa Mercedes Valera Bascherini, as Trustees of the Blake Scott Azcarate Bascherini

and Vanessa Mercedes Valera Bascherini Revocable Living Trust, dated September 1, 2021

Attachment L: website printouts from www.zillow.com regarding the subject property

[https://www.zillow.com/homedetails/12778-Dupont-Rd-Sebastopol-CA-

95472/15812505_zpid/]

   Note: page 2 of the printout states: "Sold for $640,000 on 10/3/25"

Note: page 1 lists the value of off-market nearby properties at $1,512,000; $798,000; $781,000; and $2,286,800, respectively


Attachment M: website printout from www.redfin.com regarding the subject property [https://www.redfin.com/CA/Sebastopol/12778-DuPont-Rd-95472/home/2439456]

Note: page 2 of the printout states: "Off Market – Sold Oct 2025 for $640,00

Note: page 2 lists the value of nearby properties at of $1,060,000; $1,005,000; and $1,250,000.


Attachment N: Defendant Michael Casatgnols, individually and as Trustee of the ..Amended Notice of Motion and Motion setting a hearing on March 6, 2026 for Order to Permit the claims in this federal action to proceed against Mark Adams as Receiver; to Modify Clary Castagnola's existing order to permit her pt proceed with her claims against Mark Adams in this federal action; and to terminate the receivership in light of October 3, 2025 sale of the prior Castagnola residence; and final billings submitted by Mark Adams for approval by the Court on January 8, 2026 before the Sonoma County Superior Court.


## TABLE OF CONTENTS/ATTACHMENTS

Note: we have included after each separator page, the separator exhibit page from the FAC to show the designation of the attachment as designated in the FAC


Attachment A: FAC Exhibit L: Photos of the residence [with sub exhibits]
    1. Photo of Entry to the Property
    2. Photos of Carly Castagnola's Yurt
    3. Photos of Seed Barn:
    4. Photos of Greenhouse

5. Photos of Bulldozed remains/rubble after Mark Adams's Team demolished the structure

Attachment B: FAC Exhibit B: Minute Order dated March 12, 2025 approving in part Carly Castognola's request to proceed with a lawsuit against Mark Adams

Note the following paragraphs and pages of interest:

- Page 5, Paragraph 4: "To borrow funds to pay for repairs and clean-up necessary to correct the conditions cited in the Stipulated Judgment entered on July 24, 2020…"
- Page 6, paragraph 9: requiring Mark Adams to "prepare a plan for rehabilitation of the Subject Property to remedy the conditions giving rise to the appointment of the Receiver. and any other conditions which require remediation as may be discovered by the Receiver in the course of inspections or the Subject Property (Rehabilitation Plan and Cost Estimate) and to seek court approval of that plan."
- Page 7, Paragraph 11: requiring Mark Adams "to temporarily or permanently relocate the Property's occupants (if any). The receiver shall pay relocation expenses as provided in Sec. 7262 in the Government Code..."

Attachment C: FAC Exhibit K: July 24, 2020 Stipulated Judgment in *Sonoma v. Castagnola*, Sonoma County Superior Court Case No. SCV-265714 [face page only]

Attachment D: FAC Exhibit D: Lis Pendens filed by the County of Sonoma in the underlying action *Sonoma v. Castagnola*, Sonoma County Superior Court Case No. SCV-265714

Attachment E: FAC, Exhibit H: Sonoma County Superior Court Order dated May 25, 2022 Appointing Mark Adams as Receiver

Attachment F: Excerpts of FAC Exhibit E: Initial Status Conference Statement dated July 21, 2025, which included the following attachments:

***

Attachment B: Chronology prepared by Carly Castagnola showing a series of loans that Mark Adams has taken out on this property, totaling a staggering $880,000.

Attachment G: FAC, Exhibit G: Memo re List of Eviction Related-Orders and Writ of Possession and the actual orders

1. October 31 2023 Order After Hearing for Judgment of Possession and Contempt
2. February 29, 2024 Revised Order After Hearing for Judgment of Possession
3. January 24, 2024 Minute Order re Mr. Castagnola's attempt to challenge the eviction related orders

Attachment H: Excerpts of First Amended Complaint:

1. Section I: OVERVIEW AND LIST OF CLAIMS FOR RELIEF, FAC, pages 2 – 4;
2. Section II: PARTIES, FAC, pages 4-11;
3. Section V: ALLEGATIONS OF WRONGFUL CONDUCT BY MARK ADAMS
4. Section VI: PLAINTIFFS DO NOT DISPUTE OR TAKE ISSUE WITH THE STIPULATED JUDGMENT, FAC, pages 47-51;

5. Section VII: INTENTIONALLY WRONGFUL CONDUCT OF THE COUNTY OF SONOMA AND INDIVIDUALLY-NAMED COUNTY OF SONOMA OFFICIALS, FAC, pages 51-103;

6. Section VIII: ADDITIONAL INJUNCTIVE RELIEF CLAIMS RE THE CASTAGNOLA RESIDENCE, FAC, pages 103-106;

7. Section IX: ALLEGATIONS REGARDING QUALIFIED IMMUNITY, FAC, pages 106-111;

8. Signature pages of Plaintiffs' counsel, FAC pages 223-224;

9. Plaintiffs' verifications to the FAC pages 225-226;

10. List of Exhibits to the FAC, Exhibits A-BB, FAC, pages 227-230.

Attachment I: Excerpts of First Amended Complaint regarding dates of incidents for purposes of Statute of Limitations Analysis

List of Attached pages:

Page 25, paragraphs 114-117 [re writ of possession and ownership of property] and in section V., page 42, paragraphs 155-158; They are to some extent set forth in the first claim for relief for violation of the Federal Civil Rights Act, page 114, paragraph 339; They are set forth in the Eleventh Claim for Relief for violation of the federal RICO statute [FAC, page 153, paragraph 482, and page 158, paragraphs 500-501]; See also the Fifteenth Claim for Relief for state tort claim of wrongful foreclosure, wrongful eviction, and breach and violation of plaintiff Michael Castagnola in his individual capacity and as trustee of his family trust for violation of his right to quiet enjoyment of the premises, page 204, paragraphs 628-629

Attachment J: Excerpts from First Amended Complaint specifying Misconduct by Defendants who are members of the Board of Supervisors of the County of Sonoma

Pages attached: FAC face page; FAC section II, Parties, paragraphs 10-13, 17-21, 25; FAC section IV, LEGAL AND FACTUAL BASIS FOR THIS LAWSUIT, paragraphs 33, 34, 35, 36, 37, 38; FAC Section VI, PLAINTIFFS DO NOT DISPUTE OR TAKE ISSUE WITH THE STIPULATED JUDGMENT, paragraph 15-176; FAC section VII, INTENTIONALLY WRONGFUL CONDUCT OF THE COUNTY OF SONOMA AND INDIVIDUALLY-NAMED COUNTY OF SONOMA OFFICIALS, FAC, paragraphs 207, 239, 245, 268, 269, 283, 284, 291; FAC, Section IX re Qualified Immunity:, paragraph 324; FAC, Second Claim for Relief; Violation of Monell Doctrine; FAC Seventh Claim for Relief: Intentional Infliction of Emotional Distress, paragraph 414; Eighth Claim for Relief: Conversion, 5th Amendment and Takings Clause, paragraph 424, 425, 426; Eleventh Claim for Relief – Federal RICO Act violation, paragraphs 474, 475; Twelfth Claim for Relief: California State RICO claims: paragraphs 530, 531, 563, 564

Note: The specification of County behavior in each of these claims is relevant ot show individual conduct of the involved board of Supervisor member sued as defendants herein. The County of Sonoma, and its County officials, including the members of the board of Supervisors, are not intended to be part of the state law claims asserted in the seventh claim for intentional infliction of emotional distress; and the twelfth claim for relief

**Other items not attached to the Complaint, for which Judicial Notice is requested pursuant to Fed.R.Evid., Rule 201(b):**

> **"(b) Kinds of Facts That May Be Judicially Noticed. The court may judicially notice a fact that is not subject to reasonable dispute because it:**
> **(1) is generally known within the trial court's territorial jurisdiction; or**
> **(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."**

Attachment K: October 3, 2025 Grant Deed for the sale of 12778 Dupont Road, Sebastopol, CA 95472 for $640,000.00 from Receivership Financing, LLC to Blake Scott Azcarate Bascherini and Vanessa Mercedes Valera Bascherini, as Trustees of the Blake Scott Azcarate Bascherini and Vanessa Mercedes Valera Bascherini Revocable Living Trust, dated September 1, 2021

Attachment L: website printouts from www.zillow.com regarding the subject property [https://www.zillow.com/homedetails/12778-Dupont-Rd-Sebastopol-CA-95472/15812505_zpid/]
> Note: page 2 of the printout states: "Sold for $640,000 on 10/3/25"
> Note: page 1 lists the value of off-market nearby properties, valued at $1,512,000; $798,000; $781,000; and $2,286,800

Attachment M: website printout from www.redfin.com regarding the subject property [https://www.redfin.com/CA/Sebastopol/12778-DuPont-Rd-95472/home/2439456]
> Note: page 2 of the printout states: "Off Market – Sold Oct 2025 for $640,00
> Note: page 2 lists the value of nearby properties: of $1,060,000; $1,005,000; and $1,250,000.

Attachment N: Defendant Michael Casatgnols, individually and as Trustee of the ..Amended Notice of Motion and Motion setting a hearing on March 6, 2026 for Order to Permit the claims in this federal action to proceed against Mark Adams as Receiver; to Modify Clary Castagnola's existing order to permit her pt proceed with her claims against Mark Adams in this federal action; and to terminate the receivership in light of October 3, 2025 sale of the prior Castagnola residence; and final billings submitted by Mark Adams for approval by the Court on January 8, 2026 before the Sonoma County Superior Court.

Respectfully Submitted,

//s// Herman Franck, Esq.
_____     Date: January  7,  2026
Herman Franck, Esq.
Attorneys for Plaintiffs Michael Castagnola;
Michael Castagnola as Trustee of The Michael L. Castagnola
Revocable Trust Agreement dated September 15, 2016;
and Carly Castagnola

**LIST OF ATTACHMENTS**

**Note: we have included after each separator page, the separator exhibit page from the FAC to show the designation of the attachment as designated in the FAC**

Attachment A: FAC Exhibit L: Photos of the residence [with sub exhibits]
    1. Photo of Entry to the Property
    2. Photos of Carly Castagnola's Yurt
    3. Photos of Seed Barn:
    4. Photos of Greenhouse
    5. Photos of Bulldozed remains/rubble after Mark Adams's Team demolished the structure

Attachment B: FAC Exhibit B: Minute Order dated March 12, 2025 approving in part Carly Castognola's request to proceed with a lawsuit against Mark Adams
    Note the following paragraphs and pages of interest:
- Page 5, Paragraph 4: "To borrow funds to pay for repairs and clean-up necessary to correct the conditions cited in the Stipulated Judgment entered on July 24, 2020…"
- Page 6, paragraph 9: requiring Mark Adams to "prepare a plan for rehabilitation of the Subject Property to remedy the conditions giving rise to the appointment of the Receiver. any other conditions which require remediation as may be discovered by the Receiver in the course of inspections or the Subject Property (Rehabilitation Plan and Cost Estimate) and to seek court approval of that plan."
- Page 7, Paragraph 11: requiring Mark Adams "to temporarily or permanently relocate the Property's occupants (if any). The receiver shall pay relocation expenses as provided in Sec. 7262 in the Government Code..."

Attachment C: FAC Exhibit K: July 24, 2020 Stipulated Judgment in *Sonoma v. Castagnola*, Sonoma County Superior Court Case No. SCV-265714 [face page only]

Attachment D: FAC Exhibit D: Lis Pendens filed by the County of Sonoma in the underlying action *Sonoma v. Castagnola*, Sonoma County Superior Court Case No. SCV-265714

Attachment E: FAC, Exhibit H: Sonoma County Superior Court Order dated May 25, 2022 Appointing Mark Adams as Receiver

Attachment F: Excerpts of FAC Exhibit E: Initial Status Conference Statement dated July 21, 2025, which included the following attachments:
    ***
    Attachment B: Chronology prepared by Carly Castagnola showing a series of loans that Mark Adams has taken out on this property, totaling a staggering $880,000.

Attachment G: FAC, Exhibit G: Memo re List of Eviction Related-Orders and Writ of Possession and the actual orders

Excerpts of Exhibits to FAC Etc.

1. October 31 2023 Order After Hearing for Judgment of Possession and Contempt
2. February 29, 2024 Revised Order After Hearing for Judgment of Possession
3. January 24, 2024 Minute Order re Mr. Castagnola's attempt to challenge the eviction related orders

Attachment H: Excerpts of First Amended Complaint:

11. Section I: OVERVIEW AND LIST OF CLAIMS FOR RELIEF, FAC, pages 2 – 4;
12. Section II: PARTIES, FAC, pages 4-11;
13. Section V: ALLEGATIONS OF WRONGFUL CONDUCT BY MARK ADAMS
14. Section VI: PLAINTIFFS DO NOT DISPUTE OR TAKE ISSUE WITH THE STIPULATED JUDGMENT, FAC, pages 47-51;
15. Section VII: INTENTIONALLY WRONGFUL CONDUCT OF THE COUNTY OF SONOMA AND INDIVIDUALLY-NAMED COUNTY OF SONOMA OFFICIALS, FAC, pages 51-103;
16. Section VIII: ADDITIONAL INJUNCTIVE RELIEF CLAIMS RE THE CASTAGNOLA RESIDENCE, FAC, pages 103-106;
17. Section IX: ALLEGATIONS REGARDING QUALIFIED IMMUNITY, FAC, pages 106-111;
18. Signature pages of Plaintiffs' counsel, FAC pages 223-224;
19. Plaintiffs' verifications to the FAC pages 225-226;
20. List of Exhibits to the FAC, Exhibits A-BB, FAC, pages 227-230.

Attachment I: Excerpts of First Amended Complaint regarding dates of incidents for purposes of Statute of Limitations Analysis

List of Attached pages:
Page 25, paragraphs 114-117 [re writ of possession and ownership of property] and in section V., page 42, paragraphs 155-158; They are to some extent set forth in the first claim for relief for violation of the Federal Civil Rights Act, page 114, paragraph 339; They are set forth in the Eleventh Claim for Relief for violation of the federal RICO statute [FAC, page 153, paragraph 482, and page 158, paragraphs 500-501]; See also the Fifteenth Claim for Relief for state tort claim of wrongful foreclosure, wrongful eviction, and breach and violation of plaintiff Michael Castagnola in his individual capacity and as trustee of his family trust for violation of his right to quiet enjoyment of the premises, page 204, paragraphs 628-629

Attachment J: Excerpts from First Amended Complaint specifying Misconduct by Defendants who are members of the Board of Supervisors of the County of Sonoma

Pages attached: FAC face page; FAC section II, Parties, paragraphs 10-13, 17-21, 25; FAC section IV, LEGAL AND FACTUAL BASIS FOR THIS LAWSUIT, paragraphs 33, 34, 35, 36, 37, 38; FAC Section VI, PLAINTIFFS DO NOT DISPUTE OR TAKE ISSUE WITH THE STIPULATED JUDGMENT, paragraph 15-176; FAC section VII, INTENTIONALLY WRONGFUL CONDUCT OF THE COUNTY OF SONOMA AND INDIVIDUALLY-NAMED COUNTY OF SONOMA OFFICIALS, FAC, paragraphs 207, 239, 245, 268, 269, 283, 284, 291; FAC, Section IX re Qualified Immunity:, paragraph 324; FAC, Second Claim for Relief; Violation of Monell Doctrine; FAC Seventh Claim for Relief: Intentional Infliction of Emotional Distress, paragraph 414;

Eighth Claim for Relief: Conversion, 5th Amendment and Takings Clause, paragraph 424, 425, 426; Eleventh Claim for Relief – Federal RICO Act violation, paragraphs 474, 475; Twelfth Claim for Relief: California State RICO claims: paragraphs 530, 531, 563, 564 Note: The specification of County behavior in each of these claims is relevant ot show individual conduct of the involved board of Supervisor member sued as defendants herein. The County of Sonoma, and its County officials, including the members of the board of Supervisors, are not intended to be part of the state law claims asserted in the seventh claim for intentional infliction of emotional distress; and the twelfth claim for relief

**Other items not attached to the Complaint, for which Judicial Notice is requested pursuant to Fed.R.Evid., Rule 201(b):**

**"(b) Kinds of Facts That May Be Judicially Noticed. The court may judicially notice a fact that is not subject to reasonable dispute because it:**
**(1) is generally known within the trial court's territorial jurisdiction; or**
**(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."**

Attachment K: October 3, 2025 Grant Deed for the sale of 12778 Dupont Road, Sebastopol, CA 95472 for $640,000.00 from Receivership Financing, LLC to Blake Scott Azcarate Bascherini and Vanessa Mercedes Valera Bascherini, as Trustees of the Blake Scott Azcarate Bascherini and Vanessa Mercedes Valera Bascherini Revocable Living Trust, dated September 1, 2021

Attachment L: website printouts from www.zillow.com regarding the subject property [https://www.zillow.com/homedetails/12778-Dupont-Rd-Sebastopol-CA-95472/15812505_zpid/]
Note: page 2 of the printout states: "Sold for $640,000 on 10/3/25"
Note: page 1 lists the value of off-market nearby properties, valued at $1,512,000; $798,000; $781,000; and $2,286,800

Attachment M: website printout from www.redfin.com regarding the subject property [https://www.redfin.com/CA/Sebastopol/12778-DuPont-Rd-95472/home/2439456]
Note: page 2 of the printout states: "Off Market – Sold Oct 2025 for $640,00
Note: page 2 lists the value of nearby properties: of $1,060,000; $1,005,000; and $1,250,000.

Attachment N: Defendant Michael Casatgnols, individually and as Trustee of the ..Amended Notice of Motion and Motion setting a hearing on March 6, 2026 for Order to Permit the claims in this federal action to proceed against Mark Adams as Receiver; to Modify Clary Castagnola's existing order to permit her pt proceed with her claims against Mark Adams in this federal action; and to terminate the receivership in light of October 3, 2025 sale of the prior Castagnola residence; and final billings submitted by Mark Adams for approval by the Court on January 8, 2026 before the Sonoma County Superior Court.

# ATTACHMENT A

# Exhibit L

Case 3:25-cv-03624-JD    Document 18-1    Filed 09/22/25    Page 225 of 490



Case 3:25-cv-03624-JD    Document 16-1    Filed 09/29/25    Page 26 of 490





Case 3:25-cv-03624-JD    Document 18-1    Filed 08/22/25    Page 102 of 490





229





















Case 3:25-cv-03624-JD   Document 18-1   Filed 05/24/25   Page 26 of 292



# ATTACHMENT B

# Exhibit B

Case 3:25-cv-03JD    Document 18-1    Filed 09/2    Page 4 of 490

Superior Court of California, County of Sonoma

## MINUTE ORDERS

| | |
|---|---|
| **SCV-265714** | |
| **COUNTY OF SONOMA VS CASTAGNOLA** | |
| Date of Hearing: March 12, 2025 | Motion for Leave |
| Time: 3:00 PM | Courtroom 19 |

Judicial Officer: Oscar A Pardo      Courtroom Clerk: Melisa Kennedy Galindo
Court Reporter: None

**Parties Present:**

MOSESIAN, ADENA            Attorney for Received, Mark Adams
(Via Zoom)
CAMP, THOMAS              Attorney for Carly Castagnola
(In Person)
CASTAGNOLA, CARLY        Intervenor
(In Person)

**Law and Motion Calendar**
Issues: Motion for Leave

The Court calls the matter per the request of Counsel Mosesian.

At 3:22 p.m., the case is called.
Appearances are stated for the record.
Court and Counsel discuss issues.
Upon conclusion of argument, the Court ORDERS:

The tentative ruling is ADOPTED.
Court VACATES Verified Complaint filed by Carly S. Castagnola on January 3, 2025.

Counsel Camp is to prepare proposed order for court to sign.

The Court's previously published tentative ruling reads as follows:

Plaintiff County of Sonoma (the "County"), filed the complaint in this action against the property owner in this case, defendant Michael L. Castagnola, as trustee of the Michael L. Castagnola revocable trust ("Defendant") alleging zoning violations and public nuisance under California Health and Safety Code §§ 17980 *et seq.* present at the property commonly known as 12778 Dupont Road, Sebastopol, California (the "Property"). Non-party, Carly S. Castagnola ("Intervenor") has filed a motion to bring suit against the receiver, Mark Adams ("Receiver"), or in the alternative, to intervene in this case.

**The motion is GRANTED IN PART.**

## I. Governing Law

"A receiver is a court-appointed official who can be sued only by permission of the court appointing him." *Ostrowski v. Miller* (1964) 226 Cal.App.2d 79, 84. "The rule requiring court permission to sue a receiver stems from Code of Civil Procedure section 568," *Vitug v. Griffin* (1989) 214 Cal.App.3d 488, 492. "[E]ven in cases where it would be proper for the court to dispose of the controversy under an intervention in the original special proceeding, it · may, nevertheless, grant permission to bring an independent suit. It is not, however, required to do so, and when, by virtue of its ample legal and equitable jurisdiction, it can grant full relief in all proper form of law to a party asserting a claim against the receiver by his intervening in the original proceeding, it is no abuse of discretion to refuse him permission to bring an independent suit." *De Forrest v. Coffey* (1908) 154 Cal. 444, 450. However, in so doing the court is not entitled to assess the merits of the claims asserted against the receiver, nor may the court deprive the claimant both of the opportunity to bring suit against the receiver separately and refuse to allow them to intervene. *Jun v. Myers* (2001) 88 Cal.App.4th 117, 125.

## II. Intervenor's Claims Should be Addressed in this Action

Intervenor seeks to either receive leave of this Court to file a separate action against the Receiver, or in the alternative, to intervene in this action and bring claims against the receiver. Receiver opposes the motion, asserting that the Court should not grant any leave for Intervenor to file her claims.

The Court does not find Receiver's opposition particularly persuasive, in part because Receiver's case citations appear to represent a misunderstanding of the law. Receiver contends that "Courts routinely deny leave to sue a receiver where the conduct in question falls within the receiver's role and court orders", citing *Ostrowski v. Miller* (1964) 226 Cal.App.2d 79, 83. This is not an accurate representation of the *Ostrowski* court's holding. Rather, the court there found that failing to obtain permission from the appointing court within the receivership proceeding was adequate basis for demurrer. *Id.* at 87. The *Ostrowski* court undertook no analysis of the propriety of the receiver's actions, or whether following the appointing court's orders was a defense.

Receiver's contention that the Court should not allow Intervenor to pursue her claims within this case also fails due to not reflecting the posture of the law. Receiver cites *Fireman's Fund Ins. Co. v. Gerlach* (1976) 56 Cal.App.3d 299, without pin citation, contending that "[c]ourts disfavor interventions that expand litigation unnecessarily or complicate the receiver's duties." The Court simply notes that this case does not relate to receiverships and accordingly provides no guidance.

Receiver overstates the Court's discretion in this matter. The Court may *either* allow Intervenor to file a separate case or intervene here. If this Court has legal and equitable jurisdiction to address Intervenor's claims, it is within the Court's discretion to order intervention rather than grant permission to file a separate case. *De Forrest v. Coffey* (1908) 154 Cal. 444, 449. However, in determining whether permission is appropriate, the Court may not decide whether Intervenor is entitled to present a claim at all. *Jun v. Myers* (2001) 88 Cal.App.4th 117, 125. The Court may not examine the merits of Intervenor's claims. *Ibid.* Refusal to allow Intervenor to raise her claims in any manner is denial of due process and is reversable error. *Id.* at 125. Intervenor must be allowed to raise her claims, the question is whether the claims can be adequately adjudicated in the instant action. Assuming that, the

question is tendered to the discretion of the Court.

It does not appear to be the interests of timely or effective adjudication of Intervenor's claims to allow the claims against Receiver to be brought in a separate action. This Court has substantial experience with the ongoing contentions between Plaintiff, Defendant and the Receiver. Intervenor's contentions are related to the Receiver's duties under orders issued by this Court. Receiver's defenses appear predicated on further orders issued thereon. It does not appear in the interest of justice to allow Intervenor to bring these claims separately, when many of the contended issues are directly at hand within this action. There appears to be no foreclosure of Intervenor's claims and remedies being fully addressed in the case at bar. Intervention appears as the appropriate remedy.

Intervenor's motion to file a separate action against the receiver is DENIED, Intervenor's request to bring her claims as a claim in intervention against Receiver in this action is GRANTED.

Receiver's counsel shall submit a written order to the Court consistent with this tentative ruling and in compliance with Rule of Court 3.1312(a) and (b).

Thereafter, Intervenor will file her complaint-in-intervention within 30 days of notice of this order.

Hearing Events/Documents Filed:

   - Court announces tentative decision
   - Party appeared by audio and/or video
   - The Court adopts its previously published tentative ruling

-End of Minute Order-

Next Hearing(s) - Information current as of March 14, 2025:
   March 24, 2025 10:00 AM
   At Judge's Request
   Courtroom 19
   Pardo, Oscar A

For more information please contact the Clerk's Office at (707) 521-6500 during official business hours.
www.sonoma.courts.ca.gov

# ATTACHMENT C


# Exhibit K



DO                        I HEREBY CERTIFY THAT THE WITHIN INSTRU-
                          MENT IS A FULL, TRUE AND CORRECT COPY
                          OF THE ORIGINAL ON FILE IN THIS OFFICE.

AUG 0 7 2020

Clerk of the Superior Court of California
County of Sonoma
By_____ Deputy Clerk

1 | BRUCE D. GOLDSTEIN, #135970
    County Counsel

2 | DIANA E. GOMEZ
    Deputy County Counsel

3 | County of Sonoma
    575 Administration Drive, Room 105-A

4 | Santa Rosa, California 95403
    Telephone: (707) 565-2421

5 | Fax: (707) 565-2624
    Email: Diana.Gomez2@sonoma-county.org

6

7 | Attorneys for Plaintiffs,
    County of Sonoma

ELECTRONICALLY FILED
Superior Court of California
County of Sonoma
7/24/2020 10:05 AM
Arlene D. Junior, Clerk of the Court
By: Jennifer Ellis, Deputy Clerk

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | IN AND FOR THE COUNTY OF SONOMA

10

11 | COUNTY OF SONOMA,                          No. SCV-265714

12 |       Plaintiff,                           **JUDGMENT**

13 | vs.
                                               Dept. 18
14 | MICHAEL L. CASTAGNOLA, Trustee of the
    MICHAEL L. CASTAGNOLA REVOCABLE           Honorable Jenifer Dollard
15 | TRUST, MICHAEL L. CASTAGNOLA
    REVOCABLE TRUST, and DOES 1 through
16 | 30, inclusive,

17 |       Defendants.
    _____/

18 |       The parties desire to resolve the litigation filed by the County of Sonoma (hereinafter the

19 | "County") against Michael L. Castagnola, Trustee Of The  Michael L. Castagnola Revocable

20 | Trust, Michael L. Castagnola Revocable Trust (hereinafter collectively "Defendants") on

21 | December 17, 2019, and the Cross Complaint filed against COUNTY by DEFENDANTS on

22 | May 21, 2020, arising out of the violations of the Sonoma County Code ("SCC"), Chapter 7,

23 | including abatement costs, as defined in section 1-7(b) of the SCC, civil penalties pursuant to

24 | section 1-7.1 of the SCC, and attorneys' fees arising out of this enforcement action, by way of

25 | this this compromise agreement.

26 |                                   **RECITALS**

27 |       WHEREAS, Michael L. Castagnola Revocable Trust,("TRUST") is the owner of the

28 | real property located at 12778 Dupont Road, Sebastopol, California, Assessor's Parcel Number

JUDGMENT
Page 1 of 9

1   074-020-015 ("the Property"). in the unincorporated area of Sonoma County, California,

2      WHEREAS, Michael L. Castagnola is the trustee of the TRUST.

3      WHEREAS, on June 27, 2017 Notices & Orders – Construction Without a Permit, were

4   issued for 10 violations of SCC Chapter 7-5 and served on the Property Owner, addressing the

5   following alleged violations:

6      The Property was also declared to be a public nuisance.

7      WHEREAS, the Property continues to be in violation of the SCC as follows:

8      1.    Unpermitted Greenhouse 35 x 50 with electrical and mechanical (VBU17-0224);

9      2.    Unpermitted Greenhouse (PVC) (VBU17-0225);

10      3.    Unpermitted Cargo Container #1 (VBU17-0226);

11      4.    Unpermitted Cargo Container #2 (VBU17-0227);

12      5.    Unpermitted Cargo Container removed without permit (VBU17-0230);

13      7.    Unpermitted Yurt with electrical, plumbing and mechanical (VBU17-0232);

14      8.    Unpermitted Yurt with electrical, plumbing and mechanical (VBU17-0233);

15      9.    Unpermitted Habitable Structure (Barn) with electrical, plumbing and mechanical

16   (VBU17-0234);

17      10.    Unpermitted Habitable Structure with electrical, plumbing and mechanical

18   (VBU17-0235).

19      WHEREAS, County brought this action pursuant to SCC Sections 1-7.1(a), 1-7.3(k) and

20   1-7 (b), which sections allow the County to bring the herein action and to recover costs and

21   attorney's fees, including, without limitation, costs as defined by section 1-7(b) and civil penalties.

22      WHEREAS, in order to resolve the disputes between them, the parties desire to enter

23   into a Stipulated Judgment.

24      NOW, THEREFORE, pursuant to the Stipulation for Entry of Judgment executed by

25   Defendant Michael L. Castagnola, Trustee of the Michael L. Castagnola Revocable Trust, and

26   attached herewith as "**Exhibit A**" with this Court:

27      **IT IS HEREBY ORDERED THAT:**

28      Defendants Michael L. Castagnola, Trustee Of The Michael L. Castagnola Revocable

<div align="center">

JUDGMENT
Page 2 of 9

</div>

1    Trust and The Michael L. Castagnola Revocable Trust, and persons acting on their behalf or in

2    concert with them and their assessors, assigns, agents or principals, (hereinafter collectively,

3    "DEFENDANTS") , are now permanently enjoined and restrained from ("PERMANENT

4    INJUNCTION"):

5            1.        Maintaining or allowing others to maintain violations of the SCC Chapter 7 on the

6    Property to wit:

7                    A.  Unpermitted construction

8                    B.  Unpermitted habitable structures;

9                    C.  Unpermitted commercial cannabis cultivation;

10                   D.  Unpermitted cargo containers; and

11                   E.  Unpermitted yurts with electrical plumbing and mechanical.

12       **IT IS HEREBY FURTHER ORDERED that:**

13           2.        DEFENDANTS shall abate the Code violations on the Property as follows:

14                   **A.        Unpermitted Habitable Structure (Barn) with electrical, plumbing**

15   **and mechanical (VBU17-0234):**

16                           1)        DEFENDANTS shall legalize the Barn by submitting to the

17   County a complete permit application to abate the building code violation, including any

18   required building, electrical, septic, or other required applications and all supporting documents

19   and plans no later than August 21, 2020 and obtaining final inspection within 120 days of the

20   issuance of the building permit.

21                                   a.  Legalizing (VBU17-0234) includes each and every of the following:

22   obtaining issuance of any necessary building, sewage and septic, and approvals from the County,

23   including paying any necessary fees, completing all necessary work required under each permit,

24   and obtaining final inspection approval by the County. No penalty permit multiplier will be applied

25   to this permit.

26                                   b.  DEFENDANTS shall diligently pursue all required County permit

27   review processes by responding within 14 days to any requests by the County for corrections or

28   modifications to the permit application(s).

<div align="center">

JUDGMENT
Page 3 of 9

</div>

1    c. Defendants understand that if they cannot legalize the Barn as

2 provided herein, they will remove the structure from the Property by obtaining a demolition

3 permit within 30 days of the rejection of the building permit application.

4    d. Defendants understand and agree that this structure will not be a

5 habitable structure.

6    **B. Unpermitted Greenhouse 35 x 50 with electrical and mechanical**

7 **(VBU17-0224);**

8    1) DEFENDANTS shall legalize the 35 x 50 Greenhouse by

9 submitting to the County a complete permit application to abate the building code violation,

10 including any required building, electrical, septic, or other required applications and all

11 supporting documents and plans no later than October 2, 2020 and obtaining final inspection

12 within 10 days of the issuance of the building permit.

13    a. Legalizing (VBU17-0224) includes each and every of the

14 following: obtaining issuance of any necessary building, sewage and septic, and approvals from

15 the County, including paying any necessary fees, completing all necessary work required under

16 each permit, and obtaining final inspection approval by the County. No penalty permit multiplier

17 will be applied to this permit.

18    b. DEFENDANTS shall diligently pursue all required County

19 permit review processes by responding within 14 days to any requests by the County for

20 corrections or modifications to the permit application(s).

21    c. DEFENDANTS may request an extension of this time if

22 DEFENDANTS provide written documentation that they have diligently worked on the

23 abatement of the violations and set forth reasons why they are requesting an extension of time to

24 complete the abatement.

25    d. Any such extension will be made in writing to Deputy

26 County Counsel Diana Gomez for an additional thirty (30) days to come into compliance and

27 said extension not to be unreasonably withheld.  County agreement to extend the deadlines upon

28 proof, shall not exceed a maximum of an additional 120 days to come into compliance for a total


1   of 180 days to abate this violation.

2            e.   DEFENDANTS understand that if they cannot legalize the

3   Greenhouse as provided herein, they will remove the structure from the Property by obtaining a

4   demolition permit within 30 days of the rejection of the building permit application and final

5   inspection of the demolition permit with 30 days of permit issuance.

6        C.    **Unpermitted Greenhouse (PVC) (VBU17-0225);**

7            1)   DEFENDANTS shall legalize VBU17-0225 by obtaining a

8   demolition permit by August 7, 2020 and obtain final inspection by PRMD within 30 days of

9   permit issuance.

10            2)   No penalty permit multiplier will be applied to this permit.

11        D.    **Unpermitted Cargo Container #1 and # 2 (VBU17-0226 and VBU17-**

12   **0227);**

13            1)   DEFENDANTS shall legalize VBU17-0226 and VBU17-0227 by

14   submitting to the County a complete permit application to abate the building code violation,

15   including any required building, electrical, septic, or other required applications and all

16   supporting documents and plans no later than August 21, 2020 and obtaining final inspection

17   within 90 days of the issuance of the building permit.

18            a.   **Legalizing (VBU17-02226 and -0227)** includes each and every of

19   the following: obtaining issuance of any necessary approvals from the County, including paying

20   any necessary fees, completing all necessary work required under each permit, and obtaining final

21   inspection approval by the County. No penalty permit multiplier will be applied to either permit.

22            b.  DEFENDANTS shall diligently pursue all required County permit

23   review processes by responding within 14 days to any requests by the County for corrections or

24   modifications to the permit application(s).

25        E.    **Unpermitted Cargo Container #2 (VBU17-0230);**

26            1)   This cargo container has been removed from the Property. If a

27   demo permit has not been issued and finaled, DEFENDANTS shall legalize VBU17-0227 by

28   obtaining a demolition permit by August 7, 2020 and obtain final inspection by PRMD within 30

<div align="center">

JUDGMENT
Page 5 of 9

</div>

1  days of permit issuance. DEFENDANTS shall provide proof of issued permit and final of permit.

2  No penalty permit multiplier will be applied to this permit.

3        F.    **Unpermitted Yurts with electrical, plumbing and mechanical**

4  **(VBU17-0232 and VBU-17-0233);**

5        1)    DEFENDANTS shall legalize the VBU17-0232 and VBU-17-0233

6  by either submitting to the County a complete permit application to abate the building code

7  violation, including any required building, electrical, or other required applications and all

8  supporting documents and plans no later than August 21, 2020 and obtaining final inspection

9  within 90 days of the issuance of the building permit.

10        a.    DEFENDANTS agree to remove all services from the

11  structure, including electrical, mechanical and plumbing.

12        b.    Legalization includes each and every of the following:

13  obtaining issuance of any necessary building, approvals from the County, including paying any

14  necessary fees, completing all necessary work required under each permit, and obtaining final

15  inspection approval by the County. No penalty permit multiplier will be applied to this permit.

16        c.    DEFENDANTS shall diligently pursue all required County

17  permit review processes by responding within 14 days to any requests by the County for

18  corrections or modifications to the permit application(s).

19        d.    DEFENDANTS understand that if they cannot legalize the

20  Yurts as provided herein, they will remove the structures from the Property by obtaining a

21  demolition permit within 30 days of the rejection of the building permit application.

22        e.    DEFENDANTS understand and agree that this structure

23  will not be a habitable structure.

24        f.    If DEFENDANTS do not want to legalize the Yurts

25  DEFENDANTS will remove both structures by obtaining a demolition permit by August 7, 2020

26  and obtain final inspection by PRMD within 30 days of permit issuance. No penalty permit

27  multiplier will be applied to this permit.

28  ///

<div align="center">
JUDGMENT<br>
Page 6 of 9
</div>

G.    **Unpermitted Structure with electrical, plumbing and mechanical**

(VBU17-0235).

1)    DEFENDANTS shall legalize VBU17-0235 by obtaining a

demolition permit by August 21, 2020 and obtain final inspection by PRMD within 30 days of

permit issuance.

2)    No penalty permit multiplier will be applied to this permit.

**IT IS FURTHER ADJUDGED AND DECREED** that:

1.    Plaintiff shall have judgment for costs and attorneys' fees in the amount of 16,865.00.

2.    The Court assesses against DEFENDANTS, and each of them, monetary civil

penalties as provided in section 1-7.1 of the SCC in the amount of $73,134.00.

3.    Within thirty (45) days of the filing of the Stipulation for Entry of Judgment,

DEFENDANTS shall pay the County of Sonoma $89,999.00 in total for the amount of the costs,

attorneys' fees and penalties as set forth above.  Payment shall be payable to the COUNTY OF

SONOMA and delivered by mail or in person to the following address:

> County of Sonoma
> County Counsel
> 575 Administration Drive, Rm 105A,
> Santa Rosa, CA 95403

A.    Late payments shall be subject to five (5) days' notice to cure by e-mail by

the County to Defendants or Defendants' counsel. There shall be no penalty or reduction for pre-

payment to the County of any portion of the amounts due and payable.

B.    If any payment is still not paid after the 5 day notice to cure is given, the

entire amount is immediately due and payable.

C.    If the Property is to be sold prior to the abatement of all code violations

and/or full payment of all monies owed per the Judgment,  DEFENDANTS agree to:

1)    Notify County within 48 hours of the opening of any escrow;

2)    Give proper instructions to the Escrow Agent for payment of the full

Amount, including any Penalty Payments, which are due and owing to County at time of the sale

of the Property; and

---

JUDGMENT
Page 7 of 9

1           3)  Make this Judgment part of the Escrow instructions to any interested

2  buyers, or make this Judgment and all its provisions, duties and responsibilities explicitly known

3  to any potential buyer of the Property.

4      4.   **Delinquency**. If the County does not receive payment as set forth herein, interest

5  shall accrue at the legal rate of ten percent (10%) per annum on any unpaid amount of the

6  Compromise Amount and/or Penalty Payments and costs may be assessed against the Property

7  and may be collected in the same manner as taxes, as provided by Government Code section

8  25845 and SCC section 1-7(b).

9      5.   Plaintiff is authorized to assess all costs and attorneys' fees against the Property

10  and to collect the same in the same manner as taxes as provided by Government Code section

11  25845 and by SCC sections 1-7 and 1-7.1; and

12      6.   **Breach of Agreement**. DEFENDANTS understand and agree that if they do not

13  comply with the deadlines set forth in herein to abate the violations and/or in the manner set forth

14  therein, then DEFENDANTS will be in breach of this and agree that they will pay the County a

15  penalty of $200.00 per day, (the "Penalty Payments") for every violations in which a deadline has

16  been breached, beginning on the date of the breach and continuing to accrue daily until the breach

17  is cured. The Penalty Payments for the violation will end only when DEFENDANTS have

18  received a final approval from the County for the violation.

19        A.   Ant party in breach of the Judgment may be subject to a civil contempt

20  action, a motion to enforce the judgment, a petition to appoint a receiver, or any other remedy to

21  compel compliance with all terms of this Judgment.  The non-prevailing party shall pay the

22  prevailing party all of its attorney's fees and costs associated with bringing such action(s).

23      7.   The Abstract of Judgment may be recorded immediately after filing of this

24  Judgment with the Court.

25      8.   Within ten (10) business days of receiving the final payment of all costs, fees and

26  penalties as set forth herein, and any Penalty payments due, and only if the Property is in

27  complete compliance with the Sonoma County Codes and all violations have received final

28  inspection, the County will provide DEFENDANTS with all necessary written release of lien

1   forms for DEFENDANTS to record in order to release all code enforcement liens recorded

2   against the Property for the violations as pled in the Complaint on file in this action. County shall

3   also file a release of the Lis Pendens and a Satisfaction of Judgment.

4        9.     The parties understand and agree that the County and its officers, agents or

5   employees, or persons duly authorized to act on its behalf, pursuant to this Judgment, shall have

6   the right to schedule 2 inspections of the Property for compliance of this Judgment subject to the

7   following:.

8        A.     The inspections shall take place during normal business hours (8:00 a.m. to

9   5:00 p.m., Monday through Friday) and be arranged via the parties the attorney's upon two (2)

10   business days email notice to DEFENDANTS attorney Gregory S. Walston, at the following

11   email address gwalston@walstonlaw.com notifying them of the date and time of inspecting the

12   Property for compliance with this Stipulated Judgment. The Property shall not be locked and

13   shall be accessible to the County at the date and time set forth above.

14        B.     No individual need be present on the Property during the inspection;

15        C.     The inspection shall take place during normal business hours.

16        D.     If the County provides proper noticing as set forth above and is not able to

17   gain access to the Property, the Defendant agrees to pay all the County's costs in attempting an

18   inspection; and

19        10.     The Sonoma County Superior Court shall retain jurisdiction over this matter

20   pursuant to Code of Civil Procedure Section 664.6.

21        11.     The herein Judgment shall apply to each Defendant and their assessors, assigns,

22   agents or principals, jointly and severally.

23        12.     DEFENDANTS will file a dismissal with prejudice of their Cross-Complaint filed

24   herein, within 5 court days of the filing of the Stipulation for Entry of Judgment.
    The case management conference set 9/15/20 is vacated.

25

26   Dated: ___July 24___, 2020

                  JUDGE OF THE SUPERIOR COURT

27                      Jennifer V. Dollard

28

<div align="center">JUDGMENT<br>Page 9 of 9</div>

# EXHIBIT A

1  BRUCE D. GOLDSTEIN, #135970
   County Counsel

2  DIANA E. GOMEZ, #127417
   Deputy County Counsel

3  575 Administration Drive, Room 105-A
   Santa Rosa, California 95403

4  Telephone: (707) 565-2421
   Fax: (707) 565-2624

5  Email: Diana.Gomez2@sonoma-county.org

6  Attorneys for Plaintiff
   County of Sonoma

ELECTRONICALLY FILED
Superior Court of California
County of Sonoma
7/15/2020 10:55 AM
Arlene D. Junior, Clerk of the Court
By: Jennifer Ellis, Deputy Clerk

7               SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                  IN AND FOR THE COUNTY OF SONOMA

9  COUNTY OF SONOMA,                    Case No.  SCV 265714

10       Plaintiff,                     STIPULATION FOR ENTRY OF
                                        JUDGMENT
11  vs.

12  MICHAEL L. CASTAGNOLA, Trustee of the    Dept: 18
13  MICHAEL L. CASTAGNOLA REVOCABLE
    TRUST, MICHAEL L. CASTAGNOLA           Judge: Jennifer V. Dollard
14  REVOCABLE TRUST, and DOES 1 through
15  30, inclusive,

16       Defendants.

17  _____/

18       WHEREAS, the COUNTY OF SONOMA ("County") commenced this action on the

19  December 17, 2019, by the filing of a Complaint to abate a public nuisance and to enforce and

20  permanently enjoin code violations against Michael L. Castagnola, Trustee Of The  Michael L.

21  Castagnola Revocable Trust, Michael L. Castagnola Revocable Trust (hereinafter collectively

22  "Defendants"), regarding the Property located at 12778 Dupont Road, Sebastopol, California,

23  Assessor's Parcel Number 074-020-015 ("the Property")  in the unincorporated area of Sonoma

24  County, California,

25       WHEREAS, DEFENDANTS filed a Cross Complaint filed against COUNTY on May

26

27  21, 2020.

28  ///

Stipulation for Entry of Judgment                1

WHEREAS, DEFENDANTS have stipulated to take action to abate all code violations

on the Property by the dates set forth in the Stipulated Judgment, and to pay the County of

Sonoma costs, attorney's fees, and penalties due the County in this abatement action, and

COUNTY and DEFENDANTS desire to avoid the cost and delay of further legal proceedings in

this matter.

WHEREFORE, IT IS HEREBY STIPULATED by and between Plaintiff COUNTY

and DEFENDANTS, and persons acting on their behalf or in concert with them and their

assessors, assigns, agents or principals that the Stipulated Judgment attached hereto as EXHIBIT

A and incorporated herein by this reference may be entered by the Court in this action.

The foregoing is agreed to by:

Dated: July _14_, 2020                COUNTY OF SONOMA

By: _____

Dated: ~~September~~ ~~2019~~
July 10, 20                          By: _____
                                     Michael L. Castagnola Trustee, personally and
                                     on behalf of the Michael L. Castagnola
                                     Revocable Trust

APPROVED AS TO FORM:
                July 10, 2020
Dated: ~~September~~ ~~2019~~         By: _____
                                     Gregory Walston
                                     Attorney for Defendants

        July 10, 2020
Dated: ~~September~~ ~~2019~~         BRUCE D. GOLDSTEIN, County Counsel

                                     By: _____
                                     DIANA E. GOMEZ
                                     Deputy County Counsel
                                     Attorneys for Plaintiff

Stipulation for Entry of Judgment                    2

# ATTACHMENT D

# Exhibit D

1  BRUCE D. GOLDSTEIN #135970          Free recording per Govt. Code Sec. 27383
   County Counsel
2  DIANA E. GOMEZ, SBN# 127417
   Deputy County Counsel
3  County of Sonoma
   575 Administration Drive, Room 105A
4  Santa Rosa, California 95403
   Telephone: (707) 565-2421
5  Fax: (707) 565-2624
   Email: Diana.Gomez2@sonoma-county.org
6
   Attorneys for Plaintiff
7  COUNTY OF SONOMA

8                  SUPERIOR COURT OF CALIFORNIA

9                        COUNTY OF SONOMA

10

11  COUNTY OF SONOMA,              No. SCV 265714

12       Plaintiff,                **NOTICE OF PENDENCY OF ACTION**
                                   **(LIS PENDENS)**
13  vs.

14  MICHAEL L. CASTAGNOLA, Trustee  Unlimited Civil Case
    of the  MICHAEL L. CASTAGNOLA
15  REVOCABLE TRUST, MICHAEL L.
    CASTAGNOLA REVOCABLE TRUST,
16  and DOES
    1 to 20, inclusive,
17

18       Defendants,

19                                          /

20

21       NOTICE IS HEREBY GIVEN that Plaintiff, COUNTY OF SONOMA has instituted a

22  judicial action in the above-entitled Court, against Defendant property owner MICHAEL L.

23  CASTAGNOLA, Trustee of the  MICHAEL L. CASTAGNOLA REVOCABLE TRUST,

24  MICHAEL L. CASTAGNOLA REVOCABLE TRUST, DOES 1 through 20, inclusive, to abate

25  public nuisances, to wit: violations of Sonoma County Code Chapters 7 (Building Code), and 26

26  (Zoning Code) violations; and to permanently enjoin building and zoning code violations relating

27  to the real property commonly known as 12778 Dupont Road, Sebastopol, California, in the

28

Notice of Lis Pendens                          1

# ATTACHMENT E


# Exhibit H

.

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

MAY 2 5 2022

BY
Deputy Clerk

1  ROBERT H. PITTMAN, #172154
   County Counsel
2  DIANA E. GOMEZ, #127417
   575 Administration Drive, Room 105A
3  Santa Rosa, California 95403
   Telephone: (707) 565-2421
4  Fax: (707) 565-2624
5  Diana.Gomez2@sonoma-county.org

                                         [Exempt from filing fees (CAL. GOV'T. CODE § 6103)]

6  Attorneys for Petitioner
   COUNTY OF SONOMA                      [Deemed verified (CAL. CIV. PROC. CODE § 446)]
7

8              SUPERIOR COURT OF CALIFORNIA

9                    COUNTY OF SONOMA

10 | COUNTY OF SONOMA,                    | Case No. SCV 265714
11 |         Petitioner/Plaintiff        | (PROPOSED) ORDER GRANTING
                                          | MOTION FOR PETITION TO APPOINT
12 |         v.                           | A RECEIVER
13 | MICHAEL L. CASTAGNOLA, Trustee of the | (CAL. HEALTH & SAFETY CODE § 17980.7;
   | MICHAEL L. CASTAGNOLA REVOCABLE      | CAL. CIV. PROC. CODE § 564(b)(3))
14 | TRUST; MICHAEL L. CASTAGNOLA         |
   | REVOCABLE TRUST                      |
15 |                                      | Date:
   |         Respondents/Defendants.      | Time:
16 |                                      | Dept:  18
17 |                                      | Honorable Jennifer Dollard
18

19       Plaintiff/Petitioner County of Sonoma (the "County") filed a Motion and Petition with the

20  Court for the appointment of a receiver (the "Petition") over real property particularly described in

21  the County's moving papers and commonly known a 12778 Dupont Road, Sebastopol, in the

22  unincorporated area of Sonoma County, California, and more particularly described as Assessor's

23  Parcel Number 074-020-015, (hereinafter the "Property"). The legal description of the Property is

24  set forth in the Grant Deed recorded on August 10, 1987 (recorded Document No 1987074820)

25  which is attached hereto as **Exhibit 1**.)

26       The Property is currently owned by Respondent /Defendants MICHAEL L. CASTAGNOLA,

27  Trustee of the MICHAEL L. CASTAGNOLA REVOCABLE TRUST and the MICHAEL L.

28  CASTAGNOLA REVOCABLE TRUST ("Respondents"), and may be subject to various claims and

ORDER GRANTING PETITION TO APPOINT A RECEIVER ("APPOINTMENT ORDER")

1

1   other interests held or administered by the other the other recorded documents including but not

2   necessarily limited to San Francisco Fire Credit Union ("Lienholder"). The Petition was made

3   pursuant to California Code of Civil Procedure section 568 and Health and Safety Code section

4   17980.7(c).

5       The Court, having jurisdiction over the subject matter of the Petition and having considered

6   the evidence presented therewith, the complete file and records of the herein case SCV265714, and

7   the memorandum of points and authorities and declarations submitted in support of the Petition,

8   HEREBY FINDS AND ORDERS AS FOLLOWS:

9   A.   **FINDINGS OF FACT**

10      1.   A Stipulation for Entry of Judgment was signed by all parties, including Respondent

11  and their attorney of record, and the Stipulated Judgment and Permanent Injunction ("Judgment")

12  was filed with the Court on July 24, 2020, ordering Respondents to abate the conditions on the

13  Property and permanently enjoining him from maintaining the violations so as to be in compliance

14  with the Sonoma County Code, the California Health and Safety Code, and the California Building

15  Code.

16      2.   The Notice of Entry of Judgment was filed on July 29, 2020 and served on

17  Respondents, through their attorney of record.

18      3.   When Respondents failed to comply with the Judgment, violated the Permanent

19  Injunction, and failed to abate all of the code violations on the Property, the Court found Respondent

20  in Contempt of the Judgment on February, February 19, 2021.

21      4.   Respondent has maintained additional code violations on the Property, in violation of

22  the Permanent Injunction, for which the County issued Notices and Orders on September 13, 2021,

23  for Respondents to correct and abate the violations.

24      5.   The violations were not abated despite Respondents having a reasonable opportunity

25  to do so.

26      6.   The Property is currently maintained in such a condition as to violate the California

27  Health and Safety Code, Building Code and the Sonoma County Code, and Respondents are in

28  violation of the Court's lawful Judgment, and the Property poses an imminent and substantial danger

ORDER GRANTING PETITION TO APPOINT A RECEIVER ("APPOINTMENT ORDER")

2

1 | to Respondent, his guests, tenants and the public.

2 |     7.    The Property is substandard as defined under Health & Safety Code section 17920.3

3 | and is a public nuisance. The Property has been and is now maintained in a manner that violates

4 | various provisions of the Sonoma County Code and State law.

5 |     8.    The Property is in a condition which substantially endangers the health and safety of

6 | the public pursuant to Health and Safety Code Section 17980.6 and poses an imminent and

7 | substantial danger to Respondents and the public.

8 |     9.    The Property's violations are so extensive and of such a nature that the health and

9 | safety of the general public is substantially endangered.

10 |     10.    The County, as a local enforcement agency, properly issued notices and orders to

11 | repair and abate to Respondents and Respondents have not done so within a reasonable time.

12 |     11.    Respondents failed to comply with the County's notice and order to repair and abate

13 | within a reasonable time after its issuance. Respondents have been afforded a reasonable opportunity

14 | to correct the conditions cited in the County's notices and orders.

15 |     12.    Respondents failed to comply with the Judgment which ordered the Respondents to

16 | abate the violations on their property within reasonable deadlines. Respondents have been afforded a

17 | reasonable opportunity to correct the conditions cited in the Judgment and Permanent Injunction and

18 | failed to do so.

19 |     13.    Respondents have been afforded all procedural due process rights guaranteed by the

20 | California Constitution and the United States Constitution, including receipt of the notice of

21 | violations, an opportunity to appeal and an adequate and reasonable period of time to comply with

22 | the County's notices and orders and the Judgment.

23 |     14.    The violations remain on the Property and Respondents have failed to comply with

24 | the Judgment and are actively maintaining additional violations of the County's ordinances and State

25 | law on the Property.

26 |     15.    The Property's substandard conditions will likely persist unless the Court appoints a

27 | receiver to take possession of the Property and undertake its rehabilitation.

28 |     16.    Health & Safety Code section § 17980.7(c) and the Court's inherent equitable power

ORDER GRANTING PETITION TO APPOINT A RECEIVER ("APPOINTMENT ORDER")

3

1 | authorize the Court to appoint a receiver to take possession of the Property and undertake its
2 | rehabilitation.

3 |     17.    Code of Civil Procedure section 564(b)(3) allows a Receiver to be appointed by the
4 | court in which an action or proceeding is pending, or by a judge thereof "after judgment, to carry the
5 | judgment into effect." The County obtained a Judgment and Permanent Injunction which ordered the
6 | Respondents to abate the violations on their Property and which permanently enjoined them from
7 | having any code violations thereon. They have not done so, thus, the appointment of a receiver is
8 | necessary to carry that judgment into effect.

9 |     18.    The Petitioner County has timely provided Notice of the Petition at least three (3)
10 | prior to the filing of the Petition pursuant to Health & Safety Code section 17980.7(c) to all
11 | Lienholders and persons with a recorded interest in the Property and the Petition was posted in a
12 | prominent place on the Property at least three (3) prior to the filing of the Petition pursuant to Health
13 | & Safety Code section 17980.7(c).

14 |     19.    Respondents were properly noticed and served with the Petition pursuant to Health &
15 | Safety Code section 17980.7(c) and the hearing date and were provided a reasonable opportunity to
16 | be heard in connection with the Petition.

17 |     20.    All of the Lienholders and persons with a recorded interest in the Property were given
18 | notice of the hearing on the herein Petition and were provided a reasonable opportunity to be heard
19 | on the Petition.

20 |     21.    The County's receiver-nominee, California Receivership Group, and its
21 | representative, Mark Adams, have the demonstrated capacity and expertise to undertake and
22 | supervise the Property's rehabilitation.

23 |     22.    The Court finds that, given the severity and amount of work necessary to abate the
24 | violations on the Property, the appointment of a receiver is a necessary measure to coordinate and
25 | monitor the abatement of said violations.

26 | **THE COURT HEREBY MAKES THE FOLLOWING ORDERS:**

27 | **B.    THE RECEIVER'S APPOINTMENT**

28 |     1    California Receivership Group, a California public benefit corporation, through Mark

ORDER GRANTING PETITION TO APPOINT A RECEIVER ("APPOINTMENT ORDER")

4

1    Adams ("Receiver") is appointed, pursuant to Health and Safety Code Section 17980.7(c) and Code

2    of Civil Procedure 564 as the Receiver for the Property and is delegated the duty and power to

3    correct all of the existing violations now existing upon the property and to see to it that the violations

4    do not reoccur. The Receiver will: (1) execute and file with the Court a receiver's oath; and (2) file

5    with the Court the bond required by Code of Civil Procedure section 567(b), in the amount of

6    $5,000.

7        2.    Receiver is granted the authority in Code of Civil Procedure Section 568 and Health

8    and Safety Code Section 17980.7(c)(4)(H) to generally do such acts respecting the Property as this

9    Court may authorize.

10   C.    **THE RECEIVER'S SPECIFIC POWERS**

11       In addition to the plenary powers described in Section B of this Order, the Receiver is given

12   the following specific powers:

13       1.    To take full and complete possession and control of the Property, including the

14   tangible and intangible personal property located in or about the Property or used in connection with

15   the Property

16       2.    To exercise the powers granted to receivers under C.C.P. §568 and H&S

17   §17980.7(c)(4):

18       3.    To manage the Property and pay the expenses of the operations of the Property,

19   including taxes, insurance, utilities, general maintenance, and debt secured by an interest in the

20   Property.

21       4.    To borrow funds to pay for repairs and clean-up necessary to correct the conditions

22   cited in the Stipulated Judgment entered on July 24, 2020, and any additional conditions the

23   Receiver finds on the Property which violate the County's code or State law or which renders the

24   property substandard, and secure that debt with a super-priority lien on the Property.

25       5.    To issue and record Receiver's Certificates of Indebtedness and/or a Deed of Trust

26   against the Property to evidence and secure the above debt, which shall become a first lien on the

27   Property with super priority over all preexisting private liens and encumbrances, except for federal,

28   state, and county tax liens. The Receiver's Certificate shall be issued for such amounts and for such

ORDER GRANTING PETITION TO APPOINT A RECEIVER ("APPOINTMENT ORDER")

5

1    items as the Court may hereafter expressly authorize, upon notice and after hearing as herein

2    provided. The debt evidenced by said Certificates shall be due and payable upon the completion of

3    the Receiver's duties hereunder with respect to the rehabilitation of the subject Property and, if

4    applicable, the issuance of a Certificate of Occupancy by the County of Sonoma. If at the time this

5    debt is not satisfied, the Receiver or the holder of the Certificate may apply to this Court on notice

6    and hearing to sell the Property pursuant to the California Code of Civil Procedure § 568.5 free and

7    clear of subordinate liens and encumbrances.

8        6.    To open one or more bank accounts in his name as Receiver or in the name of the

9    Receivership Estate at any federally-insured bank, savings & loan, credit union, or similar financial

10   institution.

11       7.    To collect all rents and income from Property, to sell any personal property that the

12   Receiver has declared abandoned in accord with Section C.12 of this Order, to collect any debts

13   associated with the Property, to invest all funds on hand, and to use these funds to pay for the costs

14   of operating, managing, maintaining, or rehabilitating repairs and clean-up the Property and to

15   correct the conditions cited in the Stipulated Judgment and any subsequent Notices and Orders.

16       8.    To obtain one or more proposals from appropriately licensed California contractors or

17   other qualified providers to perform the work and to select the proposal and enter into contract and

18   employ the licensed contractor that the Receiver determines is in the Receivership Estate's best

19   interests, taking into account cost, capacity, qualification and demonstrated competence to perform

20   the repairs and clean-up necessary to correct the offending conditions set forth in the Stipulated

21   Judgment, and any conditions and any violations discovered when a complete inspection of the

22   Property is able to take place in order to bring the Property into full compliance with the California

23   Health and Safety Code, State Building Code, and the Sonoma County Code, to protect the public

24   health, safety and welfare.

25       9.    To prepare a plan for rehabilitation of the Subject Property to remedy the conditions

26   giving rise to the appointment of the Receiver, and any other conditions which require remediation

27   as may be discovered by the Receiver in the course of inspections of the Subject Property

28   (Rehabilitation Plan and Cost Estimate) and to seek court approval of that plan.

ORDER GRANTING PETITION TO APPOINT A RECEIVER ("APPOINTMENT ORDER")

6

10.    Following Court approval of the Rehabilitation Plan and the Cost Estimate, to rehabilitate the Property consistent with the Rehabilitation Plan submitted to the Court, to put the Property into compliance with all applicable state and local codes, including the Uniform Housing Code, the Uniform Building Code, the Uniform Plumbing Code, the California Building Code, Sonoma County Ordinances and to otherwise render the Property as a whole inhabitable as decent, safe and sanitary housing.

11.    To temporarily or permanently relocate the Property's occupants (if any). The receiver shall pay relocation expenses as provided in Sec. 7262 in the Government Code. To this end, the Receiver may institute ancillary actions for unlawful detainer relating to the Property and may employ the services of an attorney to represent him in connection with any such unlawful detainer proceeding.

12.    To investigate the Property's condition and expected post-rehabilitation market value and determine whether it is economically and practically feasible to rehabilitate the Property or whether demolition or some other method of abating the Property's deficiencies and violations is more appropriate.

13.    To declare as abandoned any personal property remaining at the Property upon the Receiver's taking possession of the Property and to either store or sell that property. If the Receiver, in its discretion, determines that the personal property lacks sufficient value to cover the costs of sale or storage, then the Receiver may dispose of the property through any means.

14.    To sell the Property if the Respondents, their agents, heirs, assigns, representatives, or other persons with a recorded beneficial interest in the Property cannot repay all costs, expenses, liens, funds borrowed for repairs, abatement, receiver fees, attorney fees and all other costs, fees and expenses incurred as part of this action and that those costs be paid form the Receivership Estate.

15.    To pay County its abatement costs from the Receivership Estate at the same time as the Receivers' costs and fees are paid.

16.    To pay the Judgment debt from the Receivership Estate pursuant to Code of Civil Procedure Section 568.

17.    To have the duty and power to correct all existing violations on the Property and to

ORDER GRANTING PETITION TO APPOINT A RECEIVER ("APPOINTMENT ORDER")

7

1  prevent their recurrence.

2      18.    To fund an initial $30,000 receivership certificate with super-priority lien status to

3  cover the cost of securing the property, getting contractors to bid the cost of rehabilitation and the

4  initial cost of the receivership.

5      19.    To prepare monthly reports to the County that include the total amount of any rent

6  received, the nature and amount of any operating or contracts, payments made to repair and operate

7  the Property, other payments made and the progress of necessary repairs and clean-up to the

8  Property

9      20.    To file with the Court within thirty calendar days of the effective date of this Order an

10  inventory containing a complete and detailed list of all property of which the Receiver has taken

11  possession, and to promptly file a supplementary inventory of any subsequently obtained property

12      21.    To record a certified copy of this Order with the Sonoma County Recorder's Office.

13      22.    To apply to this Court for further or other instructions or orders and for further

14  powers necessary to enable the provisional receiver to perform its duties properly, or to address

15  unforeseen circumstances that may arise with respect to this receivership.

16      23.    To take any action that is implied from the powers specifically given to the Receiver

17  or that are necessary or convenient to the exercise of those powers.

18      24.    To exercise the powers granted to receivers under section 568 of the California Code

19  of Civil Procedure and Health and Safety Code section 17980.7(c)(4).

20  D.    **AFFIRMATIVE INJUNCTIVE RELIEF**

21      Respondents, their partners, assignees, successors, representatives, managers, agents,

22  attorneys, employees, and all other persons acting under or in concert with Respondents, are ordered

23  to:

24      1    Immediately relinquish and turn over possession of the Property to the Receiver. Any

25  current, lawful occupants of the Property may continue to occupy the Property unless the Receiver,

26  in its discretion, determines that their relocation is necessary or convenient to the carrying out of the

27  Receiver's powers and responsibilities.

28      2.    Immediately turn over to the Receiver all keys to the Property and all books. 28

ORDER GRANTING PETITION TO APPOINT A RECEIVER ("APPOINTMENT ORDER")

8

1  records, agreements, contracts, policies of insurance, and other instruments pertaining to the

2  Property

3        3.      Immediately inform the Receiver as to the nature and extent of insurance coverage on

4  the Property and name the Receiver as an additional insured on any insurance policies in effect with

5  respect to the Property.

6        4.      Immediately forward to the Receiver all rents, profits, insurance proceeds, or other

7  income of any type that may be received in connection with the Property.

8        5.      Within five (5) days following the Receiver's request, execute (in recordable form, if

9  necessary) and deliver to the Receiver all documents necessary or convenient (as determined by the

10 Receiver) to implementing the actions authorized by this Order or within the Receiver's power to

11 undertake, including rescissions of any notices of default or notices of trustee's sale.

12       6.      Respondent shall within 10 days hereof provide the Receiver with their social

13 security number, taxpayer identification number, or employers identification numbers so that the

14 Receiver may report the existence of this receivership to the Internal Revenue Service by completion

15 of a form SS-4 form, and the Receiver is hereby authorized to apply for a taxpayer identification

16 number if required to carry out his duties in this case.

17       7.      Cooperate with the Receiver in his management and rehabilitation of the Property.

18 E.      **PROHIBITORY INJUNCTIVE RELIEF**

19       Respondents, their partners, assignees, successors, representatives, managers, agents,

20 attorneys, employees and all persons acting under or with concert with Respondents, are enjoined

21 and prohibited from undertaking any of the below actions during the pendency of the receivership:

22       1       Interfering with the receiver, directly or indirectly, in the operation and rehabilitation

23 of the Property

24       2.      Entering upon the Property or into any structure located on the Property without the

25 Receiver's prior written consent.

26       3.      Demanding, collecting, receiving, or diverting any rents profits, insurance proceeds,

27 or other income of any type from the Property.

28       4.      Encumbering, Refinancing, mortgaging, liening, leasing, renting, gifting, conveying,

ORDER GRANTING PETITION TO APPOINT A RECEIVER ("APPOINTMENT ORDER")

9

1 selling, listing, marketing for sale, or transferring the Property or any interest in it.

2     5.    Canceling, reducing, or modifying any existing insurance coverage with respect to

3 the Property

4     6.    Commencing or continuing any judicial or non-judicial foreclosure or similar

5 process, including filing any notice of default or notice of trustee's sale.

6     7    Commencing or continuing any action which impairs or precludes the Receiver's

7 ability to obtain any policy of title insurance needed to implement the actions authorized by this

8 Order or any subsequent Court order

9     8.    Removing any furniture, fixture or item of personal property from the Property

10 without the Receiver's prior written consent.

11     9.    Claiming any deduction with respect to state income taxes for interest, taxes,

12 expenses, depreciation, or amortization paid or incurred with respect to the Property during the

13 pendency of the receivership, per H&S §17980.7(b)(1).

14     10.    Committing or maintaining any new violations of the Sonoma County Code,

15 California Building Code or Health and Safety Code on the Property.

16 **F.    THE COUNTY'S FEES AND COSTS**

17     The County, as the prevailing party under California Health and Safety Code sections

18 17980.7(c)(11) and (d), California Code of Civil Procedure section 1033.5(A)(10), California

19 Government Code section 38773.5(B), and Sonoma County Code 1-7, is, subject to Court approval,

20 entitled to recover all of its hard costs; administrative enforcement costs and attorney's fees; and

21 administrative fines and penalties (collectively, the "County's Fees and Costs").

22     The County's Fees and Costs also includes fees, costs and expenses incurred before the

23 Receiver was appointed if related to the abatement case on the Property, during the Receiver's

24 appointment, or after the Receiver was appointed if related to the abatement case on the Property, or

25 in the defense or prosecution of any appeal of any order, judgment or other ruling or determination

26 related to or arising out of the receivership case, regardless of whether the appeal is instituted by the

27 Receiver, Respondents, or any other party, including appeals related to: this Order; any order

28 approving the rehabilitation plan or financing plan for the Property; any order authorizing the sale of

ORDER GRANTING PETITION TO APPOINT A RECEIVER ("APPOINTMENT ORDER")

10

Case 3:25-cv-03624-JD   Document 51-1   Filed 01/07/26   Page 62 of 292
Case 3:25-cv-03    JD   Document 18-1   Filed 09/22/   Page 193 of 490
DOC #2022038756  Page 12 of 14

1  the Property: any order approving the Receiver's Fees and the County's Fees and Costs; and any

2  order discharging the Receiver.

3  **G.   RECEIVER'S COMPENSATION**

4        The Receiver shall be entitled to compensation for his services as Receiver over the Subject

5  Property in the amounts set forth in the Declaration of Mark Adams in Support of Petition For

6  Appointment of Receiver previously filed. Additionally, the Receiver may employ the services of a

7  property management company as needed.

8        The Receiver's compensation shall be subject to review and final approval by this Court

9  upon notice and hearing at the time the Receiver presents a Final Report and Final Accounting,

10  which accounting shall be accompanied by records adequately documenting the rehabilitation and

11  property management services rendered by the Receiver.

12  IT IS FURTHER HEREBY ORDERED that:

13        1.       The County's attorney's fees and costs and all enforcement costs incurred in this

14  action, shall be paid at the same time as the Receiver's expenses, from the Receivership Estate.

15        2.       The receiver may enforce and recover the County's Judgment debt through the same

16  mechanisms and at the same time as the receiver's fees and costs and may be paid out of the

17  Receivership Estate, as approved by the Court;

18        3.       Should any lawful order issued by the Receiver, under the authority granted herein,

19  be refused, that the receiver is authorized to enlist the assistance of any duly authorized police

20  officer(s) and further that such police officer(s) are authorized to employ all reasonably necessary

21  measures to secure cooperation and compliance with any lawful order issued by the Receiver,

22  including but not limited to, the use of forced entry onto/into the Property should consent to enter be

23  refused.

24        4.       Failure to comply with any abatement order, the Receiver's authority and directions

25  or other order contained herein, shall be punishable by civil contempt, penalties under Chapter 6

26  (commencing with section 17995) of the Health & Safety Code, and any other penalties and fines as

27  are available, including attorney's fees.

28        5.       The County may collect penalties, fees and costs, for any action commenced in

ORDER GRANTING PETITION TO APPOINT A RECEIVER ("APPOINTMENT ORDER")

11

1  support of the herein Petition.

2        6.      For such other relief as the Court deems just and proper.

3  /

4  ///

5        **IT SO ORDERED**

6

7  Dated _S-2-22_                         _____

8                                              Judge of the Superior Court

9

10        **NOTICE: Failure to comply with this Order, or other specific order contained herein,**

11  **shall be punishable by civil contempt, penalties under Chapter 6 (Commencing with section**

12  **17995) of the Health & Safety Code, and other penalties and fines as are available.**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING PETITION TO APPOINT A RECEIVER ("APPOINTMENT ORDER")

12

SCV-265714

## PROOF OF SERVICE BY MAIL

I certify that I am an employee of the Superior Court of California, County of Sonoma, and that my business address is 600 Administration Dr., Room 107-J, Santa Rosa, California, 95403; that I am not a party to this case; that I am over the age of 18; that I am readily familiar with this office's practice for collection and processing of correspondence for mailing with the United States Postal Service; and that on the date shown below I placed a true copy of *ORDER GRANTING MOTION FOR PETITION TO APPOINT RECEIVER* in an envelope, sealed and addressed as shown below, for collection and mailing at Santa Rosa, California, first class, postage fully prepaid, following ordinary business practices.

Date: May 26, 2022          Kwesi Williams
          31              Acting Clerk of the Court

By: *Melissa Waters*
    Melissa Waters, Deputy Clerk

-ADDRESSEES-

MICHAEL L CASTAGNOLA                DIANA ELAINE GOMEZ
12778 DUPONT RD                     DEPUTY COUNTY COUNSEL
SEBASTOPOL CA 95472                 SONOMA COUNTY
                                    575 ADMINISTRATION DRIVE RM 105-A
                                    SANTA ROSA CA 95403



**SF FIRE CREDIT UNION**
REAL ESTATE DIVISION

PO Box 77404
Ewing, NJ 08628

• 0739944 000012745 DCP201 0756326 AT
MICHAEL L CASTAGNOLA
12778 DUPONT RD
SEBASTOPOL CA 95472-8934

# YOUR ESCROW ACCOUNT HAS **A SHORTAGE**

Each year, we perform an analysis of your escrow account to ensure that there are enough funds to meet the required minimum balance to pay your projected taxes and insurance premiums. If there are not enough funds in your escrow account to do so, it is considered to have a shortage. Your escrow account has a shortage in the amount of **$48,396.28**.

## What are my options?

 **Take No Action and Pay Over Time**

**OR**

**Pay the Shortage in Full**

Your shortage of $48,396.28 will automatically be divided evenly over your next **12** mortgage payments.

Starting **05/01/2023**, your new monthly mortgage payment amount will be **$8,332.20**.

You can choose to pay your full shortage amount of $48,396.28.

Starting **05/01/2023**, your new monthly mortgage payment amount will be **$4,299.18**.

**AUTOPAY HOMEOWNERS:** If you have elected for us to deduct your monthly payment from your checking or savings account, we will automatically update the payment amount for you

**ONLINE BILL PAY HOMEOWNERS:** If you make your monthly payment through an online bill pay service, please do not forget to update your payment amount.

If you would like to pay the shortage now:

 **PAY ONLINE**

**www.sffirecu.org**

▷ Select "Payment."

▷ Choose "Make an Additional Payment."

▷ Enter shortage amount of $48,396.28 on the "Additional Escrow" line to make your escrow payment.

▷ Agree to Terms and Conditions and "Confirm Payment."

**OR**

**MAIL**

Mail a check with the coupon below.

MICHAEL L CASTAGNOLA
12778 DUPONT RD
SEBASTOPOL CA 95472-8934



**SF FIRE CREDIT UNION**
REAL ESTATE DIVISION

**LOAN NUMBER**
0056098445

**SHORTAGE AMOUNT:**
$48,396.28

If you choose to pay your escrow shortage of **$48,396.28** in full, your new loan payment amount will be **$4,299.18**. Please include your loan number on your check. Make payable to **SF Fire Credit Union** and send to:

PAYMENT PROCESSING CENTER
PO BOX 54040
LOS ANGELES, CA 90054-0040

0300000005609644500RTSR03100004839628000000000000000000000000000000000

 SF FIRE
CREDIT UNION
REAL ESTATE DIVISION
PO Box 27404
Ewing, NJ 08628

**ANNUAL ESCROW ACCOUNT**
DISCLOSURE STATEMENT

MICHAEL L CASTAGNOLA
12778 DUPONT RD
SEBASTOPOL CA 95472-8934

| | |
|---|---|
| Property | 12778 DUPONT ROAD |
| Address | SEBASTOPOL, CA 95472 |
| Statement Date | 03/28/2023 |
| Loan Number | 0056098445 |
| New Mortgage Payment Amount | $8,332.20 |
| New Payment Effective Date | 05/01/2023 |

## Overview

Each year, we perform an analysis of your escrow account to ensure that there are enough funds to meet the required minimum balance to pay your projected taxes and insurance premiums. This Annual Escrow Account Disclosure Statement details our findings.

▷ **Results of Our Analysis:** You have a SHORTAGE. Your escrow account balance is expected to fall below the required minimum balance.

▷ **What This Means for You:** Your shortage will be spread over 12 months and included in your monthly payment.

▷ **Your Future Monthly Payment:** Your payments will decrease, based on our escrow analysis projections for the next calendar year.

Your escrow account has a shortage in the amount of

**$48,396.28**

## Why do I have a shortage?

Below is a summary of your recent escrow activity. For more information about why your taxes or insurance premium adjusted, please contact your taxing authority or your insurance company.

For more details on how any insurance and/or tax adjustments will affect your future payments, please see the **Escrow Account Projections** section.

### Annual Escrow Review

| Escrow Item | Expected to Pay | Change | Now Expect to Pay |
|---|---|---|---|
| Insurance | $2,534.00 | | $2,534.00 |
| Hazard Ins | | | 2,534.00 |
| Taxes | $26,164.80 | | $26,164.80 |
| County Tax | | | 26,164.80 |
| **Total Disbursements** | **$28,698.80** | | **$28,698.80** |

### Monthly Payment Comparison

| Payment Itemization | Current 02/01/2023 | New 05/01/2023 |
|---|---|---|
| Principal and Interest | $1,907.61 | $1,907.61 |
| Escrow Deposit | $7,769.31 | $2,391.57 |
| Escrow Shortage | | $4,033.02 |
| **Total Payment** | **$9,676.92** | **$8,332.20** |

## How was my shortage determined?

A shortage occurs when your lowest projected escrow balance is less than your required minimum balance. This is determined by simply subtracting the Required Minimum Balance from the lowest Projected Escrow Balance, as highlighted in the **Escrow Account Projections** section.

Your required minimum balance is determined by federal law, state law and your loan contract and includes a payment cushion of up to two months of escrow payments to help cover any increase in taxes and/or insurance.

Your current payment cushion is **$4,783.13.**

| | |
|---|---|
| REQUIRED MINIMUM BALANCE<br>Balance 03/2024 | $4,783.13 |
| ESCROW SHORTAGE | $48,396.28 |

**AMERICAN SHARE INSURANCE**
Your savings insured to $250,000 per account.
By members' choice, this institution is not federally
insured, or insured by any state government.

0799944 0000012775 OEP201 0954926 RI

**SF FIRE CREDIT UNION**
REAL ESTATE DIVISION

**AMERICAN SHARE INSURANCE**
Your savings insured to $250,000 per account.
By members' choice, the institution is not federally
insured, or insured by any state government.

**YOUR ANNUAL ESCROW ACCOUNT STATEMENT**
LOAN NUMBER
0056098445

PAGE
2/6

## Escrow Account History

This section is the actual activity that occurred from 12/2022 through 01/2023. It represents the period of time between the last analysis statement date and the last analysis effective date. Over this period, an additional $3.39 was deposited into your escrow account for interest on escrow.

| MONTH | Actual Escrow PAYMENTS | Actual Escrow DISBURSEMENTS | Actual Escrow DESCRIPTION | BALANCE |
|---|---|---|---|---|
| | | | BEGINNING BALANCE | -$52,269.92 |
| DEC 2022 | 413.08 | | | -51,856.84 |
| JAN 2023 | 409.69 | | | -51,447.15 |

**Escrow account activity from February 2023 to April 2023**
This section details your actual escrow account activity for the review period, which may help explain any changes to your payment.

| Date | DEPOSITS TO ESCROW Projected | Actual | PAYMENTS FROM ESCROW Projected | Actual | Description | ESCROW BALANCE Projected | Actual |
|---|---|---|---|---|---|---|---|
| | | | | | BEGINNING BALANCE | $13,082.39 | -$51,447.15 |
| FEB 2023 | 2,391.57 | * | | | | 15,473.96 | -51,447.15 |
| MAR 2023 (estimate) | 2,391.57 | 17,855.92 * | 13,082.40 | 13,082.40 | R.E. TAX | 4,783.13 | -46,673.63 |
| MAR 2023 | | | | 2,317.30 * | ESC REFUND | 4,783.13 | -48,990.93 |
| APR 2023 (estimate) | 2,391.57 | 7,769.31 * | | | | 7,174.70 | -41,221.62 |
| MAY 2023 | 2,391.57 | * | | | | 9,566.27 | |
| JUN 2023 | 2,391.57 | * | | | | 11,957.84 | |
| JUL 2023 | 2,391.57 | * | | | | 14,349.41 | |
| AUG 2023 | 2,391.57 | * | 2,534.00 | | * HAZARD INS | 14,206.98 | |
| SEP 2023 | 2,391.57 | * | | | | 16,598.55 | |
| OCT 2023 | 2,391.57 | * | | | | 18,990.12 | |
| NOV 2023 | 2,391.57 | * | 13,082.40 | | * R.E. TAX | 8,299.29 | |
| DEC 2023 | 2,391.57 | * | | | | 10,690.86 | |
| JAN 2024 | 2,391.57 | * | | | | 13,082.43 | |
| Totals | $28,698.84 | $25,625.23 | $28,698.80 | $15,399.70 | | | |

An asterisk (*) beside an amount indicates a difference from projected activity either in the amount or the date. Please note since mortgage insurance is paid monthly on the annual renewal date of the premium and PMI is paid monthly for the prior month's premium, additional asterisks report in the Account History for these items, if applicable.

The "estimate" under any of the dates indicates that the payment or disbursement has not yet occurred, but is estimated to occur as shown.

Last year we anticipated that Disbursements would be made from your Escrow Account during the period equaling $28,698.80. Under Federal Law, your lowest monthly balance should not have exceeded $4,783.13, or 1/6th of total anticipated payments from the account, unless your loan contract or State law specifies a lower amount. Under your loan contract and State law your lowest monthly balance should not have exceeded $4,783.13.

CONTINUED ON REVERSE SIDE

**SF FIRE CREDIT UNION**
REAL ESTATE DIVISION

**AMERICAN SHARE INSURANCE**
Your savings insured to $250,000 per account.
By members' choice, this institution is not federally
insured, or insured by any state government.

| YOUR ANNUAL ESCROW ACCOUNT STATEMENT | PAGE 3/6 |
|---|---|
| LOAN NUMBER 0056098445 | |

CONTINUATION

## Escrow Account Projections

This section provides an estimate of all payments we anticipate receiving as well as what we expect to pay on your behalf in the next year. The lowest projected balance and required minimum balance are highlighted for reference.

**Escrow account projections from May 2023 to April 2024**

| DATE | PAYMENTS TO ESCROW | WHAT WE EXPECT TO PAY | DESCRIPTION | PROJECTED ESCROW BALANCE | REQUIRED ESCROW BALANCE |
|---|---|---|---|---|---|
| | | | BEGINNING BALANCE | -$41,221.62 † | $7,174.66 |
| MAY 2023 | 2,391.57 | | | -38,830.05 | 9,565.23 |
| JUN 2023 | 2,391.57 | | | -36,438.48 | 11,957.80 |
| JUL 2023 | 2,391.57 | | | -34,046.91 | 14,349.37 |
| AUG 2023 | 2,391.57 | 2,534.00 | HAZARD INS | -34,189.34 | 14,206.94 |
| SEP 2023 | 2,391.57 | | | -31,797.77 | 16,598.51 |
| OCT 2023 | 2,391.57 | | | -29,406.20 | 18,990.08 |
| NOV 2023 | 2,391.57 | 13,082.40 | R.E. TAX | -40,097.03 | 8,299.25 |
| DEC 2023 | 2,391.57 | | | -37,705.46 | 10,690.82 |
| JAN 2024 | 2,391.57 | | | -35,313.89 | 13,082.39 |
| FEB 2024 | 2,391.57 | | | -32,922.32 | 15,473.96 |
| MAR 2024 | 2,391.57 | 13,082.40 | R.E. TAX | **-43,613.15** | **4,783.13** |
| APR 2024 | 2,391.57 | | | -41,221.58 | 7,174.70 |
| **TOTALS** | **$28,698.84** | **$28,698.80** | | | |

† Your beginning account balance is negative, which means your account has a deficiency. We will collect this deficiency over 12 months, as part of your shortage.

## New Loan Payment

| Your new payment consists of: | Principal & Interest (P & I) | $1,907.61 |
|---|---|---|
| | Escrow Deposit | $2,391.57 |
| | Escrow Shortage Amount | $4,033.02 |
| **NEW LOAN PAYMENT** | Beginning on May 01, 2023 | **$8,332.20** |

## Member Service

🌐 www.sffirecu.org

💬 **Live Chat:** Find all your loan information online. Still have questions? Use Live Chat on the website to speak with one of our representatives.

✉ **Correspondence**
PAYMENT PROCESSING CENTER
PO BOX 54040
LOS ANGELES, CA 90054-0040

📞 **Telephone**
888-653-7739

We accept telecommunications relay service calls.



0737944 000012775 0EP201 0456326 RT

SF FIRE
CREDIT UNION
REAL ESTATE Division

⚠️ **AMERICAN SHARE INSURANCE**
Your savings insured to $250,000 per account.
By members' choice, this institution is not federally
insured, or insured by any state government.

🏠 EQUAL HOUSING OPPORTUNITY

**YOUR ANNUAL
ESCROW ACCOUNT
STATEMENT**
LOAN NUMBER
0056098445

PAGE
4/6

## Important Information

**AUTOPAY HOMEOWNERS**
If you're enrolled in Autopay, any additional principal deductions you have previously authorized are not included in the above listed new payment amount. However, until we are otherwise advised, the authorized additional principal amount will continue to be withdrawn from your account.

**ADJUSTABLE RATE MORTGAGE CUSTOMERS**
If your loan has an adjustable interest rate, your monthly principal and interest payment may change prior to your next Escrow Analysis.

**INSURANCE RENEWAL/CHANGING INSURANCE COMPANIES**
Upload proof of insurance coverage at www.mycoverageinfo.com/Cen300. Your insurance documents can also be sent to us via the following methods: Email – Cen300@mycoverageinfo.com; Mail – PO Box 202028, Florence, SC 29502-2028; and Fax – 843-413-7133

**TO THE EXTENT YOUR OBLIGATION HAS BEEN DISCHARGED OR IS SUBJECT TO THE AUTOMATIC STAY IN A BANKRUPTCY PROCEEDING, THIS LOAN STATEMENT IS FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT OR AN ATTEMPT TO COLLECT INDEBTEDNESS AS YOUR PERSONAL OBLIGATION.**

# HOW-TO-READ YOUR ANNUAL ESCROW ACCOUNT DISCLOSURE STATEMENT

A quick guide to help you understand all your important escrow account information.

ANNUAL ESCROW ACCOUNT
DISCLOSURE STATEMENT

Overview

$XXX.XX

Why do I have a shortage?

Annual Escrow Review

Monthly Payment Comparison

How was my shortage determined?

ESCROW SHORTAGE $XXX.XX

### Statement Identifying Information

Look here to find some basics, including your loan number, new mortgage payment amount and new payment effective date.

### Overview

Go here to see whether you have a shortage or surplus (including the amount) or sufficient funds. Learn how any surplus or shortage may be handled, and whether your future monthly payment will increase, decrease or stay the same.

### Summary

This quick summary of your recent escrow activity can help you learn more about why you may have a surplus or shortage. See the difference between what was expected to be paid for taxes and insurance versus what is now expected to be paid for the upcoming period, as well as how your new monthly payment compares to your existing payment.

### Required Minimum Balance

Your required minimum balance, also known as your payment cushion, covers any unanticipated tax or insurance increases. Your projected escrow balance is what we anticipate your lowest balance will be in the next 12 months. The difference between these two amounts will determine whether your account has a surplus or shortage

0739944 0000012791 OCP201 0956326 KT

## Escrow Account History Summary

Look here to see the details of what was actually paid into and from your account and how your actual account balance compares with what was previously projected.

## Escrow Account Projections

This is where you can find the estimate of all payments we expect to receive from you, and pay out for you, each month over the next year. The highlighted amounts are the lowest projected balance and the required minimum balance amounts used to determine whether you have a shortage or surplus.

The required minimum balance is the minimum acceptable amount in your escrow account over the next 12-month period.

## New Loan Payment

Go here to see a breakdown of your new loan payment amount, which includes your principal and interest, new escrow deposit and, if applicable, any monthly escrow shortage amount that needs to be paid.

## Customer Service

Here's how to get in touch with us for any questions or assistance. Please be sure to include your loan number on all correspondence.

# We're here to help!


Find everything you need to know by going to www.stfirecu.org then selecting your mortgage account.

For any additional questions, use **Live Chat** to connect directly with an agent.


To learn more about escrow and what it means to you as a homeowner, please watch this short **video.**

https://bit.ly/3tPEuoV

# ATTACHMENT F


# Exhibit E

1    Herman Franck, Esq. SBN 123476
     Elizabeth Betowski, Esq., SBN 245772
2    Franck & Associates
     1750 Prairie City Road, Ste. 130, #254
3    Folsom, CA 95630
     Tel: 916-256-6266
4    Email: franckhermanlaw88@yahoo.com

5    Attorney for Defendant Michael Castagnola
     and Intervenor Carly Castagnola
6
                    SUPERIOR COURT OF THE STATE OF CALIFORNIA
7                          FOR THE COUNTY OF SONOMA

8    COUNTY OF SONOMA                    Case No. SCV-265714

9        Plaintiff,                      DEFENDANT MICHAEL CASTAGNOLA'S
                                         AND INTERVENOR CARLY
10   v.                                  CASTAGNOLA'S STATUS CONFERENCE
                                         STATEMENT
11   MICHAEL CASTAGNOLA, TRUSTEE OF
     THE MICHAEL L. CASTAGNOLA
12   REVOCABLE TRUST; MICHAEL L.         Date: July 24, 2025
     CASTAGNOLA REVOCABLE TRUST          Time: 3:00pm
13                                       Dept: 19
14       Defendant.

15

16

17

18

19   Defendant Michael Castagnola and Intervenor Carly Castagnola herewith submit this Status

20   Conference Statement.

21

22

23

24

25
                                                                                            1

     Castagnola Status Statement

                                                                                     021
                                                                                     066

# I.
## DOCUMENTS ATTACHED

To let the Court understand just how god-awful receiver Mark Adams is, and to make sure it is clear as a bell not only to the Court but to the County Counsel who actually retained him, recommended him, and proposed him to be the receiver in this case, we have attached the following items that show, without a doubt, that Mark Adams is a crook beyond your wildest dreams:

Attachment A: Series of press articles regarding Mark Adams:

1. May 17, 2023 article entitled "Evictions, homelessness, debt: Skid Row Housing Trust receiver has checkered history" by Liam Dillon and Doug Smith from the *Los Angeles Times*, a review of Mark Adams' work in several locations, including Fresno County and Los Angeles County. The article states in part at page 4:

> "A Times review of court records and dozens of interviews with parties involved in Adams' past receiverships, however, raise concerns about his ability to manage the trust's beleaguered portfolio and care for the vulnerable tenants now under his control.

> In two cases comparable in size and scope to the trust matter, Adams left years before they were resolved and, in court filings, omitted key facts about his involvement in them. In other cases involving Adams, tenants faced the risk of eviction and property owners lost their houses while his fees have risen as high as $465 an hour.

> In multiple instances, judges and local governments have determined that Adams has padded staffing, increased his staff's rates without informing the judge and engaged in duplicative billing -inflating his fees by six-figure amounts. A judge in one case likened Adams' billing to a "feeding frenzy."

1    The Article also states at page 11:

2    "Because all of its administrative and legal services billings are 'in house' it gets

3    to effectively bill itself for its legal and administrative expenditures and it gets to

4    set the billing rates for all of its employees. What could go wrong with that?"

5    wrote Robert F. Moody, a judge presiding over an Adams receivership in

6    Mariposa County, in a 2022 ruling.

7    Moody found "accounting and billing irregularities" by Adams in the case, which

8    stretched for 13 years, though the judge did not determine specific violations.

9    Ultimately, Moody reduced Adams' fees and costs by more than $300,000,

10   according to court filings and attorneys for Mariposa County.

11   That ruling came after attorneys for the county, which had requested the

12   receivership, objected to Adams' accounting. In recent years, lawyers representing

13   the cities of Duarte and Palmdale and L.A. County - in Jacobs' case - have done

14   the same.

15   The cases share common issues: Adams assigns a dozen or more employees work

16   on a case, bills for multiple employees on the same task (including weekly

17   internal meetings) and raises staffers' rates without notifying the judge.

18   The judge in the Palmdale case rejected the city's argument and approved Adams'

19   billings. But in the Duarte case, which involved a 28-unit apartment complex,

20   Adams' fees were reduced by over $100,000."

21

22   2.  June 12, 2023 article entitled "One Of Skid Row's Largest Housing Providers Veered

23       Toward Financial Collapse. New Issues Are Surfacing After A City-Led Takeover"

24       by Nick Gerda for the *LAist*, regarding Mark Adams' work in L.A. County, which

25

1   was astonishing to the city attorney's office who hired him and put them in a position

2   of total embarrassment over what they did to the homeless people. The article states

3   in part at page 2-3:

4       "An LAist review of online records late last week found that a company Adams

5       previously used for receivership work - California Receivership Group, LLC - has

6       been banned by the state from doing business since 2015, because he hadn't paid

7       business taxes that totaled about $3,380.

8       A few months after the state suspended his business, records show Adams formed

9       a new business with the same name that ends in "Inc." instead of "LLC." That's

10      his current company, which was appointed as the Skid Row Housing Trust

11      receiver along with Adams.

12      In addition, LAist reviewed court documents that show just weeks before L.A.

13      City Attorney Hydee Feldstein Soto recommended Adams for the Skid Row job

14      in late March, an Orange County judge reduced Adams' fees by $500,000 after

15      finding he had overbilled for a receivership in Dana Point by an average of 39%.

16      The L.A. Times has reported on other past rulings where judges found Adams

17      overcharged.

18      "If judges find that he overbills, then why is this somebody that we're picking?"

19      said Jessica Levinson, a former president of the Los Angeles City Ethics

20      Commission who teaches at Loyola Law School, after reviewing LAist's

21      findings."

22      The article also states at page 4:

23      "Adams also discussed the unpaid taxes in a 2017 deposition about a receivership

24      he handled in Santa Barbara. He said: "It wasn't something I was very focused on,

25

4

and by the time I was focused on it, we had formed the [newer] corporation so it didn't matter to me."

Adams noted that his current business is in good standing with the state. He said he let the first business get suspended because he was already operating under the newer business.

"We did not get suspended and then I formed a new company. That's just not the case," he said.

But the state records do show Adams created the new business in July 2015, five months after the earlier business was suspended in February of that year."

See also, page 7:

"The L.A. Times and LAist have since identified public court rulings showing multiple judges had previously found problems with Adams' handling of past receiverships, including inflating his fees by hundreds of thousands of dollars. Adams says the decisions against him are from a small handful of cases out of the roughly 300 court-appointed receiverships he's handled. And he says in those handful of cases, billings were approved by judges before another judge came in and decided the charges were inappropriate.

"That case went through four or five different judges," he told LAist, about the March ruling in Orange County where a judge drastically reduced his billing. "And when it was active, the judges who I was working for approved everything that we did. They know all of our billings, there was no dinging of it. But then it went to a judge who had not been involved in the case ... and he found what he found."

3.  June 15, 2023 article entitled "Judge Removes 7 Buildings From Troubled Skid Row Housing Receiver's Portfolio" by David Wagner for the *LAist*, Another article from L.A. Times about the homeless problem down in L.A. Mark Adams literally steals money from budgets given to homeless people. It doesn't get any lower than that. The article states in part at pages 2-3:

> "A Los Angeles County Superior Court judge approved a deal Thursday to remove seven buildings from a troubled receivership tasked with stabilizing 29 buildings formerly managed by the Skid Row Housing Trust.
>
> In a Thursday afternoon court hearing in Downtown L.A., Judge Mitchell Beckloff at times grew frustrated with the responses from court-appointed receiver Mark Adams, who has faced questions about his suitability to rehabilitate these sensitive properties. "I don't know how much problem-solving is going on," Beckloff told Adams."

The article also states at page 4:

> "An investigation by the city attorney's office City Attorney Hydeee Feldstein Soto previously told the Los Angeles Times that her staff is investigating Adams' performance. When LAist asked for an update on that investigation Thursday, her office declined to comment. In recent weeks, LAist and the Times identified public court rulings showing multiple judges have found problems with Adams' handling of past receiverships.
>
> LAist reporting earlier this week also revealed that a prior company Adams used for previous receivership business was banned by the state of California over

1    unpaid taxes. Adams told us he'd look into it and said his current company is in

2    good standing.."

3

4    4.  July 17, 2025 article entitled "Sonoma County family loses their home after yearslong

5        battle over permits, court appointed cleanup company", by Marisa Endicott and Phil

6        Barber for the *Sonoma Press Democrat*, in which they investigated Mark Adams, and

7        specifically concerning the case of Michael Castagnola and Carly Castagnola, and

8        also did some research into similar shenanigans by Mark Adams over in Berkeley,

9        California. The article states in part at page 3:

10           "The family's initial set of battles was with inspectors for Permit Sonoma, the

11           county's planning and code enforcement division. They began to catalog the

12           alleged violations at the site in 2017.

13           The Castagnolas, like other residents who have dug in their heels after running

14           afoul of the department, describe Permit Sonoma as unyielding.

15           The accusations are not new. The agency has long faced criticism over its

16           enforcement practices, and it was recently sued by the ACLU Foundation of

17           Northern California over alleged unconstitutional use of drone surveillance — to

18           document land-use violations that have, in some cases, led to rapidly escalating

19           penalties for affected residents."

20

21    The article also states at page 11:

22           "In 2023, the Los Angeles Times published a series of stories about Adams and

23           California Receivership Group, detailing allegations of overcharging and

24

25

1     underperformance. At the time, Adams and the city of Los Angeles were

2     wrangling over accountability for a real estate rehab project that had ballooned far

3     over budget.

4     California Receivership Group claimed it was owed $1.7 million in unpaid bills

5     on the project, which served 1,500 low-income tenants of the Skid Row Housing

6     Trust.

7     The LA Times uncovered additional conflicts involving Adams' company.

8     In the Coachella Valley, they wrote, Adams was appointed receiver for a

9     community of 4,000 people, primarily migrant farmworkers; he accumulated

10     $220,000 in debt before a judge removed him from the case.

11     Two years after Adams assumed control of the Trails End Mobile Home Park in

12     Fresno, a third of the lots were vacant and the remaining tenants faced eviction. In

13     East Los Angeles, he took over a dilapidated triplex, sold it and tried to bill the

14     estate $530,000 before a judge pointedly cut the amount by more than half, the

15     LA Times reported."

16

17 Attachment B: Chronology prepared by Carly Castagnola showing a series of loans that Mark

18 Adams has taken out on this property, totaling a staggering $880,190. Regrettably, each of these

19 loans has been approved by this Court. It is astonishing that this Court would approve such

20 behavior. They basically gutted all the million-dollar-plus equity this former battalion chief of

21 the fire department of San Francisco had in his residence.

22

23

24

25

1    Attachment C: A 24-page chronology prepared by Carly Castagnola that chronicles the series of

2    incredible behaviors that Mark Adams did, that the County Counsel approved of, and that this

3    Court approved of.

4

5    Attachment D: Excerpts from a recently-filed [Not yet served], federal complaint in which there

6    is a claim for relief regarding Mark Adams' completely unlawful, self-help eviction of Carly

7    Castagnola from a yurt she was living in on Michael Castagnola's home. Mark Adams basically

8    just mowed it down. That's one way to get rid of a tenant, I suppose. But under California law,

9    you're obviously not allowed to do that. You actually need to bring an unlawful detainer action,

10   which he completely failed to do. He just destroyed the home, and that was that. See Attachment

11   D, pages 55-56, paragraphs 321-324:

12        "321. The Defendants, Adams and his staff evicted the Plaintiff Carly Castagnola without

13        hearing.

14        322. Plaintiff Carly Castagnola was a long time renter from her father, Plaintiff Michael

15        Castagnola.

16        323. Despite having a lease and legal residence at the Dupont property if not a legal

17        building, the Defendant Adams summarily removed Plaintiff from the property.

18        324. The Defendants are not above the plethora of laws protecting the civil rights of

19        renters in California and their breach of the Plaintiffs' due process rights deserves

20        penalty, both to compensate the Plaintiff as well as to send a message to those who think

21        their association with the government or courts makes them above the law."

22   Mark Adams did an unlawful and improper three-day notice to quit and without proceeding to

23   any kind of unlawful detainer lawsuit, simply demolished the yurt that Carly Castagnola

24   occupied as her residence and in doing that, committed a wrongful eviction.

25

1

2  Attachment E: A list prepared by Carly Castagnola of structures formerly on Michael

3  Castagnola's home that Mark Adams has demolished. What is important to note is about the only

4  thing he has accomplished, Mark Adams that is, is demolishing things. He hasn't fixed anything.

5  $880,190 for a demolition is obviously criminal in nature. If this Court is going to sit back and

6  not do anything about this, this Court is going to be deemed an aider and abettor of what Mark

7  Adams has done.

8

9  Attachment F: May 23/May 29, 2025 Arbitration Award re Natures Way LLC v Respondent

10  Mark Adams. See discussion of the arbitration in Section III below.

11

12                                          II.
13  **STATEMENT OF OFFENSES COMMITTED BY RECEIVER MARK ADAMS AT THE
    SPECIFIC REQUEST OF SONOMA COUNTY COUNSEL AND SONOMA COUNTY
14  CODE ENFORCEMENT, AND WITH THE APPROVAL AND RATIFICATION OF
    THE SUPERIOR COURT OF CALIFORNIA FOR THE COUNTY OF SONOMA**
15

16  The attachments to this status conference statement show the following offenses having been

17  committed by Mark Adams, receiver appointed at the special instance and request of County

18  Counsel at the behest of County Code Enforcement, and with ratification and approval by the

19  Superior Court Sonoma County Superior Court:

20

21  1. Embezzlement. Quite clearly, Mark Adams has committed an embezzlement within the

22  empowerment of his receivership status given to him by the court at the request of Sonoma

23  County Counsel and at the urging of Code Enforcement. He has embezzled $880,000 and has

24

25

                                                                                10

Castagnola Status Statement



1    literally stolen the house belonging to Michael Castagnola in the process. This is a major, major

2    embezzlement.

3

4    2. Wire fraud. Mark Adams has committed wire fraud in the process of obtaining a bunch of fake

5    loans in the process of boosting up the loan balances to $880,000 in the process of e-filing items

6    with the court to convince the court that he's actually spent these monies. The Court has ratified

7    what he's done by approving these. He did these at the request of County Council and at the

8    request of Code Enforcement.

9

10    3. Mail Fraud. It is not clear to us at this point whether Mark Adams ever uses the mail in the

11    process of obtaining these fake loans, pretending to have loans, obtaining his LLC shells

12    companies that run out of his office and purportedly loaned money to these properties. As can be

13    seen from the news articles, he does this as a pattern of practice. It is quite probable that

14    somewhere in his activities, he actually uses the mails and as such has committed a further

15    offense of mail fraud.

16

17    4. Evidence tampering. Mark Adams has manipulated the circumstances and factual showings

18    that he's made in this case to make it appear as though he legitimately went out and borrowed

19    880,000 to cure the Code Enforcement violations on the property. It's a total lie. He has tampered

20    with evidence. He has tampered with witnesses to assist him in his deeds. He has done this at the

21    request of Sonoma County Counsel, at the request of Sonoma County Code Enforcement and

22    with the ratification and approval by the Sonoma County Superior Court.

23

24

25

11

5. Obstruction of Justice. Mark Adams's conduct also included Falsifying evidence, giving false statements, and interfering with the execution of court orders.

It bears mentioning here that during the commission of the above-stated offenses, Michael Castagnola is an elder within the meaning of Welfare & Institutions Code section 15610.27: "'Elder' means any person residing in this state, 65 years of age or older."

### III.
### RECENT ARBITRATION AWARD CONFIRMING VALIDITY OF AN EXPRESS LEASE AND A LEASE AGREEMENT GIVING MICHAEL CASTAGNOLA AND CARLY CASTAGNOLA THE RIGHT TO OCCUPY AND POSSESS THE PROPERTY

Attached as Attachment F is an arbitration award signed on May 23, 2025 and May 29, 2025, and served on June 3, 2025. The arbitration award arose from an easement and a lease agreement entered into between an LLC by the name of Nature's Way, 12778 DuPont Road and Respondent Mark Adams.

The arbitration resulted in a hearing via Zoom and resulted in a final decision, a copy of which is attached as Attachment F.

Mark Adams initially challenged jurisdiction, which the arbitrators considered on the merits and denied. See Attachment F, page two:

> "The panel held a work session on January 31, 2025. Per Commercial Rules of Arbitration 7(a), the Panel reviewed the jurisdiction issue, the briefs and the relevant documents. The panel found that all elements necessary to establish jurisdiction were complied with, found the arbitration clause was binding on the parties, found the

12

1    Respondent, as title-holder-in-fact, is a party to the contracts, and, per Rule 52, found that

2    the previous judicial proceeding that took place between the parties of Sonoma County

3    and Michael Castagnola did not waive the rights of the arbitration parties to arbitrate

4    namely because the Claimant was never a party to the judicial proceeding Respondent

5    previously engaged in. Additionally the panel found that Mark Adams misrepresented the

6    express easement as a statutorily defined "conservation easement" to the court in an

7    effort to invalidate the easement."

8

9  The panel found that all elements necessary to establish jurisdiction were complied with; found

10  the arbitration clause was binding on the parties; found the Respondent as title holder in fact is a

11  party to the contracts and per rule 52; found that the previous judicial proceedings that took place

12  between the parties of Sonoma County and Michael Castagnola did not waive the rights of the

13  arbitration parties to arbitrate, namely because the claimant was never a party to the judicial

14  proceeding.

15

16  The decision also describes the arbitration hearing at page two, quote,

17    "The panel held a work session on February 7, 2025 purposed to review the various

18    statements of damages including eye-witness accounts of the demolition, Adams receipts

19    for demolition costs, an affidavit of damages to the property dated January 20, 2025 and

20    the reconstruction costs submitted with an affidavit dated February 4, 2025 containing

21    contractor-quote exhibits."

22

23  Page two of the arbitration award also states the following issue:

24

25

13

1    "The claimant seeks confirmation of an express grant easement and a lease agreement.

2    Claimant alleges that respondent interfered with the use and enjoyment of the easement

3    and caused a nuisance, which entitles claimant to liquidated damages and damages. The

4    claimant further claims that respondent breached the terms of a lease contract related to

5    the easement and is liable for damages."

6

7    The arbitration award describes the easement as follows, at page two:

8    "The claimant holds an easement over the respondent's property for the purpose of

9    enjoying the rights, benefits, and uses of the property in the same manner as any

10    leaseholding tenant would while also conserving several locally endangered wildlife

11    species. The claimant contends that this easement was expressly granted upon a written

12    easement between the former titleholder and grantor, Michael Lewis Casanola, and the

13    claimant on February 12, 2022, and the terms of the easement are binding on all future

14    titleholders."

15

16    The arbitration panel makes a series of findings at page two and three of particular note is page

17    three, paragraph five:

18    "After reviewing the documents presented, including the recorded easement contract, the

19    title report, related correspondence, and deeds, it is clear that Nature's Way, LLC holds an

20    express easement over the property located at 12778 DuPont Road, Sebastopol,

21    California..."

22

23    The arbitration panel further determined at page three, paragraph six:

24

25

14

1    "Respondent Mark Adams became subject to the terms of the easement agreement, which

2    is binding upon all future titleholders, upon becoming the titleholder in fact of the

3    property and court-appointed receiver on March 25, 2022. Paragraph eight says,

4    therefore, the panel of arbitrators confirm that the claimant holds an express grant

5    easement as per the terms of the written agreement."

6

7    Pages three-four make a further series of findings at paragraphs nine, ten, eleven, and twelve that

8    upheld the validity of the lease. Paragraph twelve says: "Therefore, the panel of arbitrators

9    confirm that the claimant holds a valid and unexpired lease agreement as per the terms of the

10   written agreement."

11

12   At pages four-five, the panel made a series of findings that determine that Mark Adams breached

13   the terms of the lease. Paragraph eighteen states:

14    "The panel of arbitrators find in favor of the claimant and confirm that a breach of

15    contract has occurred. Adams' actions materially breached the lease agreement between

16    the claimant and its tenant. Respondent is liable for damages, both compensatory

17    reconstruction costs and consequential (lost rents)."

18

19   At pages four-six, the panel further found that Mark Adams' conduct created a nuisance: "The

20   arbitrators conclude that the respondent's conduct amounts to a nuisance..."

21

22   At page five, the arbitrators issue an award that includes a damage award in paragraph five of

23   $250,000 for liquidated damages, $7,500 a month for lost rents beginning March 1, 2024, and

24

25

15

Castagnola Status Statement

1  reconstruction costs determined in the amount of $358,312.94. The findings of the arbitration are

2  binding.

3

4  Michael Castagnola will take appropriate steps to petition the Superior Court to confirm the

5  arbitration award. We do not seek the court's intervention into this arbitration award, but instead

6  seek to make the Court aware of it. Any claim that Mark Adams has raised that Michael

7  Castagnola has criminally trespassed upon the property would thus be fully defensible by this

8  arbitration award.

9

10 It should be further pointed out that Mark Adams has been very well aware of this issue, an

11 arbitration award, and yet still went forward and maliciously prosecuted a false claim of trespass,

12 knowing that, in fact, Michael Castagnola and Carly Castagnola have a right to occupy and

13 possess the property. That criminal case has not gone forward as of yet, but when it does, the

14 arbitration award will be Exhibit A for the defense. Once it is upheld by a judgment of the

15 Sonoma County Superior Court, it will be binding in any criminal case, and such case will need

16 to be dismissed with prejudice. After that, Mark Adams will need to answer a new cause of

17 action for malicious prosecution. For now, we just bring these matters to the attention of the

18 Court.

19

20                                    IV.
21       **THERE IS HUGE TROUBLE WITH MARK ADAMS, THE RECEIVER**

22

23 There is huge trouble with Mark Adams, the receiver. The Court may still not fully grasp what a

24 total criminal it unwittingly appointed as receiver in this matter. He has done so many bad things

25

                                                                              16

Castagnola Status Statement

1   that we have literally contacted the FBI. His activities include theft of property, fake loans,

2   stealing money, demolishing things that should never be demolished.

3

4   He is not fixing anything up. He has literally borrowed about $880,000 and has fixed nothing.

5   All he has done is demolish a couple of yurts on this site.

6

7   The Court may recall that Michael Castagnola made an issue that Mark Adams was a crook long

8   ago. For whatever reason, the Court ignored it. We have to wonder why the Court would ignore

9   such a clear and blatant case of impropriety by an out-of-town receiver who has multiple

10  violations from prior receivership issues, so many that it's even hard to list them all. But, if we

11  look at this case, we can see right away.

12

13  First of all, he never gave the Court a plan of action, which makes perfect sense that the Court

14  would put that in his receivership order. What I can explain to the Court is that he's never made

15  one. The Court was asked to hold him in contempt, but for some reason, the Court would not

16  hold him in contempt. He still has not given a plan of action.

17

18  What he's done instead is taken out massive loans, and put up giant deeds of trust on the

19  property. If we are to believe that those loans were really taken, they are under the circumstance

20  where Mike Castagnola already had a first deed of trust for approximately $350,000, and a

21  second deed of trust on a line of credit of about $90,000. None of those have been paid off. The

22  judgment that the County has has not been paid off. So, one must ask, what do you suppose this

23  man really did with the money he got? Well, one thing for sure, he didn't fix up the property.

24  Absolutely nothing has been fixed up.

25

17

Castagnola Status Statement

1

2    But, the bigger question is, we have zero proof that actual real money was ever lent to him. We

3    don't see an account statement, a deposit into account of the massive sums. We don't see any of

4    that. He says he got it. But it's kind of hard to believe that in this day and age of credit, that

5    anyone would give a loan where there's a judgment on the house and a lis pendens filed by the

6    County, and first and second deeds of trust, none of which were taken care of in escrow. As the

7    Court is well aware, most refinances happen where you pay out the first and the second, and you

8    become in first place, or you accept the role as being a second. But, who accepts the role of being

9    a third, and then a fourth? It's just simply unbelievable.

10

11   We have attached to this brief as Attachment A, a chronology of major events, prepared by Carly

12   Castagnola, who has sifted through the various court documents to prepare the chronology. Mark

13   Adams will be investigated. We are not going to rest until he is.

14

15   If this Court is not going to do it, we are going to find someone who will. It seems at this point it

16   useless to make claims in this Court of Mr. Adams's impropriety. This Court appears to be of a

17   view that the County and Mark Adams can do anything they want. But let's be clear about this.

18   Through the joint effort of this Court, Sonoma County Counsel's office, County Code

19   Enforcement and this criminal receiver, Mark Adams, this Court is literally allowing and aiding

20   and abetting in the theft of a property.

21

22   Mark Adams has a long string of these situations where he ends up taking away the property.

23   The Court may know that Michael Casstagnola is a stand-up guy, former battalion chief of the

24   fire department, with decades of service. He saw it.

25

18

Castagnola Status Statement

1

2    The Court is allowing this solid citizen who has lived in Sonoma County for decades to have his

3    house stolen. Don't expect us to be happy about it, and don't expect us to stand idly by while all

4    these terrible events have happened.

5

6    I might add we have seen this time and time again. Let me provide right now a list of names that

7    similar abuse by code enforcement by county council and by the court has occurred: Esteban

8    Diaz, Thomas Lutge, Keni Meyer, Mike Castagnola, Carly Castagnola, Ron Cupp. Michael

9    Robert Keyes, and Avril Hysmenya Maciel, Linda Ludwig, Keith Alden, Barbara Scalabrini,

10   Karen Koelker, Jaqueline King. This list continues to grow.

11

12   Word is getting around that people are no longer going to sit around and let the government

13   engage in this kind of outrageous conduct. We are going to take action, and it won't be action in

14   Sonoma County Superior Court because we look at the court as one of the bad guys, one of the

15   aiders and abettors, one of the entities who have joined with Sonoma County Code enforcement

16   and Permit Sonoma, and let them get away with everything they are doing.

17
                                              **V.**
18                          **CONCLUSION AND REQUESTED REMEDY**

19

20   Fire Mark Adams on the spot. Get rid of him. He is a bad person. Surely they can find another

21   receiver in the County of Sonoma who has an unblemished record. Mark Adams is far from it. If

22   the Court doesn't want to do that, the Court has just proven up one of the contentions we have

23   that the Court is in on it.

24

25

                                                                                          19

Castagnola Status Statement

1   Respectfully Submitted,

2   //s// Herman Franck, Esq.                              Date: July __21__ , 2025

3   _____
    Herman Franck, Esq.
4   Attorney for Defendant Michael Castagnola
    and Intervenor Carly Castagnola
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                        20

Castagnola Status Statement

## LIST OF ATTACHMENTS

Attachment A: Series of press articles showing Mark Adams is a crook:
1. May 17, 2023 article entitled "Evictions, homelessness, debt: Skid Row Housing Trust receiver has checkered history" by Liam Dillon and Doug Smith from the *Los Angeles Times*
2. June 12, 2023 article entitled "One Of Skid Row's Largest Housing Providers Veered Toward Financial Collapse. New Issues Are Surfacing After A City-Led Takeover" by Nick Gerda for the *Los Angeles Times*
3. June 15, 2023 article entitled "Judge Removes 7 Buildings From Troubled Skid Row Housing Receiver's Portfolio" by David Wagner for the Los Angeles Times
4. July 17, 2025 article entitled "Sonoma County family loses their home after yearslong battle over permits, court appointed cleanup company", by Marisa Endicott and Phil Barber for the *Sonoma Press Democrat*

Attachment B: Chronology prepared by Carly Castagnola showing a series of loans that Mark Adams has taken out on this property, totaling a staggering $880,000.

Attachment C: A 24-page chronology prepared by Carly Castagnola that chronicles the series of incredible behaviors that Mark Adams did, that the County Counsel approved of, and that this Court approved of.

Attachment D: Excerpts from a recently-filed [Not yet served], federal complaint in which there is a claim for relief regarding Mark Adams' completely unlawful, self-help eviction of Carly Castagnola from a yurt she was living in on Michael Castagnola's property.

Attachment E: A list prepared by Carly Castagnola of structures formerly on Michael Castagnola's home that Mark Adams has demolished.

Attachment F: May 23/May 29, 2025 Arbitration Award re Natures Way LLC v Respondent Mark Adams

21



# ATTACHMENT B



# Mark Adams Estate Loans on Dupont Property AKA Michael Castagnola Estate

Receivership Loans As of July 18, 2025

| | |
|---|---|
| 05/22/2022. | $30,000.00 |
| 6/8/2022 | $60,000.00 |
| 1/17/2023 | $90,500.00 to $150,000.00 |
| 2/03/2023 | $60,000.00 to $150,000.00 |
| 6/22/2023 | $316,160.00 to $466,660.00 |
| 6/26/2023 | $150,000.00 to $466,660.00 |
| 3/27/2024 | $532,695.73 |
| 03/2025 March | $304,783.50, |
| 05//2025 May | $347,501.00, |

Grand Total $880,196.00

6/8/022

No 2022039956  Short Term Super Priority Deed Of Trust

Recorded June 3rd 2022 where Mark A is named Trustor, Total Lender Solutions called Trustee, and Glan Investments called Beneficiary. Says Witnesseth That Trustor Irrevocably Grants Transfers and assigns To   Trustee in Trust with POWER OF SALE over our property Receiver's Certificate of Indebtedness (the "Certificate") in the amount of $30,000 (the Funds") to Glan Investments, LLC ("Lender"), The Certificate shall bear interest at 15% per annum from the date of funding. Interest shall be payable at maturity and the Certificate may be paid off at any time without prepayment penalty. Recorded Doc 2022058786.Order Increasing Recievership Certificate From $30,000 to $60,000The sums due under the Certificate shall all be due and payable on September5, 2022. The Caffeinate shall be secured by a Deed of Trust which includes a power of Sale
Dated: June 3, 2022  Mark Adams  President

9/16/22 No 2022060644

AMENDMENT TO SUPER PRIORITY DEED OF TRUST

Amendment clarifies that Receivership Certificates is enter into by California   Receivership Inc and Marks Capacity as Receiver as ( Borrower) Trustee is Total Lender Solutions Inc and Beneficiary is Glan Investments This shows the increase of Rec Cert to Go from $30,000 to $60,000

So as of February 3rd, 2022, the liens are up to $150,000 without any proper rehabilitation plan and cost estimate. Three major inspections with 10 to 15 paid employees walking around inspecting the site. After 273 days, $150,000 later in receivership certificates, no cost estimate or plan has been approved by the court. (See receivership laws annex.)

Now we are in 2023, March, April, May. Then on June 6th, 2023, a certificate was filed in the recorder's office, taking the amount from 150,000 to $466,600. On June 22nd, 23rd, the court approves receiver certificate by $314,160 total, totaling $466,666 without a proper rehabilitation plan or cost estimate approved by the court. Now it's been 418 days until the June spike in receivership funds. All amounts added were not done procedurally correct according to receivership law

( see receivership laws).

02/01/2023

2nd  Recording 2023004414
ORDER INCREASING RECEIVER'S CERTIFICATE
CALIFORNIA RECEIVERSHIP GROUP INC(PROPOSE-BY ORDER INCREASING RECEIVER'S CERTIFICATE)
Date: Date: January 1 7, 2023

23 NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1.The First Report, Second Report, and third Report are approved, and the actions 25. described therein are ratified and approved.

2.California Receivership Group through its President Mark Adams in the official capacity as Receiver in this action ("Receiver"), is authorized to increase the Receiver's

Certificate by $90,500 to a total authorized amount of $150,500 which will be secured by the Deed Of Trust.

02/03/2023

RECCEIVER'S CERTIFICATE NO. 3

Recorded By CALIFORNIA RECEIVERSHIP GROUP INC

1. For good and valuable consideration, receipt of which is hereby acknowledged, California Receivership Group, Inc., a California Benefit Corporation, solely in its capacity as Receiver herein, hereby acknowledges an additional advance of the Receiver's Certificate of Indebtedness (the "Certificate") from $60,000 to $ 150,500 (the "Funds") to Glan Investments, LLC ("Lender")

The Certificate shall bear interest at 15% per annum from the date of finding. Interest shall be payable at maturity and the Certificate may be paid off at any time without prepayment penalty. The sums due under the Certificate shall all be due and payable on May 1 , 2023. The Certificate shall be secured by a Deed of Trust which includes a power of sale

06/22/2023
ORDER INCREASING RECEIVER'S CERTIFICATE
#2023027908 Recorded by
CALIFORNIA RECEIVERSHIP GROUP INC
PROPOSED) ORDER INCREASING
RECEIVER'S CERTIFICATE. Hearing Date: June 2023 Hon Oscar Pardo
The Fourth Report is approved. and the actions described therein are ratified and approved
2.California Receivership Group through its President Mark Adams in the official capacity as Receiver in this action ("Receiver"). is authorized to increase the Receiver's Certificate by $316,160 for a total authorized amount of $466,660, which will be secured by the 4 property at 12778 Dupont Road. Sebastopol. CA 95472 (APN# 074-020-01 5-000) ("Property") 5 with super-priority status over any and all other liens other than property taxes.
IT IS SO ORDERED.
6/20/2023. Signed By Clerk of Court Robert Oliver

06/26/2023 No 2023028374
Amendment To Super-Priority Deed Of Trust
Document Recorded by Mark Adams same
For Value Received the undersigned grants, assigns and transfers......
Glen Investments LLC  Transfers to Receivership Funding LLC all benefical interest under that certain Deed Of Trust dated 6/3/2022 executed by Cal Receivership Group Inc as capacity of Receiver (Trustor) for our Property 12778 DuPont. as Trustee recorded as instrument No. 2022039957 Total Lender Solutions Inc together with promissory note secured by deed of trust and also all rights accrue or to accrue under said Deed Of Trust
Dated and signed 6/18/24 by Same guy from Glan Investments LLC

06/26/2023
RECEIVER'S CERTIFICATE  #2023028373
Recorded by CALIFORNIA RECEIVERSHIP GROUP INC

For god and valuable consideration, receipt of which is hereby acknowledged, California Receivership Group, Inc., a California Benefit Corporation, solely in its capacity as Receiver herein, hereby acknowledges an additional advance of the Receiver's Certificate of Indebtedness (the "Certificate") from $150,500 to $466,660 (the "Funds") to Glan Investments, LLC ("Lender"). This Certificate is issued for covering all costs needed to manage and rehabilitate the Receivership property located at 12778 Dupont Road, The Certificate shall bear interest at 15% per annum from the date of funding. Interest shall be payable at maturity and the Certificate may be paid off at any time without prepayment penalty. The sums due under the Certificate shall all be due and payable on September 22, 2023. The Certificate shall be secured by a Deed of Trust which includes a power of sale.

Dated: June 22, 2023

Signed By Mark Adams


3/28/24

Notice Of Default And Election To Sell Under Deed Of Trust

Recorded by TLS PO Box 910739 San Diego Ca 92191, PACIFIC COAST TITLE / Mortgage Lender Service is also on top right part of recorded document under Official Sonoma County Seal

The amount of $532,695.73 as of 3/27/24

Here's where it gets fishy on page 2 the standard Format is

                    On This NODETSUDT

    Barrower.    Is Receivership Funding LLC

    Lender       c/o Total Lender Solutions Inc

    Address that 10505 Sorrento Valley Road Stew 125

        San Diego 92121

is collateral???? Also TLS and Total Lender Solutions Inc have  two addresses???? Observe when and where they show up???

AND IS OUR FIRST GLANCE AT RECEIVERSHIP FUNDING LLC ?? C/O  TOTAL LENDER SOLUTIONS INC????

Page 3 Reveals the Truth in Declaration of Beneficiary Pursuant to civil code 2923.5(b)

Barrowers ; California Receivership Group Inc

        Beneficiary; Receivership Funding LLC

        For Property 12778 Dupont Rd Sebastopol ( Our Property )

See at the end of Document " I clarify that this declaration is accurate.........

Then he signs as Beneficiary Mark Adams as Receiver

Also note that on page 2 #3 exempt from HUD because individual owns more than 3 residential properties!!!!! Yeah so he must Steal a elders primary and only RESIDENCE !!!

**Lets Remember Eviction Day was January 8ᵗʰ 2025 so even after all equity was drained and the property stolen from the Castagnola's somehow a bill is still accruing.....????**

Dated: June 27, 2025
**MAY 2025 MONTHLY ACCOUNTING OF RECEIVERSHIP INCOME, EXPENSES, AND INTERIM FEES; (PROPOSED) ORDER**
In May, I advanced funds to pay costs associated with recording/filing fees, repairs and maintenance, and supplies. I also paid expenses associated with cleanout costs, property security, and storage fees.
The available cash balance for the receivership account at the beginning of the month was $9,276.00 at month's end was $4,957.00. In the month of May, receivership fees totaled $17,311.50. Total unpaid receivership fees as of this reporting period, including May fees, are $347,501.00, and total unpaid advances as of this reporting period are $16,247.62. Invoices for these fees and advances may be found in this and previously submitted Monthly Accounting reports. Exhibit 1 is a summary cashflow statement for the month for the receivership account. Exhibit 2 provides a detailed monthly cashflow statement and paid invoices. Exhibit 3 contain Exhibit 3 contains miscellaneous documentation, including a monthly bank statement and unpaid invoices for receiver fees.
Signed Mark Adams, Court-Appointed Receiver


**MARCH 2025 MONTHLY ACCOUNTING OF RECEIVERSHIP INCOME, EXPENSES, AND INTERIM FEES; (PROPOSED) ORDER**

In March, I paid expenses associated with cleanout costs, legal fees, postage, property security, recording/filing fees, repairs and maintenance, storage, supplies, and travel expenses. I also reimbursed myself for advances previously made on behalf of the receivership.

The available cash balance for the receivership account at the beginning of the month was $38,133.27 at month's end was $10,025.00. In the month of March, receivership fees totaled $25,864.50. Total unpaid receivership fees as of this reporting period, including March fees, are $304,783.50, and total unpaid advances as of this reporting period are $16,072.57. Invoices for these fees and advances may be found in this and previously submitted Monthly Accounting reports. Exhibit 1 is a summary cashflow statement for the month for the receivership account. Exhibit 2 provides a detailed monthly cashflow statement and paid invoices. Exhibit 3 contains miscellaneous documentation, including a monthly bank statement and unpaid invoices for receiver fees.


# ATTACHMENT C

**PROOF OF SERVICE**

1

2

I, Elizabeth Betowski, declare as follows: That I am an adult over the age of 18, and reside in

3  Folsom, California, and am not a party to the present action. On the date signed below, I served
   by electronic mail, the following documents:

4

1. **DEFENDANT MICHAEL CASTAGNOLA AND INTERVENOR CARLY**
5      **CASTAGNOLA'S STATUS CONFERENCE STATEMENT**

6
   The above-listed documents were served on all parties by personal delivery to the following
7  addressees:

8  Robert H. Pittman, Esq.
   Sonoma County Counsel
9  Michael A. King, Esq.
   575 Administration Drive, Room 105A
10 Santa Rosa, California 95403
   Telephone: (707) 565-2421
11 Fax: (707) 565-2624
   Michael.King@sonoma-county.org
12 *Attorneys for County of Sonoma*

13
   Mark S. Adams
14 California Receivership Group
   3435 Ocean Park Blvd., Suite 107
15 Santa Monica, CA 90405
   Tel. (310) 471-8181
16 Fax (310) 471-8180
   madams@calreceivers.com
17 *Court-Appointed Receiver*

18

19
   I declare under oath and under penalty of perjury that the foregoing is true and correct and that
20 this Declaration was executed in Folsom, California, on July 21__, 2025.

21

22 //s// Elizabeth Betowski
   _____
23 Elizabeth Betowski

24

25

                                                                                                22

Castagnola Status Statement

# ATTACHMENT G

# Exhibit G

# Exhibit G

### Memo re Writ of Possession and Related Orders

The way Mark Adams obtained an eviction against both Michael Castagnola and Carly Castagnola was to skip the unlawful detainer process entirely.

Instead, he filed a false request to the Sonoma County Superior Court to obtain an order to evict them, which he then used to obtain a writ of possession. He then gave the writ of possession to the Sheriff, and the Sheriff Evicted them.

**List of Attachments:**

1. October 31 2023 Order After Hearing for Judgment of Possession and Contempt

2. September 9, 2024 Writ of Possession issued by the Sonoma County Superior Court Clerk

3. February 29, 2024 Revised Order After Hearing for Judgment of Possession

# Attachment 1

1  MARK S. ADAMS, SBN 68300
   ADENA MOSESIAN KASHANI, SBN 336564
2  California Receivership Group
   3435 Ocean Park Blvd., Suite 107
3  Santa Monica, CA 90405
   Tel. (310) 471-8181
4  Fax (310) 471-8180
   madams@calreceivers.com
5  Court-Appointed Receiver

6

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

**OCT 3 1 2023**

BY_____
Deputy Clerk

7                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                              **COUNTY OF SONOMA**

9  COUNTY OF SONOMA,                        Case No. SCV-265714

10              Petitioner/Plaintiff,        (PROPOSED) **ORDER AFTER HEARING**
                                            **FOR: JUDGMENT OF POSSESSION AND**
11        v.                                 **CONTEMPT**

12  MICHAEL L. CASTAGNOLA, Trustee of the    Judge: Hon. Oscar A. Pardo
    MICHAEL L. CASTAGNOLA REVOCABLE         Dept.: 19
13  TRUST; MICHAEL L. CASTAGNOLA
    REVOCABLE TRUST,                         Hearing:
14                                           Date: October 26, 2023
                Respondents/Defendants.      Time: 3:30 p.m.

15

16

17

18        The Court, having reviewed and considered California Receivership Group's

19  ("Receiver") Sixth Report of Receiver ("Report"), and all other oral and documentary evidence

20  presented to the Court in connection with the hearing of the Report, and good cause appearing

21  therefore,

22        **NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

23        1.      The Report is approved, and the actions described therein are ratified and

24  approved.

25        2.      The Receiver's request for Writs of Possession for the real properties located at:

26              i.   12778 Dupont Road, Sebastopol, CA 95472 ("Property");

27              ii.  12778 Dupont Road, Unit A Sebastopol, CA 95472 ("Unit A");

28

                                    -1-                                    **101**
                        **(PROPOSED) ORDER AFTER HEARING**

1                iii.  12778 Dupont Road, Unit C Sebastopol, CA 95472 ("Unit C")

2                     (collectively "Properties").

3  **is granted.**

4        3.    The Writs of Possession shall be executed against:

5             i.  Michael Castagnola;

6            ii.  Carly-Suzanne Castagnola;

7           iii.  Dean Reichel; and

8           iv.  all tenants, subtenants, named claimants, and other occupants of the

9                Properties/premises.

10       4.    The Sonoma County clerk shall issue three separate Writs of Possession, for each

11  of the above-mentioned properties, to the Receiver in reliance on this Order.

12       5.    The Receiver may enlist the assistance of the Sonoma County Sheriff's

13  Department ("Sheriff's Department") to remove any persons who fail to vacate the Properties by

14  the deadline stated in the duly posted Notice to Vacate. The Sheriff's Department deputies are

15  authorized to employ all reasonably necessary measures to secure cooperation and compliance

16  with this Order, including, but not limited to, the use of forced entry onto/into the Properties and

17  arrest and removal of persons from the Properties for trespassing and/or violation of this Order.

18       6.    On the Order to Show Cause the Court finds:

19             i.  There are valid orders of the Court;

20            ii.  Michael Castagnola, Carly-Suzanne Castagnola, and Dean Reichel had

21                knowledge of the orders; and

22           iii.  Michael Castagnola, Carly-Suzanne Castagnola, and Dean Reichel have

23                violated the orders by failing to vacate Unit A and Unit C

24          iv. Pursuant to CCP §1213(a) the Court may impose a $500

25  IT IS SO ORDERED.    against each individual if they take any further action

26                       impeding execution of

27  DATED: 10/31/23            Writ of Possession

28                            Judge of the Superior Court

**(PROPOSED) ORDER AFTER HEARING**

# Attachment 2

**EJ-130**

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY:** STATE BAR NO. 68300<br>**NAME:** Mark S. Adams<br>**FIRM NAME:** California Receivership Group<br>**STREET ADDRESS:** 3435 Ocean Park Blvd., Suite 107<br>**CITY:** Santa Monica    **STATE:** CA    **ZIP CODE:** 90405<br>**TELEPHONE NO.** (310) 471-8181    **FAX NO.** (310) 471-8180<br>**EMAIL ADDRESS:** madams@calreceivers.com<br>**ATTORNEY FOR (name):** California Receivership Group, Court-Appointed Receiver<br>[X] ATTORNEY FOR   [X] ORIGINAL JUDGMENT CREDITOR   [X] ASSIGNEE OF RECORD | *FOR COURT USE ONLY* |

| |
|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SONOMA<br>STREET ADDRESS 3055 Cleveland Avenue<br>MAILING ADDRESS: 3055 Cleveland Avenue<br>CITY AND ZIP CODE: Santa Rosa, CA 95403<br>BRANCH NAME: Civil and Family Law Courthouse |

| | |
|---|---|
| **PLAINTIFF/PETITIONER:** County of Sonoma<br>**DEFENDANT/RESPONDENT:** Castagnola, et al. | **CASE NUMBER:**<br>SCV-265714 |

| | |
|---|---|
| **WRIT OF**<br>[ ] EXECUTION (Money Judgment)<br>[X] POSSESSION OF   [ ] Personal Property<br>[ ] SALE   [X] Real Property | [ ] **Limited Civil Case**<br>(including Small Claims)<br>[X] **Unlimited Civil Case**<br>(including Family and Probate) |

1. **To the Sheriff or Marshal of the County of:** Sonoma
   You are directed to enforce the judgment described below with daily interest and your costs as provided by law.
2. **To any registered process server:** You are authorized to serve this writ only in accordance with CCP 699.080 or CCP 715.040.
3. (Name): California Receivership Group, Court-Appointed Receiver
   is the [ ] original judgment creditor   [X] assignee of record   whose address is shown on this form above the court's name.

4. **Judgment debtor** *(name, type of legal entity if not a natural person, and last known address):*

   Michael Castagnola
   12778 Dupont Road
   Sebastopol, CA 95472

   [X] Additional judgment debtors on next page

5. **Judgment entered on** *(date):* October 31, 2023
   *(See type of judgment in item 22.)*

6. [ ] Judgment renewed on *(dates):*

7. **Notice of sale** under this writ:
   a. [X] has not been requested.
   b. [ ] has been requested *(see next page).*

8. [ ] Joint debtor information on next page.

9. [X] Writ of Possession/Writ of Sale information on next page.
10. [ ] This writ is issued on a sister-state judgment.
   ——— For items 11–17, see form MC-012 and form MC-013-INFO.
11. Total judgment *(as entered or renewed)*          $          0.00
12. Costs after judgment *(CCP 685.090)*              $          0.00
13. Subtotal *(add 11 and 12)*                        $          0.00
14. Credits to principal *(after credit to interest)* $
15. Principal remaining due *(subtract 14 from 13)*   $          0.00
16. Accrued interest remaining due per
    CCP 685.050(b) *(not on GC 6103.5 fees)*          $          0.00
17. Fee for issuance of writ *(per GC 70626(a)(l))*   $          0.00
18. Total amount due *(add 15, 16, and 17)*           $          0.00
19. Levying officer:
    a. Add daily interest from date of writ *(at
       the legal rate on 15) (not on
       GC 6103.5 fees)* . . . . . . . . . . . . . .   $          0.00
    b. Pay directly to court costs included in
       11 and 17 *(GC 6103.5, 68637;
       CCP 699.520(i))* . . . . . . . . . . . . . .   $          0.00
20. [ ] The amounts called for in items 11–19 are different for each
        debtor. These amounts are stated for each debtor on
        Attachment 20.

[SEAL]

Date: **SEP - 9 2024**    **ROBERT OLIVER**
Clerk, by _____ **TAYLOR CURTIS**, Deputy

**NOTICE TO PERSON SERVED: SEE PAGE 3 FOR IMPORTANT INFORMATION.**

Page 1 of 3

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>EJ-130 [Rev. September 1, 2020] | **WRIT OF EXECUTION** | Code of Civil Procedure, §§ 699.520, 712.010, 715.010<br>Government Code, § 6103.5<br>www.courts.ca.gov |

104

**EJ-130**

| | |
|---|---|
| Plaintiff/Petitioner: County of Sonoma<br>Defendant/Respondent: Castagnola, et al. | CASE NUMBER:<br>SCV-265714 |

21 [ x ]  Additional judgment debtor(s) *(name, type of legal entity if not a natural person, and last known address):*

Carly-Suzanne Castagnola
12778 Dupont Road, Unit A
Sebastopol, CA 95472

Dean Reichel
12778 Dupont Road, Unit C
Sebastopol, CA 95472

22.  The judgment is for *(check one):*

a. [    ]  wages owed.
b. [    ]  child support or spousal support.
c. [ x ]  other. Order After Hearing For: Judgment of Possession and Contempt (signed October 31, 2023)

23. [    ]  Notice of sale has been requested by *(name and address):*

24. [    ]  Joint debtor was declared bound by the judgment (CCP 989-994)

a.  *on (date):*
b.  name, type of legal entity if not a natural person, and
    last known address of joint debtor:

a.  *on (date):*
b.  name, type of legal entity if not a natural person, and
    last known address of joint debtor:

c. [    ]  Additional costs against certain joint debtors are itemized: [    ] below [    ] on Attachment 24c.

25. [ x ]  (Writ of Possession or Writ of Sale) **Judgment** was entered for the following:

a. [ x ]  Possession of real property: The complaint was filed on *(date):* December 17, 2019
           *(Check (1) or (2). Check (3) if applicable. Complete (4) if (2) or (3) have been checked.)*

(1) [ x ]  The *Prejudgment Claim of Right to Possession* was served in compliance with CCP 415.46. The
           judgment includes all tenants, subtenants, named claimants, and other occupants of the premises.

(2) [    ]  The *Prejudgment Claim of Right to Possession* was NOT served in compliance with CCP 415.46.

(3) [    ]  The unlawful detainer resulted from a foreclosure sale of a rental housing unit. (An occupant not named in the
           judgment may file a *Claim of Right to Possession* at any time up to and including the time the levying officer returns
           to effect eviction, regardless of whether a *Prejudgment Claim of Right to Possession* was served.) *(See CCP
           415.46 and 1174.3(a)(2).)*

(4)  If the unlawful detainer resulted from a foreclosure (item 25a(3)), or if the *Prejudgment Claim of Right to Possession* was
     not served in compliance with CCP 415.46 (item 25a(2)), answer the following:

     (a)  The daily rental value on the date the complaint was filed was  $0.00

     (b)  The court will hear objections to enforcement of the judgment under CCP 1174.3 on the following dates *(specify):*
          Not Applicable.

*Item 25 continued on next page*

**EJ-130**

| Plaintiff/Petitioner: County of Sonoma | CASE NUMBER: |
|---|---|
| Defendant/Respondent: Castagnola, et al. | SCV-265714 |

25. b. [ ]   Possession of personal property.

   [ ]   If delivery cannot be had, then for the value *(itemize in 25e)* specified in the judgment or supplemental order.

   c. [ ]   Sale of personal property.

   d. [ ]   Sale of real property.

   e.   The property is described   [ x ] below   [ ] on Attachment 25e.
   12778 Dupont Road
   Sebastopol, CA 95472

---

**NOTICE TO PERSON SERVED**

WRIT OF EXECUTION OR SALE. Your rights and duties are indicated on the accompanying *Notice of Levy* (form EJ-150).

WRIT OF POSSESSION OF PERSONAL PROPERTY. If the levying officer is not able to take custody of the property, the levying officer will demand that you turn over the property. If custody is not obtained following demand, the judgment may be enforced as a money judgment for the value of the property specified in the judgment or in a supplemental order.

WRIT OF POSSESSION OF REAL PROPERTY. If the premises are not vacated within five days after the date of service on the occupant or, if service is by posting, within five days after service on you, the levying officer will remove the occupants from the real property and place the judgment creditor in possession of the property. Except for a mobile home, personal property remaining on the premises will be sold or otherwise disposed of in accordance with CCP 1174 unless you or the owner of the property pays the judgment creditor the reasonable cost of storage and takes possession of the personal property not later than 15 days after the time the judgment creditor takes possession of the premises.

EXCEPTION IF RENTAL HOUSING UNIT WAS FORECLOSED. If the residential property that you are renting was sold in a foreclosure, you have additional time before you must vacate the premises. If you have a lease for a fixed term, such as for a year, you may remain in the property until the term is up. If you have a periodic lease or tenancy, such as from month-to-month, you may remain in the property for 90 days after receiving a notice to quit. A blank form *Claim of Right to Possession and Notice of Hearing* (form CP10) accompanies this writ. You may claim your right to remain on the property by filling it out and giving it to the sheriff or levying officer.

EXCEPTION IF YOU WERE NOT SERVED WITH A FORM CALLED PREJUDGMENT CLAIM OF RIGHT TO POSSESSION. If you were not named in the judgment for possession and you occupied the premises on the date on which the unlawful detainer case was filed, you may object to the enforcement of the judgment against you. You must complete the form *Claim of Right to Possession and Notice of Hearing* (form CP10) and give it to the sheriff or levying officer. A blank form accompanies this writ. You have this right whether or not the property you are renting was sold in a foreclosure.

---

**WRIT OF EXECUTION**

# Attachment 3

1    MARK S. ADAMS, SBN 68300
     ADENA MOSESIAN KASHANI, SBN 336564

2    California Receivership Group
     3435 Ocean Park Blvd., Suite 107

3    Santa Monica, CA 90405
     Tel. (310) 471-8181

4    Fax (310) 471-8180
     madams@calreceivers.com

5    Court-Appointed Receiver

ELECTRONICALLY FILED
Superior Court of California
County of Sonoma
2/29/2024 4:18 PM
Robert Oliver, Clerk of the Court
By: Angela Mendia, Deputy Clerk

6

7            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                    **COUNTY OF SONOMA**

9    COUNTY OF SONOMA,             Case No. SCV-265714

10            Petitioner/Plaintiff,        ***REVISED*** **(PROPOSED) ORDER AFTER**
                                   **HEARING FOR: JUDGMENT OF**

11         v.                         **POSSESSION**

12    MICHAEL L. CASTAGNOLA, Trustee of the
     MICHAEL L. CASTAGNOLA REVOCABLE

13    TRUST; MICHAEL L. CASTAGNOLA
     REVOCABLE TRUST,              Judge: Hon. Oscar A. Pardo
                                   Dept.: 19

14            Respondents/Defendants.
                                   <u>Hearing:</u>

15                                           Date: October 26, 2023
                                          Time: 3:30 p.m.

16

17         The Court, having reviewed and considered California Receivership Group's

18 ("Receiver") Sixth and Seventh Reports of Receiver (collectively, "Reports"), and all other oral

19 and documentary evidence presented to the Court in connection with the hearing of the Reports,

20 and good cause appearing therefore,

21         **NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

22         1.      The Reports are approved, and the actions described therein are ratified and

23 approved.

24         2.      The Receiver's request for Writs of Possession for the real properties located at:

25             i.     12778 Dupont Road, Sebastopol, CA 95472 ("Property");

26            ii.     12778 Dupont Road, Unit A Sebastopol, CA 95472 ("Unit A");

27           iii.     12778 Dupont Road, Unit C Sebastopol, CA 95472 ("Unit C")

28                 (collectively "Properties").

<div align="center">-1-</div>

1    **is granted.**

2         3.      The Writs of Possession shall be executed against:

3              i.   Michael Castagnola;

4              ii.  Carly-Suzanne Castagnola;

5              iii. Dean Reichel; and

6              iv.  all tenants, subtenants, named claimants, and other occupants of the

7                   Properties/premises.

8         4.      The Sonoma County clerk shall issue three separate Writs of Possession, for each

9    of the above-mentioned properties, to the Receiver in reliance on this Order.

10        5.      The Receiver may enlist the assistance of the Sonoma County Sheriff's

11   Department ("Sheriff's Department") to remove any persons who fail to vacate the Properties by

12   the deadline stated in the duly posted Notice to Vacate. The Sheriff's Department deputies are

13   authorized to employ all reasonably necessary measures to secure cooperation and compliance

14   with this Order, including, but not limited to, the use of forced entry onto/into the Properties and

15   arrest and removal of persons from the Properties for trespassing and/or violation of this Order.

16

17

18        IT IS SO ORDERED.

19

20   DATED: _2/29/2024_____

21                                              Judge of the Superior Court

22

23

24

25

26

27

28

-2-
***REVISED* (PROPOSED) ORDER AFTER HEARING FOR: JUDGMENT OF
POSSESSION AND CONTEMPT**

# ATTACHMENT H

1  Herman Franck, Esq. SBN 123476
   Elizabeth Betowski, Esq., SBN 245772
2  Franck & Associates
   1750 Prairie City Road, Ste. 130, #254
3  Folsom, CA 95630
   Tel: 916-256-6266
4  Email: franckhermanlaw88@yahoo.com
   Attorneys for Plaintiffs Michael Castagnola;
5  Michael Castagnola as Trustee of The Michael L. Castagnola
   Revocable Trust Agreement dated September 15, 2016;
6  and Carly Castagnola

7              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
8                 [San Francisco Division]

9  MICHAEL CASTAGNOLA; MICHAEL              Case No: 25-cv-03624-JD
10 CASTAGNOLA AS TRUSTEE OF THE MICHAEL L.
   CASTAGNOLA REVOCABLE TRUST              **VERIFIED**
11 AGREEMENT DATED SEPTEMBER 15, 2016;    **FIRST AMENDED COMPLAINT**
   CARLY CASTAGNOLA,
12                                          **FOR VIOLATION OF THE FEDERAL
                                            CIVIL RIGHTS ACT, FEDERAL
13 Plaintiffs,                             R.I.C.O. ACT; RELATED STATE LAW
                                            CLAIMS INCLUDING AN ACTION
14 v.                                       FOR REFORMATION OF DEED AND
                                            QUIET TITLE**
15

16 MARK ADAMS in his capacity as Receiver;
   ROBERT PITTMAN in his capacity as Sonoma County
17 Counsel;
   DIANA GOMEZ, in her capacity as Sonoma Deputy
18 County Counsel;
   MICHAEL KING, in his capacity as Sonoma Deputy
19 County Counsel
   COUNTY OF SONOMA;
20 TYRA HARRINGTON in her capacity as Manager of
   Code Enforcement Permit Sonoma;
21 SUSAN GORIN in her capacity as Supervisor;
   DAVID RABBITT in his capacity as Supervisor;
22 CHRIS COURSEY in his capacity as Supervisor;
   JAMES GORE in his capacity as Supervisor;
23 LYNDA HOPKINS in her capacity as Supervisor;
   JESSIE CABLK in his capacity as employee of Permit
24 Sonoma;

25

First Amended Complaint

1  CALIFORNIA RECEIVERSHIP GROUP INC. a
   California Corporation;
2  RECEIVERSHIP FINANCING, LLC, a California
   limited liability company;
3  DOES 1-10

4  Defendants.                    .

5

6

Plaintiffs Michael Castagnola; Michael Castagnola as Trustee of The Michael L. Castagnola

7  Revocable Trust Agreement dated September 15, 2016 and Carly Castagnola herewith submit

8  this **First Amended Complaint,** and allege and state as follows:

9

10                                    I.
                    **OVERVIEW AND LIST OF CLAIMS FOR RELIEF**
11

12

13  1.  Diana Gomez, Mark Adams and the Permit Department in particular, have engaged in a

        seven year long scheme to defraud and take the homes of senior citizens in Sonoma under
14
        the color of law. The pattern and practice of the Defendants activities of charging the
15
        senior citizens with health and safety violations (for running electricity to an
16
        outbuilding), bypassing the administrative courts and appointing Mark Adams as
17
        receiver. Once Adams is appointed, his billable fees quickly matriculate into the hundreds
18
        of thousands, inevitably causing the loss of the home to the senior citizen. This is playing
19
        out across Sonoma County right now with five other retirees fighting to save their homes
20
        from the predation of Pittman and Co., with the Plaintiff being the only defendant to take
21
        the County of Sonoma to federal court. James Q Quail, age 78; Paul Mendiboure, age 71;
22
        Nancy Davies, age 81; and the Plaintiff, Michael Castagnola age 73 make up eighty
23
        percent of Defendant Adams receiver case load in Sonoma. The aftermath of the Pittman,
24

25

First Amended Complaint

1     Adams and Harrington scheme left some victims in a senior home if they were fortunate

2     or homeless if they were not. See **Exhibit A**, List of exemplar Sonoma County cases.

3   2. This Verified First Amended Complaint contains the following sections setting forth

4     general allegations applicable to all or some of the claims for relief

5       a.  II. Parties

6       b.  III. Jurisdiction and Venue

7       c.  IV. Legal and Factual Basis for this Lawsuit

8       d.  V. Intentionally-Wrongful Conduct of Mark Adams, Court-Appointed Receiver

9          with the Assistance, Full Cooperation, Approval and Ratification by the County

10          of Sonoma and its Officials

11      e.  VI. Plaintiffs do not Dispute or Take Issue with the Stipulated Judgment

12      f.  VI.  Intentionally-Wrongful Conduct of the County of Sonoma and Individually-

13          Named County of Sonoma officials

14      g.  VII. Additional Injunctive Relief Claims re the Castagnola Residence

15      h.  VIII. Allegations Regarding Qualified Immunity

16      i.  IX. Allegations Discussing the Litigation Privilege

17      j.  X. Claims for Relief

18      k.  IX. Prayer for Relief

19

20  3. This Verified First Amended Complaint sets forth the following series of claims for

21     relief:

22      a.  First Claim for Relief: 42 USC Section 1983 14th Amendment Due Process;

23      b.  Second Claim for Relief: Monell Doctrine;

24      c.  Third Claim for Relief: The State Created Danger Doctrine;

25      d.  Fourth Claim for Relief: 14th Due Process Prosecution/Advisor;

First Amended Complaint

e.  Fifth Claim for Relief: Unjust Enrichment;

f.  Sixth Claim for Relief: Improper Appointment of Receiver;

g.  Seventh Claim for Relief: Intentional Infliction of Emotional Distress;

h.  Eighth Claim for Relief: Conversion 5th Amendment and Takings Clause;

i.  Ninth Claim for Relief: Breach of Fiduciary Duty;

j.  Tenth Claim for Relief: 14th Amendment due process illegal eviction;

k.  Eleventh Claim for Relief: Violation of Federal RICO Act;

l.  Twelfth Claim for Relief: Violation of State of California RICO Act;

m.  Thirteenth Claim for Relief: Reformation of Deed and Quiet Title Action;

n.  Fourteenth Claim for Relief: Fraudulent Conveyance;

o.  Fifteenth Claim for Relief: Violation for right to quiet enjoyment to residential premises and wrongful foreclosure and wrongful eviction;

p.  Sixteenth Claim for Relief: Willful Destruction of improvements on real property;

q.  Seventeenth Claim for Relief: for Elder Abuse Based on Fraud;

r.  Eighteenth Claim for Relief: Breach of the Fiduciary Duty.

## II.
## PARTIES

4.  Plaintiff Michael Castagnola, an individual, is a resident of Sonoma County, California.

5.  Plaintiff Michael Castagnola as Trustee of The Michael L. Castagnola Revocable Trust Agreement dated September 15, 2016 is named as a plaintiff in this action, as the subject real property located 12778 Dupont Road Sebastopol, CA 95472-8934 was owned by this plaintiff before Mark Adams foreclosed on the property. The Trust is a family trust created by Michael Castagnola, who remains the Trustee of the Trust.

First Amended Complaint

114

6. Plaintiff Carly Castagnola, an individual, is a resident of Sonoma County, California.

7. Defendant Mark Adams, is sued herein in his individual and personal capacity for actions taken under color of legal authority granted to him by the behavior and conduct of the Sonoma County defendants and the Sonoma County Counsel's office who found him as a receiver to be installed through a Court order on a motion filed through the County counsel's office. The specific County Counsel members that filed the motion included defendant Mr. Robert Pittman, Diana Gomez. County Counsel Michael King has been directly involved in status conferences, including up to and including August 14, 2025, as recently as August 14, 2025 stated in court at a status conference before the Sonoma County Superior Court Department 19, that he requested that the court permit Mark Adams to complete the tasks that Mark Adams wanted to do. This was after Plaintiffs had submitted to the Court the status conference statement and the supplemental status conference statements, Exhibits E and F hereto, informing the Court and County Counsel of Mark Adams's extremely checkered past,, and of the fact that Mark Adams had embezzled approximately $880,000 out of the property in a series of convoluted and fake loans that resulted in Mark Adams seizing control of the property, foreclosing on the property, and evicting Michael Castagnola and Carly Castagnola from the premises. as a result of the Honorable Judge Pardo's decision, is no longer protected under immunities of a Court employee. (See **Exhibit B**, Minute Order dated March 12, 2025 approving Carly Castognola's request to proceed with a lawsuit against Mark Adams).

8. Michael King was also directly involved in approving and ratifying the October 31 2023 Order After Hearing for Judgment of Possession and Contempt (**Exhibit G-1**), the February 29, 2024 Revised Order After Hearing for Judgment of Possession (**Exhibit G-2**), the opposing Castagnola's attempt to challenge the eviction related orders on January 24, 2024 (See January 24, 2024 Minute Order, Exhibit **G-3 hereto**).

9. There is a symbiotic relationship between the County of Sonoma in seeking to exact payments under its judgment to be paid the huge fines imposed by the County against the property and Mr. Castagnola and Mr. Castagnola's family trust, The Michael L. Castagnola Revocable Trust Agreement dated September 15, 2016 [the owner of the property ] and that Mark Adams actually carries out the desires and purposes of the county of Sonoma with regard to the Castagnola property. Further details of the behavior of Mark Adams and this symbiotic relationship are set forth in Section V of this complaint.

10. Defendant Robert Pittman, was a resident of Sonoma County during the events of action and is still an employee of Sonoma County, California. He acted under color of legal authority in connection with his position as a lawyer in the County of Sonoma's County Counsel's office. He is sued herein in his individual and personal capacity for conduct he personally did.

11. Defendant Diana Gomez, is a resident and an employee of Sonoma County. She acted under color of legal authority in connection with her position as a lawyer in the County of

First Amended Complaint

Sonoma's County Counsel's office. She is sued herein in her individual and personal capacity for conduct she personally did.

12. Defendant Michael King is a resident and an employee of Sonoma County. He acted under color of legal authority in connection with his position as a lawyer in the County of Sonoma's County Counsel's office. He is sued herein in his individual and personal capacity for conduct he personally did. He has been directly involved in status conferences, including up to and including August 14, 2025, as recently as August 14, 2025 stated in court at a status conference before the Sonoma County Superior Court Department 19, that he requested that the court permit Mark Adams to complete the tasks that Mark Adams wanted to do. This was after Plaintiffs had submitted to the Court the status conference statement and the supplemental status conference statements, Exhibits E and F hereto, informing the Court and County Counsel of Mark Adams's extremely checkered past,, and of the fact that Mark Adams had embezzled approximately $880,000 out of the property in a series of convoluted and fake loans that resulted in Mark Adams seizing control of the property, foreclosing on the property, and evicting Michael Castagnola and Carly Castagnola from the premises.

13. Michael King was also directly involved in approving and ratifying the October 31 2023 Order After Hearing for Judgment of Possession and Contempt (Exhibit G-1), the February 29, 2024 Revised Order After Hearing for Judgment of Possession (Exhibit G-2), and opposing Mr. Castagnola's attempt to challenge the eviction related orders on January 24, 2024 (See minute Order, Exhibit G-3).

First Amended Complaint

117

14. Defendant County of Sonoma is a general-law county within California.

15. Defendant Sonoma County Supervisors are elected officials of Sonoma County.

16. Defendant Tyra Harrington is sued in her capacity as Manager of County of Sonoma Code Enforcement. She acted under color of legal authority in connection with her position as Code Enforcement Manager with Sonoma County. She is sued herein in her individual and personal capacity for conduct she personally did.

17. Defendant Susan Gorin, was an elected official of the County of Sonoma. She acted under color of legal authority in connection with her position as a member of the Sonoma County Board of Supervisors. She is sued herein in her individual and personal capacity for conduct she personally did.

18. Defendant David Rabbit, is an elected official of the County of Sonoma. He acted under color of legal authority in connection with her position as a member of the Sonoma County Board of Supervisors. He is sued herein in his individual and personal capacity for conduct he personally did.

19. Defendant Chris Coursey, is an elected official of the County of Sonoma. He acted under color of legal authority in connection with her position as a member of the Sonoma County Board of Supervisors. He is sued herein in his individual and personal capacity for conduct he personally did.

First Amended Complaint

118

20. Defendant James Gore, is an elected official of the County of Sonoma. He acted under color of legal authority in connection with her position as a member of the Sonoma County Board of Supervisors. He is sued herein in his individual and personal capacity for conduct he personally did.

21. Defendant Lynda Hopkins, is an elected official of the County of Sonoma. She acted under color of legal authority in connection with her position as a member of the Sonoma County Board of Supervisors. She is sued herein in her individual and personal capacity for conduct she personally did.

22. Defendant Jessie Cablk is an employee of the County of Sonoma Permit Department. She acted under color of legal authority in connection with her position as Permit Sonoma. She is sued herein in her individual and personal capacity for conduct she personally did.

23. Defendant California Receivership Group Inc. is a California Corporation that is also the alter ego of Mark Adams, and was set up and established by Mark Adams in Mark Adams own office as a front entity to run loans through and to give loans the appearance of propriety when in fact they were completely illegitimate loans and done outside the scope of the limited authority given in the receivership order, a copy of which is attached as Exhibit H to this complaint, and provides at page 5, paragraph 4, the following limited legal authority to obtain loans:

"4. To borrow funds to pay for repairs and clean-up necessary to correct the conditions cited in the Stipulated Judgment entered on July 24, 2020, and any

First Amended Complaint

119

1      additional conditions the Receiver finds on the Property which violate the

2      County's code or State law or ,,..hich renders the property substandard. and secure

3      that debt with a super-priority lien on the Property."

4

5   24. Defendant Receivership Financing, LLC is a California limited liability company also an

6      alter ego of Mark Adams and as in the case of defendant California Receivership Group,

7      Inc, was set up as a prop and a front entity to make it appear that loans and loan related

8      activities were legitimate when in fact they were not at all legitimate.

9

10  25. At all times relevant to the facts of this case, Sonoma County and its officials, agents, and

11     employees have acted under color of state law. The actions that give rise to Plaintiffs'

12     claims are, unless otherwise indicated, taken pursuant to the policies, practices, and

13     customs of the County at the direction of, with the knowledge of, and through the actions

14     of its former and current policymakers, including its Board of Supervisors and its

15     Planning and Permit Building Department.

16

17  26. Does 1-10 is a person or persons, whose true identities are not known to Plaintiffs, but

18     are, according to Mark Adams, individual or individuals that are intending to purchase

19     the property. At a court appearance on August 14, 2025, Mark Adams reported that these

20     buyers were well aware of the whole entanglement of the County of Sonoma, the

21     judgment against Michael Castagnola, and the fact that Mark Adams has taken out all

22     these loans against the property, and with full knowledge of this entanglement, seek only

23     to absolve themselves from any liability for what the county has done against the

24     property. Does 1 , 2, 3, 4, 5, 6, 7, 8, 9, and 10 are named herein as being parties to the

25     Twenty-First Claim for Relief for Reformation and Quiet Title, and are in the categories

First Amended Complaint

of about-to-be necessary parties, as they are about to obtain title ownership to the Castagnola property. As soon as Plaintiffs learn of the names of Doe 1, Doe 2, Doe 3, Doe 4, Doe 5, Doe 6, Doe 7, Doe 8, Doe 9, and Doe 10, Plaintiffs will seek to amend the complaint to add their true names and identities.

## III.
## JURISDICTION AND VENUE

27. Venue is properly in this Court pursuant to 28 U.S.C 1391, in that all parties reside in the Judicial District and that matters at issue arose in the Judicial District.

28. This action arises under the laws of the United States, and therefore this Court has jurisdiction pursuant to 28 U.S.C §§1331 (federal question).

29. This action also arises under the following 42 U.S.C. §§ 1983 and Constitutional Amendments: 14th and 8th Amendments of the United States.

30. The Court has supplemental jurisdiction over the state law claims pursuant to 28 USC section 1367(a).

31. The Plaintiffs are informed and believe, and based upon such information and belief, alleges that each of the Defendants are responsible in some manner for the events and happenings referred to herein and was the legal cause of injury and damages to Plaintiff as herein alleged. Plaintiff is further informed and believes and based upon such information and belief alleges, that at all times herein mentioned each and every

First Amended Complaint

Defendant was the agent and / or employee of the co-defendants and each of them acting at all relevant times herein under color of authority olf a governmental entity under the statutes, ordinances, regulations, customs and usage of the State of California and /or the United States Constitution and related laws.

## IV.
### LEGAL AND FACTUAL BASIS FOR THIS LAWSUIT

32. The Plaintiff, while serving 39 years as a fireman and retiring as a Captain in the San Francisco Fire Department, purchased the property on Dupont Road in 1987.

33. On March 7th, 2017, the Sonoma Board of Supervisors and Sonoma County Counsel made a conscious decision to "clean up" Western Sonoma County by giving Permit Sonoma free reign to aggressively cite residents for permit violations. **(Exhibit C,** County of Sonoma Agenda Item Dated March 7, 2017; and March 8, 2017 ratification of it by the County Board of Supervisors)

34. The Supervisors added $300,000 to $450,000.00 to Permit Sonoma's budget over several years and added in 2017 Tyra Harrington at $8,200 a month as Manager of Code Enforcement at Permit Sonoma.

35. To assist Defendant Harrington in her new job, the Sonoma Board of Supervisors, in a unanimous vote, authorized Permit Sonoma and the County Counsel to bypass the administrative hearings for individuals who have been accused of code violations that concern health and safety. **(Exhibit C)**

First Amended Complaint

125. After Adams foreclosed on his own receivership, several things happened:

    a.   eliminated the mortgage of $400,000.00 owed to the Fire Fighters Community Credit Union;

    b.   The $100,000.00 debt owed to the County by the Plaintiff that was secured by a *lis pendens* was erased as well.

126. When Adams as his alter ego "the Lender" sold it to his covertly owned LLC, imaginatively named Receivership Financing LLC.

127. By selling the Plaintiff's property to his LLC where his identity is concealed behind the firewalls of paid agents, Adams would be able to sell the property on the market without having to disclose his identity or any of his co-conspirators with all the criminal/civil possible consequences that would accompany the release of such information.

## V.
**INTENTIONALLY WRONGFUL CONDUCT OF MARK ADAMS, COURT-APPOINTED RECEIVER WITH THE ASSISTANCE, FULL COOPERATION, APPROVAL AND RATIFICATION BY THE COUNTY OF SONOMA AND ITS OFFICIALS**

128. Defendant Mark Adams is sued herein in his individual and personal capacity for actions taken under color of legal authority granted to him by the behavior and conduct of the Sonoma County defendants and the Sonoma County Counsel's office who found him as a receiver to be installed through a Court order on a motion filed through the County counsel's office.

First Amended Complaint

123

1    129.    The specific County Counsel members that filed the motion included defendant

2    Mr. Pittman, Diana Gomez. County Counsel Michael King has been directly involved in

3    status conferences, including up to and including August 14, 2025, as recently as August

4    14, 2025 stated in court at a status conference before the Sonoma County Superior Court

5    Department 19, that he requested that the Court permit Mark Adams to complete the

6    tasks that Mark Adams wanted to do. This was after Plaintiffs had submitted to the Court

7    the status conference statement and the supplemental status conference statements,

8    Exhibits E and F hereto, informing the Court and County Counsel of Mark Adams's

9    extremely checkered past,, and of the fact that Mark Adams had embezzled

10    approximately $880,000 out of the property in a series of convoluted and fake loans that

11    resulted in Mark Adams seizing control of the property, foreclosing on the property, and

12    evicting Michael Castagnola and Carly Castagnola from the premises.

13

14    130.    Michael King was also directly involved in approving and ratifying the October

15    31 2023 Order After Hearing for Judgment of Possession and Contempt (Exhibit G-1),

16    the  February 29, 2024 Revised Order After Hearing for Judgment of Possession (Exhibit

17    G-2), the opposing Castagnola's attempt to challenge the eviction related orders on

18    January 24, 2024 (See January 24, 2024 Minute Order, Exhibit G-3

19

20    131.    There is a symbiotic relationship between the County of Sonoma in seeking to

21    exact payments under its judgment to be paid the huge fines imposed by the County

22    against the property and Mr. Castagnola and Mr. Castagnola's family trust, The Michael

23    L. Castagnola Revocable Trust Agreement dated September 15, 2016 [the owner of the

24    property] and that Mark Adams actually carries out the desires and purposes of the

25    county of Sonoma with regard to the Castagnola property.

First Amended Complaint

124

1

2    132.    Defendant California Receivership Group Inc. is a California corporation that is

3    also the alter ego of Mark Adams, and was set up and established by Mark Adams in

4    Mark Adams own office as a front entity to run loans through and to give loans the

5    appearance of propriety when in fact they were completely illegitimate loans and done

6    outside the scope of the limited authority given in the receivership order, a copy of which

7    is attached as **Exhibit H** to this complaint, and provides at page 5, paragraph 4, the

8    following limited legal authority to obtain loans:

9    "4. To borrow funds to pay for repairs and clean-up necessary to correct the conditions

10   cited in the Stipulated Judgment entered on July 24, 2020, and any additional conditions

11   the Receiver finds on the Property which violate the County's code or State law or .,..hich

12   renders the property substandard. and secure that debt with a super-priority lien on the

13   Property."

14

15   133.    Defendant Receivership Financing, LLC is a California limited liability company,

16   and is also an alter ego of Mark Adams and as in the case of defendant California

17   Receivership Group, Inc, was set up as a prop and a front entity to make it appear that

18   loans and loan related activities were legitimate when in fact they were not at all

19

20   134.    In a statement submitted to the Sonoma County Superior Court on August 7,

21   2025, page 2, lines 5-14, Mark Adams as receiver stated as follows:

22   "As originally briefed in the Ninth Report, the receivership lender completed its

23   foreclosure in August of 2024, and subsequently recorded its Trustee's Deed Upon Sale

24   in September of 2024. The Receiver understands that since completing its foreclosure, the

25   receivership lender has advanced funds to make the Property sale ready, and then listed

First Amended Complaint

1    the Property for sale. Given the history of this case, and in particular, the litigation tactics

2    employed by Defendant, the sale process has been more complicated than would

3    otherwise be expected. Even with those complications, the Receiver understands that the

4    receivership lender is now under contract to complete a sale, but the prospective buyers

5    are not willing to close escrow without an order from this Court assuring them that

6    neither they, nor the receivership property will be subject to any liability stemming from

7    this receivership."

8

9    135.    In a title report from Lawyers Title Co dated December 3, 2024, excerpts of

10    which are attached as **Exhibit I** hereto, at pages 3-4 the following entry is listed from a

11    transaction recordation dated September 10, 2024:

12    Recording Date: September 10,2 204

13    Document type: Deed

14    Document description: Deed of Trust

15    Sale Price/Loan Amount: $565,181

16    Document number: 2024041588

17    Buyer/Borrower: Receivership Financing LLC

18    Seller: California Receivership Group, LLC

19

20    136.    The forgoing shows that record title to the residence formerly owned by Mr.

21    Castagnola and his family trust is now vested with Receivership Financing, LLC

22

23    137.    The legal description of the real property located at 12778 Dupont Road

24    Sebastopol, CA 95472-8934 is: APN 074-020-015-000; it is contained in Exhibit Y

25    hereto, the September 10, 2024 Trustee's Deed Upon Sale, page 1-2.

First Amended Complaint

138.    Attached as **Exhibit E** hereto is a copy of a status conference statement, which plaintiff Michael Castagnola filed in connection with Sonoma County Superior Court proceedings involving Mark Adams, the receiver [County of Sonoma v. Castagnola, Case No. Sonoma v. Castagnola, Sonoma Case No. SCV-265714], dealing with issues about the real property premises located at 12778 Dupont Road Sebastopol, CA 95472-8934.

139.    The statements and allegations and attachments A-F to that status conference statement are incorporated herein, and show that Mark Adams committed a number of wrongdoings offenses, mainly in the form of embezzlement and wrongful foreclosures wrongful evictions of Michael Castagnola and wrongfully evictions of his daughter, Carly Castagnola, who occupied a yurt on their premises

140.    Section one of the Status Conference Statement describes the following series of press articles that show that Mark Adams has an extremely checkered past, which also describes specific victims, including victims in activities in Los Angeles County, Fresno County, Berkeley, Sonoma, and elsewhere. These further victims are cited as also supporting the RICO claims asserted herein, which require two or more predicate act events involving two or more victims within the past 10 years. The press articles include the following summaries as set forth in section one of the status conference statement as follows [See Exhibit E hereto, pages 2-8]:

1.    "May 17, 2023 article entitled "Evictions, homelessness, debt: Skid Row Housing Trust receiver has checkered history" by Liam Dillon and Doug Smith from the *Los Angeles Times*, a review of Mark Adams' work in several locations, including Fresno County and Los Angeles County. The article states in part at page 4:

First Amended Complaint

"A Times review of court records and dozens of interviews with parties involved in Adams' past receiverships, however, raise concerns about his ability to manage the trust's beleaguered portfolio and care for the vulnerable tenants now under his control.

In two cases comparable in size and scope to the trust matter, Adams left years before they were resolved and, in court filings, omitted key facts about his involvement in them. In other cases involving Adams, tenants faced the risk of eviction and property owners lost their houses while his fees have risen as high as $465 an hour.

In multiple instances, judges and local governments have determined that Adams has padded staffing, increased his staff's rates without informing the judge and engaged in duplicative billing -inflating his fees by six-figure amounts. A judge in one case likened Adams' billing to a "feeding frenzy."

The Article also states at page 11:

"Because all of its administrative and legal services billings are 'in house' it gets to effectively bill itself for its legal and administrative expenditures and it gets to set the billing rates for all of its employees. What could go wrong with that?" wrote Robert F. Moody, a judge presiding over an Adams receivership in Mariposa County, in a 2022 ruling.

Moody found "accounting and billing irregularities" by Adams in the case, which stretched for 13 years, though the judge did not determine specific violations.

First Amended Complaint

Ultimately, Moody reduced Adams' fees and costs by more than $300,000, according to court filings and attorneys for Mariposa County.

That ruling came after attorneys for the county, which had requested the receivership, objected to Adams' accounting. In recent years, lawyers representing the cities of Duarte and Palmdale and L.A. County - in Jacobs' case - have done the same.

The cases share common issues: Adams assigns a dozen or more employees work on a case, bills for multiple employees on the same task (including weekly internal meetings) and raises staffers' rates without notifying the judge.

The judge in the Palmdale case rejected the city's argument and approved Adams' billings. But in the Duarte case, which involved a 28-unit apartment complex, Adams' fees were reduced by over $100,000."

2.  June 12, 2023 article entitled "One Of Skid Row's Largest Housing Providers Veered Toward Financial Collapse. New Issues Are Surfacing After A City-Led Takeover" by Nick Gerda for the *LAist*, regarding Mark Adams' work in L.A. County, which was astonishing to the city attorney's office who hired him and put them in a position of total embarrassment over what they did to the homeless people. The article states in part at page 2-3:

"An LAist review of online records late last week found that a company Adams previously used for receivership work - California Receivership Group, LLC - has been banned by the state from doing business since 2015, because he hadn't paid business taxes that totaled about $3,380.

1
2
3
4

A few months after the state suspended his business, records show Adams formed a new business with the same name that ends in "Inc." instead of "LLC." That's his current company, which was appointed as the Skid Row Housing Trust receiver along with Adams.

5
6
7
8
9
10

In addition, LAist reviewed court documents that show just weeks before L.A. City Attorney Hydee Feldstein Soto recommended Adams for the Skid Row job in late March, an Orange County judge reduced Adams' fees by $500,000 after finding he had overbilled for a receivership in Dana Point by an average of 39%. The L.A. Times has reported on other past rulings where judges found Adams overcharged.

11
12
13
14
15

"If judges find that he overbills, then why is this somebody that we're picking?" said Jessica Levinson, a former president of the Los Angeles City Ethics Commission who teaches at Loyola Law School, after reviewing LAist's findings."

16

The article also states at page 4:

17
18
19
20

"Adams also discussed the unpaid taxes in a 2017 deposition about a receivership he handled in Santa Barbara. He said: "It wasn't something I was very focused on, and by the time I was focused on it, we had formed the [newer] corporation so it didn't matter to me."

21
22
23

Adams noted that his current business is in good standing with the state. He said he let the first business get suspended because he was already operating under the newer business.

24
25

First Amended Complaint

1    "We did not get suspended and then I formed a new company. That's just not the

2    case," he said.

3    But the state records do show Adams created the new business in July 2015, five

4    months after the earlier business was suspended in February of that year."

5    See also, page 7:

6    "The L.A. Times and LAist have since identified public court rulings showing

7    multiple judges had previously found problems with Adams' handling of past

8    receiverships, including inflating his fees by hundreds of thousands of dollars.

9    Adams says the decisions against him are from a small handful of cases out of the

10   roughly 300 court-appointed receiverships he's handled. And he says in those

11   handful of cases, billings were approved by judges before another judge came in

12   and decided the charges were inappropriate.

13   "That case went through four or five different judges," he told LAist, about the

14   March ruling in Orange County where a judge drastically reduced his billing.

15   "And when it was active, the judges who I was working for approved everything

16   that we did. They know all of our billings, there was no dinging of it. But then it

17   went to a judge who had not been involved in the case ... and he found what he

18   found."

19

20

21   3.  June 15, 2023 article entitled "Judge Removes 7 Buildings From Troubled

22       Skid Row Housing Receiver's Portfolio" by David Wagner for the *LAist*, Another

23       article from L.A. Times about the homeless problem down in L.A. Mark Adams

24

25

literally steals money from budgets given to homeless people. It doesn't get any lower

than that. The article states in part at pages 2-3:

"A Los Angeles County Superior Court judge approved a deal Thursday to

remove seven buildings from a troubled receivership tasked with stabilizing 29

buildings formerly managed by the Skid Row Housing Trust.

In a Thursday afternoon court hearing in Downtown L.A., Judge Mitchell

Beckloff at times grew frustrated with the responses from court-appointed

receiver Mark Adams, who has faced questions about his suitability to rehabilitate

these sensitive properties. "I don't know how much problem-solving is going on,"

Beckloff told Adams."


The article also states at page 4:

"An investigation by the city attorney's office City Attorney Hydeee Feldstein

Soto previously told the Los Angeles Times that her staff is investigating Adams'

performance. When LAist asked for an update on that investigation  Thursday, her

office declined to comment. In recent weeks, LAist and the Times identified

public court rulings showing multiple judges have found problems with Adams'

handling of past receiverships.

LAist reporting earlier this week also revealed that a prior company Adams used

for previous receivership business was banned by the state of California over

unpaid taxes. Adams told us he'd look into it and said his current company is in

good standing.."

4. July 17, 2025 article entitled "Sonoma County family loses their home after yearslong battle over permits, court appointed cleanup company", by Marisa Endicott and Phil Barber for the *Sonoma Press Democrat*, in which they investigated Mark Adams, and specifically concerning the case of Michael Castagnola and Carly Castagnola, and also did some research into similar shenanigans by Mark Adams over in Berkeley, California. The article states in part at page 3:

"The family's initial set of battles was with inspectors for Permit Sonoma, the county's planning and code enforcement division. They began to catalog the alleged violations at the site in 2017.

The Castagnolas, like other residents who have dug in their heels after running afoul of the department, describe Permit Sonoma as unyielding.

The accusations are not new. The agency has long faced criticism over its enforcement practices, and it was recently sued by the ACLU Foundation of Northern California over alleged unconstitutional use of drone surveillance — to document land-use violations that have, in some cases, led to rapidly escalating penalties for affected residents."

The article also states at page 11:

"In 2023, the Los Angeles Times published a series of stories about Adams and California Receivership Group, detailing allegations of overcharging and underperformance. At the time, Adams and the city of Los Angeles were wrangling over accountability for a real estate rehab project that had ballooned far over budget.

First Amended Complaint

133

1    California Receivership Group claimed it was owed $1.7 million in unpaid bills

2    on the project, which served 1,500 low-income tenants of the Skid Row Housing

3    Trust.

4    The LA Times uncovered additional conflicts involving Adams' company.

5    In the Coachella Valley, they wrote, Adams was appointed receiver for a

6    community of 4,000 people, primarily migrant farmworkers; he accumulated

7    $220,000 in debt before a judge removed him from the case.

8    Two years after Adams assumed control of the Trails End Mobile Home Park in

9    Fresno, a third of the lots were vacant and the remaining tenants faced eviction. In

10   East Los Angeles, he took over a dilapidated triplex, sold it and tried to bill the

11   estate $530,000 before a judge pointedly cut the amount by more than half, the

12   LA Times reported."

13

14

15   141.    The result of Mr. Adams' conduct was that the trust that plaintiff Michael

16        Castagnola had placed ownership of the property and known as The Michael L.

17        Castagnola Revocable Trust Agreement dated September 15, 2016 lost title, which

18        instead went over to Mark Adams and/or his LLC entity, California Receivership Group,

19        LLC.

20

21   142.    During October 31, 2023, Mark Adams further committed wire fraud and

22        obstruction of justice by submitting to the Sonoma County Superior Court, on October

23        31, 2023, Order After Hearing for Judgment of Possession and Contempt, which led to

24        the issuance of a September 9, 2024, Writ of Possession issued by the Sonoma County

25        Superior Court Clerk. The judgment was further modified on February 29, 2024 in a

First Amended Complaint

1    document called Revised Order After Hearing for Judgment of Possession. These three

2    items are attached to the complaint as Exhibits G-1, G-2, and G-3 ,and constitute wire

3    fraud and obstruction of justice in that Mark Adams' contention that he had a right to

4    evict Mark Castagnola and Carly Castagnola was based on a pack of lies embedded in the

5    series of accounting reports leading to Mark Adams taking out, in a manner that

6    constitutes embezzlement, loans totaling $880,000 and then declaring those loans in

7    default and using that default to obtain a September 10, 2024 foreclosure on the property

8    in the form of a trustee foreclosure attached as Exhibit Y hereto.

9

10    143.    Before obtaining that deed, he falsely advised the court in his written submissions

11    given via the court's e-file system and thus constituting wire fraud and in a false manner

12    thus further constituting obstruction of justice that he declared the property his and or

13    under his control and that he thereby had a right to evict the true owner, Michael

14    Castagnola's family trust, from the property. In doing so, he quite literally stole the

15    property and the house from these residents. Plaintiffs note that this is his pattern and

16    practice in the articles that are attached to the status conference statement as Exhibit E

17    hereto  and identified as attachment A and described above

18

19    144.    Plaintiffs also point out the following statement of offenses committed by Mark

20    Adams in Section 2 of the Status Conference Statement, which includes a recitation

21    regarding Attachment B to the Status Conference Statement, showing an add-up and a

22    chronology of events leading to Mark Adams obtaining loans against the Castagnola

23    property, totaling over $880,000.  See **Exhibit W** hereto, List of Short Summaries of

24    Series of Monthly Expense Reports E-Filed by Mark Adams to the Sonoma County

25    Superior Court Seeking Approval for Payment to Mark Adams of the Listed Amounts.

First Amended Complaint

See also **Exhibit X**: List of Other Orders Requested by Mark Adams via E-File Submission to the Sonoma County Superior Court

145.    These loans constitute embezzlement, as they came from placing Mark Adams in a position of trust as a court-appointed receiver, which Mark Adams clearly abused and took monies and loans well beyond the ambit of the receivership order, Exhibit H hereto, page 5, paragraph 4 quoted above, which allows him to take loans to do abatements to the property. The only conduct he did with the property was to demolish the yurts and the utility shed and to destroy the septic system.

146.    As stated below, non-party Keni Meyer was a witness to circumstances where Mr. Hogan, a noted septic expert hired by Code Enforcement of the County of Sonoma to inspect the septic, had opined that the septic system was fine. Also, Keni Meyer is an eyewitness and earwitness to remarks made by Code Enforcement officials that the other improvements on the property, including the yurts and the utility shed, were actually built in compliance with the building code. The only problem was that there was no building permit taken to do that construction, a fact that could easily have been solved by obtaining an as-built building permit or building permit after the fact.

147.    Rather than allowing that type of remedy, Mark Adams, knowing full well that there was actually nothing wrong with the buildings themselves, other than not having a building permit, decided to demolish them all. The demolition of these buildings would have cost in the neighborhood of $50,000 or so, not $880,000. Mark Adams has worked quick to obtain all these giant loans and then to sell the property to a new buyer.

First Amended Complaint

148.    Plaintiffs do not know the name or identity of the new buyer and have named
them in this complaint as Doe 1.

149.    Mark Adams never applied for a building permit after the fact. This was
fundamentally what was needed to legalize the property, and Mark Adams just never
even tried to do it.

150.    Plaintiffs had tried to legalize the property themselves. They hired a professional
by the name of Jim Huntington.  Plaintiffs are not sure what kind of professional he is.
He might be either a contractor or an engineer, but he definitely works as a kind of liaison
between homeowners who are applying for a permit with Sonoma County. He spoke with
Jim today, and Jim told him clearly that Sonoma County does have a program to apply
for a permit after the fact.

151.    In other words, after you've already built the place. They do have a procedure for
it, but it may not be a procedure defined in any kind of actual ordinance or other
description, for example, on the county's website. It's more of what you might call a
practice that you are allowed to go down there and do that.

152.    Jim Huntington was the person they hired to prepare drawings and application
forms to obtain a building permit after the fact on all the structures cited in the judgment.
Basically, this was what was needed to legalize the property. Jim Huntington will testify
that he prepared all those in a very professional manner.

First Amended Complaint

153.    He went and submitted them and that the county refused to grant the permits. They have paperwork on this, including the actual permit application submitted and the letters from Code Enforcement or Permit Sonoma, giving them a runaround and declining to issue the requested building permit. They basically did everything they could do to get those permits by hiring a professional to assist them.

154.    That professional, Jim Huntington, is extremely experienced in submitting building permits to Sonoma County, totally knows what he's doing, prepared the drawings, the application forms, did everything he's supposed to do, submitted them all, then got an endless runaround, the result of which a permit was never granted

155.    There were certain events that happened that day, but mainly the sheriff came out with eviction papers and ordered them to leave, and they left. They were given some kind of 15-day window in which to do it. It was kind of like a similar notice letter that Keni Meyer obtained, but basically on the date certain, they had to go and they left.

156.    So their eviction was done by the sheriff himself on January 8, 2025. It was after that date that the process of bulldozing everything happened. The way Carly put it is the sheriff came and the bulldozers were right behind the sheriff

157.    Mike Castagnola's date of eviction was January 8, 2025. The sheriff came with the paperwork to vacate. they gave him a 15-day period

158.    The date for eviction as to Carly Castagnola was January 8, 2025 as well.

First Amended Complaint

159.    Mark Adams never attempted to obtain a building permit, which had he done so would have solved the abatement violations. Instead he did nothing visible for about a year, They did put a surveillance camera outside on the driveway. Then Mark Adams proceeded to bull doze the other structures but not Carly's yurt during July 24, 2023. He bulldozed Carly's yurt during January 8, 2025 right after the sheriff ordered them to leave.

160.    On January 24, 2023 there was an initial series of demolitions done by Mark Adams to the following buildings: a yurt occupied by an elder not a party to this lawsuit. Mark Adams also demolished a bathroom laundry connected to the yurt that was destroyed; one utilities shed that was connected to the yurt occupied by Carly; she continued to live there by connecting extension cords to the garage on the premises.

161.    This is what Mark Adams does. He takes property from residents that doesn't belong to him. He jacks up a bunch of gigantic loans that are fake, false, and fraudulent and then uses those loans and a default on those loans as a predicate to then evict the true owners of the home from the premises.

162.    This is exactly what he did to Mike Castagnola and the tenant, Mike's daughter, co-plaintiff Carly Castagnola.

163.    In so doing this wrongful eviction, Mark Adams disregarded and disobeyed Para. 11 of the May 25, 2022 Order Appointment his as receiver (Exhibit H hereto, page 7), which provides:

First Amended Complaint

1     "To temporarily or permanently relocate the Property's occupants (if any). The receiver

2     shall pay relocation expenses as provided in Sec. 7262 in the Government Code. To this

3     end, the Receiver may institute ancillary actions for unlawful detainer relating to the

4     Property and IO may employ the services of an attorney to represent him in connection

5     with any such unlawful detainer proceeding."

6

7     164.    One particular example of how wrongful it was for Mark Adams to demolish the

8     structures on the property is the example of the seed barn on the premises. Plaintiff Mike

9     Castagnola had hired a permit consultant/expert by the name of Jim Huntington.

10

11    165.    Jim Huntington is a California licensed general contractor with decades of general

12    contractor experience and about seven or eight years of experience as a permit consultant.

13    In his capacity as a permit consultant, he prepares the various paperwork required to

14    submit a proper, well-documented permit application and helps guide people like Michael

15    Castagnola through the permit process. In this case, he actually was able to submit a

16    permit application for the seed barn.

17

18    166.    A photo of the seed barn is attached as Exhibit L-4 to this complaint. The seed

19    barn is a structurally-sound barn which had one basic problem. It was built without a

20    permit. This was something recognized by Plaintiff in the judgment he signed up to and

21    was undisputed. Plaintiff clearly understood his task to legalize that seed barn by

22    applying for a building permit. Mr. Huntington did do the paperwork to submit a building

23    permit application and the county did actually issue a building permit for the seed barn.

24

25

First Amended Complaint

167.     One of the requirements of that permit was that Plaintiff was required to lift the barn off of a system of concrete piers that had been working as the foundation of the barn and to lay in a concrete foundation. This condition of the permit was the County's way of requiring a solid concrete foundation to the barn. Plaintiff was ready and willing to comply with that condition, and had found suitable contractors to go through the process of lifting up the barn and laying in a concrete foundation.

168.     Unfortunately, when Plaintiff sought to fund the laying of this foundation with a loan against his property, he was blocked from doing so because the county had placed a *lis pendens* on the property, a copy of which is attached as Exhibit D to this complaint. By placing that *lis pendens* on the property, the County knew that it would block any funding that Plaintiff would obviously need in order to bring about the construction activities required from the building permits. Plaintiff was unable to obtain funding even though he had somewhere in the range of $1 million of equity in the property.

169.     By placing the *lis pendens* on the property, the County engaged in behavior that was contradictory and inconsistent with the terms of the judgment entered into between plaintiff Michael Castagnola and the County. On the one hand, the County wanted Plaintiff to legalize the properties, but on the other hand, by placing a *lis pendens* on the property, they made it impossible for him to do so because the lis pendens blocked funding needed to bring about the repairs. This process occurred during the period of time before Mark Adams came on board as a receiver.

170.     However, once Mark Adams came on board, during the course of his investigations into the property, he became aware that a permit had been issued. We point

First Amended Complaint

1    out the Seed Barn example of a case where Mark Adams had no business in demolishing

2    that building. It's an example of how basically all the structures on the premises could

3    have been legalized had Mark Adams efforts been pointed toward legalization instead of

4    simply demolishing them.

5    171.    Mark Adams borrowed something like $880,000 on the property, at least if we are

6    to believe the amounts that Mark Adams has told the Court about. There is a huge

7    question as to why Mark Adams did not simply use some of that funding to install the

8    foundation to the Seed Barn, in which case it would not have needed to be demolished.

9    The County approved the demolishing of the Seed Barn, notwithstanding the fact that it

10   had issued a permit for the Seed Barn.

11

12   172.    This conduct by the County is contradictory to the Judgment entered into between

13   the parties [**Exhibit K** hereto] and constitutes a further example of how the County's

14   behavior in this matter and standing by Mark Adams to permit the demolishing of the

15   Seed Barn was and constituted a violation of plaintiff's rights protected under the 14th

16   Amendment Substantive Due Process Clause.

17

18   173.    In addition, Defendant supplies as Exhibit BB to this complaint, a further memo

19   prepared by Mark Castagnola's daughter, Carly Castagnola, in which she notes a series of

20   further improprieties with respect to the process in which Mark Adams borrowed more

21   than $880,000 to supposedly legalize the property, and actually didn't legalize anything.

22   All he did was demolish everything, foreclose on it, evict the defendant Michael

23   Casstagnola and his daughter, Carly Castagnola, and then go and sell the place.

24

25

174.     Carly Casgtagnolas's report, Exhibit BB, attaches a series of supporting

documents identified as sub-exhibits A-S. One of the exhibits attached the report, is

Exhibit N: Summaries of Series of Monthly Expense Reports E-Filed by Mark Adams to

Sonoma County Superior Court Seeking Approval for Payment to Mark Adams of the

Listed Amounts. That report tracks Mark Adams's expense reports filed with the Sonoma

County Superior Court, which are summarized as follows:

"-The $880,196.00 includes all of the Recorded Receivership Certificates,

-The NOD $532,695.73 recorded 3/27/2024, signed Adams, HUD-exempt lie)

-The $347,501 Unpaid Fees/Advances (May 2025)

Grand Total Liability is $880,196 ($532k NOD + $347k fees)".

## VI.
## PLAINTIFFS DO NOT DISPUTE OR TAKE ISSUE WITH THE STIPULATED JUDGMENT

175.     The following facts are stated in light of the *Rooker-Feldman* Doctrine, which

"prevents the lower federal courts from exercising jurisdiction over cases brought by

'state-court losers' challenging 'state-court judgments" rendered before the district court

proceedings commenced" [*Lance v. Dennis*, 546 U.S. 459, 460, 126 S. Ct. 1198, 1199

(2006) (per curiam) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S.

280, 284, 125 S. Ct. 1517 (2005)).]

176.     The point of departure of the claimed wrongdoings of the County of Sonoma and

its various officials from code enforcement [Defendant Tyra Harrington] County Counsel

[Defendants Robert Pittman, Diana Gomez, and Michael King], Permit Sonoma [Jessie

First Amended Complaint

147<u>3</u>

174.    Carly Casgtagnolas's report, Exhibit BB, attaches a series of supporting

documents identified as sub-exhibits A-S. One of the exhibits attached the report, is

Exhibit N: Summaries of Series of Monthly Expense Reports E-Filed by Mark Adams to

Sonoma County Superior Court Seeking Approval for Payment to Mark Adams of the

Listed Amounts. That report tracks Mark Adams's expense reports filed with the Sonoma

County Superior Court, which are summarized as follows:

"-The $880,196.00 includes all of the Recorded Receivership Certificates,

-The NOD $532,695.73 recorded 3/27/2024, signed Adams, HUD-exempt lie)

-The $347,501 Unpaid Fees/Advances (May 2025)

Grand Total Liability is $880,196 ($532k NOD + $347k fees)".

## VI.
### PLAINTIFFS DO NOT DISPUTE OR TAKE ISSUE WITH THE STIPULATED JUDGMENT

175.    The following facts are stated in light of the *Rooker-Feldman* Doctrine, which

"prevents the lower federal courts from exercising jurisdiction over cases brought by

'state-court losers' challenging 'state-court judgments" rendered before the district court

proceedings commenced" [*Lance v. Dennis*, 546 U.S. 459, 460, 126 S. Ct. 1198, 1199

(2006) (per curiam) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S.

280, 284, 125 S. Ct. 1517 (2005)).]

176.    The point of departure of the claimed wrongdoings of the County of Sonoma and

its various officials from code enforcement [Defendant Tyra Harrington] County Counsel

[Defendants Robert Pittman, Diana Gomez, and Michael King], Permit Sonoma [Jessie

First Amended Complaint

144

Cablk, Lynda Hopkins], Board of Supervisors [Susan Gorin, David Rabbit, Chris

Coursey, and James Gore] is the stipulation and judgment that was entered into between

Michael Castagnola and the County on July 24, 2020, a copy of which is attached as

**Exhibit K** hereto.

177.    We point out to the Court published case law showing that the litigation privilege

does not apply to RICO obstruction of justice claims. See *United States v. Pendergraft,*

297 F.3d 1198 (11th Cir. 2002) [criminal action for mail fraud, 18 USC section 1623;

filing false affidavits in court held to be predicate mail fraud under RICO]. See also

similar analysis for federal civil rights Clain: *Kimes v. Stone,* 84 F.3d 1121 (9th Cir. 1996)

[reaffirming California's litigation privilege does not immunize parties from federal

section 1983 liability].

178.    The following clarifications will be made in this section of the complaint to make

it clear to the defendants and to the Court that by bringing this lawsuit, the Plaintiffs are

not attempting any form of a *de facto* appeal or collateral attack on the stipulation for a

judgment and the judgment itself. That judgment was reached pursuant to a bargain and

compromise process between the parties.

179.    There is a factual basis for the judgment in that Mr. Castagnola acknowledges the

basic series of violations that are specified at page two of the judgment, a listing of 10

items on his property that he constructed without obtaining a building permit. He agreed

to those violations. He agreed to make it right as is specified in the Judgment [**Exhibit

K**], page 3, paragraph 2.A.1:

"DEFENDANTS shall legalize the Barn by submitting to the County a complete

permit application to abate the building code violation, including any required
building, electrical, septic, or other required applications and all supporting
documents and plans no later than August 21, 2020 and obtaining final inspection
within 120 days of the issuance of the building permit."

180.    He agreed to pay the County abatement expenses of $89,999.00, Judgment
[Exhibit K], page 7, paragraph 3.

181.    He basically agreed to fess up to his own wrongdoing and building a group of
structures on the property that needed to be permitted and weren't permitted.

182.    The structures include the following items:

1. Unpermitted Greenhouse 35 x 50 with electrical and mechanical (VBU17-0224)

2. Unpermitted Greenhouse (PVC) (VBUI 7-0225);

3. Unpermitted Cargo Container #1 (VBUI 7-0226);

4. Unpermitted Cargo Container #2 (VBUI 7-0227);

5. Unpermitted Cargo Container removed without permit (VBUI 7-0230);

6. Unpermitted Yurt with electrical, plumbing and mechanical (VBUI 7-0232);

7. Unpermitted Yurt with electrical, plumbing and mechanical (VBUI 7-0233);

8. Unremitted Habitable Structure (Barn) with electrical, plumbing and mechanical
   (VBUI 7-0234);

9. Unpermitted Habitable Structure with electrical, plumbing and mechanical (VBUI 7-
   0235).

First Amended Complaint

183.     By entering into the stipulation for judgment, Mr. Castagnola acknowledged that these structures were built without a permit. He acknowledged that it was his obligation under the law to obtain a permit, and his further obligation to pay the County, it's purported abatement expenses, which were compromised in what is most certainly accurately described as an accord and satisfaction of a disputed amount that ended up becoming $89,999.00. See Judgment, Exhibit K, page 7, paragraph 3:

"3. Within thirty (45) days of the filing of the Stipulation for Entry of Judgment, DEFENDANTS shall pay the County of Sonoma $89,999.00 in total for the amount of the costs, attorneys' fees and penalties as set forth above. Payment shall be payable to the COUNTY OF SONOMA and delivered by mail or in person to the following address:

County of Sonoma

County Counsel

575 Administration Drive, Rm 105A,

Santa Rosa, CA 95403"

184.     This Judgment, Exhibit K, is Plaintiffs' point of departure. The complaint does not challenge that judgment, does not attempt to invalidate it or have it set aside, does not attempt any nature of a collateral attack of it or a de facto appeal. Instead, this complaint focuses on events that occurred AFTER the judgment.

185.     Those events are described in the Section IV above called "Legal and Factual Basis for this Lawsuit,"; Section V: and are laid out in considerable detail in that section.

186.    The purpose of this current section is to make this clarification that the events

complained of occurred after and can be categorized most certainly as a pattern and

practice for purposes of the *Monell* claim [Third Claim for Relief herein] and for

purposes of the federal RICO and state RICO claims asserted in the Nineteenth and

Twentieth Claims for Relief below.

## VII.
## INTENTIONALLY WRONGFUL CONDUCT OF THE COUNTY OF SONOMA AND INDIVIDUALLY-NAMED COUNTY OF SONOMA OFFICIALS

187.    The pattern and practice of the County includes its own wrongdoing committed

against the plaintiffs in this matter after the judgment was entered to stop Mr. Castagnola

from doing what he agreed to do in the judgment.

188.    He agreed to legalize the properties. See judgment page 3, paragraph 2.A.1,

Exhibit K, quoted above. He attempted to do so as is detailed above in paragraphs 150-

154, and 164-169.

189.    The County through its individual defendants, Tyra Harrington, Jessie Cablk,

Lynda Hopkins, from the code enforcement department and permit Sonoma responsible

for issuing building permits blocked Mr. Castagnola is series of attempts to cure the lack

of a permit on his property. Basically, Mr. Castagnola had admitted to the concept that he

needed a building permit. He did not have a building permit, and he would then embark

First Amended Complaint

148

on a process allowed by the County called legalization to obtain the necessary building permits after the fact, it should be noted that in the judgment.

190.    The basic issue is a lack of a permit. You don't see items in the judgment suggesting or claiming that the buildings were somehow improperly built, or that the buildings had a series of building code violations that the buildings were somehow not safe or otherwise in need of repair, what was needed was a building permit.

191.    The building permit process was skipped by Michael Castagnola, a fact that he fully acknowledged in the judgment and agreed to legalize it and set out to obtain building permits after the fact, this is where the complaint against the County starts. It's the behavior and conduct of the code enforcement officials, the building permit officials, and County Counsel officials in disallowing Mr. Castagnola the process of legalizing the property through getting building permits; they blocked him from doing so.

192.    So, one of the basic events that is complained of in this complaint is the County's blockage of Mr. Castagnola from legalizing the properties. Those events are detailed in the above Section IV, V, VII, which is referenced herein.

193.    The other big event that the County itself through the work of Code Enforcement, Permit Sonoma, and County Counsel's office did was the bizarre decision to hire Mark Adams, attorney at law as a receiver in this matter when they either knew or should have known about Mr. Adams checkered past as detailed in the Sonoma County Superior

First Amended Complaint

Court status conference statement dated July 21, 2025. attached as Exhibit E to this complaint. And in particular section one of that status conference statement, referencing a series of articles attached as attachments, A-1, A-2, A-3, and A-4 to the status conference statement section one, which gives a summary of those articles includes the following descriptions of Mr. Adams checkered past:

1. May 17, 2023 article entitled "Evictions, homelessness, debt: Skid Row Housing Trust receiver has checkered history" by Liam Dillon and Doug Smith from the *Los Angeles Times*, a review of Mark Adams' work in several locations, including Fresno County and Los Angeles County. The article states in part at page 4:

    "A Times review of court records and dozens of interviews with parties involved in Adams' past receiverships, however, raise concerns about his ability to manage the trust's beleaguered portfolio and care for the vulnerable tenants now under his control.

    In two cases comparable in size and scope to the trust matter, Adams left years before they were resolved and, in court filings, omitted key facts about his involvement in them. In other cases involving Adams, tenants faced the risk of eviction and property owners lost their houses while his fees have risen as high as $465 an hour.

    In multiple instances, judges and local governments have determined that Adams has padded staffing, increased his staff's rates without informing the judge and engaged in duplicative billing -inflating his fees by six-figure amounts. A judge in one case likened Adams' billing to a "feeding frenzy."

First Amended Complaint

The Article also states at page 11:

1

2    "Because all of its administrative and legal services billings are 'in house' it gets

3    to effectively bill itself for its legal and administrative expenditures and it gets to

4    set the billing rates for all of its employees. What could go wrong with that?"

5    wrote Robert F. Moody, a judge presiding over an Adams receivership in

6    Mariposa County, in a 2022 ruling.

7    Moody found "accounting and billing irregularities" by Adams in the case, which

8    stretched for 13 years, though the judge did not determine specific violations.

9    Ultimately, Moody reduced Adams' fees and costs by more than $300,000,

10   according to court filings and attorneys for Mariposa County.

11   That ruling came after attorneys for the county, which had requested the

12   receivership, objected to Adams' accounting. In recent years, lawyers representing

13   the cities of Duarte and Palmdale and L.A. County - in Jacobs' case - have done

14   the same.

15   The cases share common issues: Adams assigns a dozen or more employees work

16   on a case, bills for multiple employees on the same task (including weekly

17   internal meetings) and raises staffers' rates without notifying the judge.

18   The judge in the Palmdale case rejected the city's argument and approved Adams'

19   billings. But in the Duarte case, which involved a 28-unit apartment complex,

20   Adams' fees were reduced by over $100,000."

21

22

23   5. June 12, 2023 article entitled "One Of Skid Row's Largest Housing Providers Veered

24   Toward Financial Collapse. New Issues Are Surfacing After A City-Led Takeover"

25

First Amended Complaint

by Nick Gerda for the *LAist*, regarding Mark Adams' work in L.A. County, which

was astonishing to the city attorney's office who hired him and put them in a position

of total embarrassment over what they did to the homeless people. The article states

in part at page 2-3:

"An LAist review of online records late last week found that a company Adams

previously used for receivership work - California Receivership Group, LLC - has

been banned by the state from doing business since 2015, because he hadn't paid

business taxes that totaled about $3,380.

A few months after the state suspended his business, records show Adams formed

a new business with the same name that ends in "Inc." instead of "LLC." That's

his current company, which was appointed as the Skid Row Housing Trust

receiver along with Adams.

In addition, LAist reviewed court documents that show just weeks before L.A.

City Attorney Hydee Feldstein Soto recommended Adams for the Skid Row job

in late March, an Orange County judge reduced Adams' fees by $500,000 after

finding he had overbilled for a receivership in Dana Point by an average of 39%.

The L.A. Times has reported on other past rulings where judges found Adams

overcharged.

"If judges find that he overbills, then why is this somebody that we're picking?"

said Jessica Levinson, a former president of the Los Angeles City Ethics

Commission who teaches at Loyola Law School, after reviewing LAist's

findings."

The article also states at page 4:

1

2    "Adams also discussed the unpaid taxes in a 2017 deposition about a receivership

3    he handled in Santa Barbara. He said: "It wasn't something I was very focused on,

4    and by the time I was focused on it, we had formed the [newer] corporation so it

     didn't matter to me."

5    Adams noted that his current business is in good standing with the state. He said

6    he let the first business get suspended because he was already operating under the

7    newer business.

8    "We did not get suspended and then I formed a new company. That's just not the

9    case," he said.

10   But the state records do show Adams created the new business in July 2015, five

11   months after the earlier business was suspended in February of that year."

12

13

14   See also, page 7:

15   "The L.A. Times and LAist have since identified public court rulings showing

16   multiple judges had previously found problems with Adams' handling of past

17   receiverships, including inflating his fees by hundreds of thousands of dollars.

18   Adams says the decisions against him are from a small handful of cases out of the

19   roughly 300 court-appointed receiverships he's handled. And he says in those

20   handful of cases, billings were approved by judges before another judge came in

21   and decided the charges were inappropriate.

22   "That case went through four or five different judges," he told LAist, about the

23   March ruling in Orange County where a judge drastically reduced his billing.

24

25

First Amended Complaint

1
2
3
4

"And when it was active, the judges who I was working for approved everything that we did. They know all of our billings, there was no dinging of it. But then it went to a judge who had not been involved in the case ... and he found what he found."

5

6. June 15, 2023 article entitled "Judge Removes 7 Buildings From Troubled Skid Row Housing Receiver's Portfolio" by David Wagner for the *LAist*, Another article from L.A. Times about the homeless problem down in L.A. Mark Adams literally steals money from budgets given to homeless people. It doesn't get any lower than that. The article states in part at pages 2-3:

"A Los Angeles County Superior Court judge approved a deal Thursday to remove seven buildings from a troubled receivership tasked with stabilizing 29 buildings formerly managed by the Skid Row Housing Trust.

In a Thursday afternoon court hearing in Downtown L.A., Judge Mitchell Beckloff at times grew frustrated with the responses from court-appointed receiver Mark Adams, who has faced questions about his suitability to rehabilitate these sensitive properties. "I don't know how much problem-solving is going on," Beckloff told Adams."

The article also states at page 4:

"An investigation by the city attorney's office City Attorney Hydeee Feldstein Soto previously told the Los Angeles Times that her staff is investigating Adams' performance. When LAist asked for an update on that investigation Thursday, her office declined to comment. In recent weeks, LAist and the Times identified

public court rulings showing multiple judges have found problems with Adams'

handling of past receiverships.

LAist reporting earlier this week also revealed that a prior company Adams used

for previous receivership business was banned by the state of California over

unpaid taxes. Adams told us he'd look into it and said his current company is in

good standing.."

7. July 17, 2025 article entitled "Sonoma County family loses their home after yearslong

battle over permits, court appointed cleanup company", by Marisa Endicott and Phil

Barber for the *Sonoma Press Democrat*, in which they investigated Mark Adams, and

specifically concerning the case of Michael Castagnola and Carly Castagnola, and

also did some research into similar shenanigans by Mark Adams over in Berkeley,

California. The article states in part at page 3:

"The family's initial set of battles was with inspectors for Permit Sonoma, the

county's planning and code enforcement division. They began to catalog the

alleged violations at the site in 2017.

The Castagnolas, like other residents who have dug in their heels after running

afoul of the department, describe Permit Sonoma as unyielding.

The accusations are not new. The agency has long faced criticism over its

enforcement practices, and it was recently sued by the ACLU Foundation of

Northern California over alleged unconstitutional use of drone surveillance — to

document land-use violations that have, in some cases, led to rapidly escalating

penalties for affected residents."

First Amended Complaint

1

2          The article also states at page 11:

3              "In 2023, the Los Angeles Times published a series of stories about Adams and

4          California Receivership Group, detailing allegations of overcharging and

5          underperformance. At the time, Adams and the city of Los Angeles were

6          wrangling over accountability for a real estate rehab project that had ballooned far

7          over budget.

8          California Receivership Group claimed it was owed $1.7 million in unpaid bills

9          on the project, which served 1,500 low-income tenants of the Skid Row Housing

10         Trust.

11         The LA Times uncovered additional conflicts involving Adams' company.

12         In the Coachella Valley, they wrote, Adams was appointed receiver for a

13         community of 4,000 people, primarily migrant farmworkers; he accumulated

14         $220,000 in debt before a judge removed him from the case.

15         Two years after Adams assumed control of the Trails End Mobile Home Park in

16         Fresno, a third of the lots were vacant and the remaining tenants faced eviction. In

17         East Los Angeles, he took over a dilapidated triplex, sold it and tried to bill the

18         estate $530,000 before a judge pointedly cut the amount by more than half, the

19         LA Times reported."

20

21

22    194.    Mr. Castagnola with the assistance of his daughter, co-plaintiff Carly Castagnola

23         brought these various issues of Mr. Mark Adams checkered past to the attention of the

24         County.

25

First Amended Complaint

195.    So whatever the County might say about not knowing at the beginning of this journey, they most certainly were made aware of, and yet once made aware of those background deficiencies of Mr. Adams, proceeded to fully support Mr. Adams in becoming a receiver in this case. County Counsel's office through Diana Gomez and Robert Pittman did the motion paperwork to appoint Mark Adams. The Code Enforcement officials did their part by making a fake need for a receiver. There was no need for a receiver in this action. All they needed to do was to accept the permit application submitted by Mr. Castagnola, which would have fully legalized the property.

196.    Mr. Castagnola would have paid the $89,999.00, and the matter would be done and over. He would not have lost his house. He would not have had the yurts mowed down. He would not have had his greenhouse mode down his utility shed mode down his perfectly fine barn mode down. We should point out at this point that we have hundreds of photos and a score of videotaping of Mr. Mark Adams work in crushing down, demolishing, and taking out to the trash, the various items on the property, basically everything except the house itself.

197.    Plaintiffs also point out at this point, the fact that code enforcement themselves after the judgment, but before Mark Adams was appointed as receiver, took it upon themselves in a good way to go out to the property and do expert level inspections of the premises. For example, they use Mr. Hogan, a well-known septic expert to check out the septic system. Mr. Hogan was heard by witness Keni Meyer explaining very clearly to Code Enforcement that the septic is fine. It's a separate issue. You could call it an

First Amended Complaint

administrative/procedural legalization issue that it should have had a permit and it didn't. Mr. Castagnola was fully prepared to legalize it by obtaining that permit. But the fact of the matter is according to the expert workup of Mr. Hogan, that the septic system was fine.

198.    The County's own inspectors were on the premises that day. Keni Meyer, who keeps herself extremely busy monitoring the County's behavior in this regard, is an earwitness and eyewitness to the fact that the County's own experts, inspectors, and people in the know about the building code, code enforcement issues, and zoning issues, examined all the structures and determined that they were sound, without building code violations, and that the basic violation at hand was a lack of a building permit. This is a reflection of more or less exactly what the Judgment says.

199.    The task at hand wasn't to demolish the buildings. There was absolutely no reason for that. The task at hand was to let Mr. Castagnola legalize the building structures on the premises by obtaining building permits after the fact.

200.    It should be further noted that the County has a program to obtain permits after the fact. But it's a common practice in the construction field that if you build something and you didn't have a permit for it, and the County Code Enforcement people figure it out, the basic remedy isn't to tear it all down, but rather to permit the homeowner.

First Amended Complaint

201.    And in this case, Mr. Castagnola to obtain a permit after the fact and to impose abatement fees as a fine and then be done with it. That is what the judgment, Exhibit K, is all about. The wrongdoing of the county is refusing to allow that legalization process and to block that legalization process and then to use the fact that he had not legalized the property as an excuse to warrant the hiring retention and appointment of Mark Adams as a receiver.

202.    The County's wrongdoing with respect to Mark Adams is he is their guy. They found him. They appointed him. They stood by him throughout his entire process, culminating in an event dated July 24, 2023, documented by hundreds of photos and scores of videos by Carly Castagnola in which Mr. Adams and his team demolished all the structures. It should be noted that these were beautiful structures. This is a beautiful place up in Sonoma. This is not some trashy place to give the court an idea. Plaintiffs have excerpted a group of several photographs as **Exhibit L** hereto. A picture tells a thousand words. The yurts are surrounded by gorgeous trees. The yurts themselves are very nicely built. The county made claims that the yurts were not suitable for human use. This claim is what you could describe as a bad attitude by the county.

203.    They just don't accept yurts. They have an issue about yurts. Yurts are kind of an interesting concept of a home.

204.    It should be noted that yurts actually come from Mongolia and are a common way of home existence in Mongolia. Leave it to the open-minded Bohemian people of Sonoma to find Mongolian yurts interesting enough to create their own California version

First Amended Complaint

of them, which are done in a solid manner, are entirely livable, as is evidenced by the fact that Carly lived without complaint, without issue in her yurt for years. There was no problem.

205.    The only problem is it didn't have a building permit. The judgment itself doesn't say the yurts need to be torn down. In fact, the judgment doesn't mention that they should be demolished.

206.    What the judgment says is legalize it. And there basically are two choices. A, get a permit, or B, you have to tear it down.

207.    Plaintiff reiterates the allegations concerning the Seed Barn described in Section V above as a further example of improper conduct by the County of Sonoma. The County of Sonoma, through its permit officials, code enforcement officials, and with the assistance, cooperation, approval, and ratification of its County Counsel officials and Board of Supervisors, stood by and approved the demolishing of the various structures on the building knowing full well that all of the structures would be able to be legalized with appropriate funding levels.

208.    The County also, through its officials named as defendants herein, took the position that yurts are simply unacceptable and would not allow a permit on the yurts at all. Plaintiff had even suggested that the yurts be converted into storage facilities, in which case they could have been kept. The county was against any use of the yurts and required them to simply be demolished.

First Amended Complaint

209.     This attitude of anti-yurt by the county is itself a violation of the plaintiff's

substantive due process rights under the 14th Amendment to the United States

Constitution and especially in light of the particulars of the judgment entered into

between the parties which required plaintiff to legalize the yurts and then the county

refused to allow plaintiff to legalize the yurts and instead required them to be demolished.

Plaintiff also points out that the county acts in a contradictory manner as for yurts.

There's an example of a Christian camp in Sonoma County that's somewhat famous

actually that has a group of yurts that are all being allowed by the county as they should

be. The yurts on the camp are perfectly fine. The yurts and the camp have been featured

in various publications from local magazine publications and are well known in the

Sonoma area. The camp has a zip line that allows people to fly through the redwood trees

and has become a destination spot.


210.     The yurts are there in plain view, are well known to the county and are allowed to

exist. So one must wonder why they allow them to exist on the one hand in some

locations and then took an attitude with the Plaintiffs that they would not allow the two

yurts on plaintiff's property even if the yurts were converted into storage facilities.


211.     There are attitudes within the County in which they prefer demolishing buildings

rather than keeping buildings. This is one of the problems the County has, as can be

shown in a series of other cases that constitute a recitation of other events that support the

Monell claim of a pattern in practice and a pattern of racketeering required for the RICO

federal claim and RICO state law claim.

First Amended Complaint

212.     We now set forth a summary of the other victims that the county has engaged

similar anti-legalization, blockage of legalization, and fundamental desire to demolish

structures:

1.   The Case of Esteban Diaz

213.     The County of Sonoma by and through its County Counsel, and in particular

Diane Gomez and its Code Enforcement team headed up by Tyra Harrington committed

grievous acts of extrinsic fraud, duress, and undue influence to extort, deceive, and insist

on the threat of losing his home that Esteban Diaz and his company Esteban Diaz Marble

Tile and Stone, LLC sign a stipulation for entry of judgment in a code enforcement

proceeding that resulted in a whopper judgment that he absolutely knew he could never

afford to pay, and still cannot pay, and is in danger of losing his home to the County. A

copy of the March 7, 2023 Stipulated Judgment and the March 7, 2023 Stipulation for

Entry of Judgment is attached to this complaint as **Exhibit M.**

214.     Esteban Diaz signed the stipulated settlement on March 7, 2023. It was on that

date that his lawyer basically told him he had to sign it. He totally did not want to sign it,

but County Counsel Diana Gomez made the threat right to Diaz's face of words to the

effect "Fine, I'll just take his house." Diaz took that threat very seriously.

215.     The basic settlement amount was $160,000 plus the $56,154.89 that had already

been wrongfully taken for the false charge of cannabis. What Diaz learned from his

First Amended Complaint

lawyer in the underlying case was that they were completely non-negotiable. He had to just agree to the whole thing of $160,000.

216.    The problem Diaz had is he absolutely did not have enough money to pay that amount, and he was extremely worried about signing up to a judgment that he knew he couldn't possibly perform. The County was 100% non-responsive and non-negotiable. It was either you pay it all or you go to trial, and at trial we're going to try to get way more, and at the end of that we're going to take your house. Diaz stated clearly that he could not perform, and Martinez Law and County Counsel suggested this was the prudent business approach, and he could either figure it out in the period before the 1st installment was required, or even that economic circumstances are unknown and perhaps they could swing in his favor during that period.  County Counsel made concessions to delay the start of payment installments in the range of 90 - 120 days.

217.    Some further background: The day before the case was to go to trial Diaz's attorney had requested an appointment to go see Mr. Diaz at his home. Mr. Diaz said "yes." The attorney showed up and basically urged Mr. Diaz to take the settlement.

218.    During the discussion, Mr. Diaz's attorney indicated that if he didn't sign the proposed stipulation for judgment that the County would go after him for a sum in the neighborhood of $600,000, which would result in the total loss of the home. Mr. Diaz made it very clear during these pre-trial presentations of the agreement that he absolutely

First Amended Complaint

did not want to sign it. He wanted to go forward to trial, but his attorney basically

threatened with extortion that he more or less had to sign the deal.

219.     Mr. Diaz signed the deal against his will and desire but when they went in to

present it to the court there was some problem with the court not being available at that

moment and the stipulation was not actually given to the court. Mr. Diaz then stated I

didn't want to sign that anyway, I don't want it submitted, and it was not submitted. His

attorney advised him that the stipulation is not valid until submitted to the court.

220.     Mr. Diaz on the other hand was telling the lawyer that he had a valid defense first

of all the $56,154.89 or so in fines for unlawful cannabis grow were completely bogus

because he was growing peppers not marijuana.

221.     Obviously, that would be a total defense to the unlawful cannabis cultivation

citation. It should also be pointed out that Mr. Diaz's residence there is zoned residential

and agricultural so the growth of peppers there would have been 100% completely legal

and would not have required any kind of permit or other use permit.

222.     The County also asserted that some hoop coverage systems which are used kind

of like a tent structure to protect plants constituted a greenhouse that was built without a

building permit. Mr. Diaz took the position that it's like setting up a tent in your

backyard; you don't need a building permit to put up this kind of tent structure/temporary

coverage for plants. That claim against that structure was asserted to have some kind of huge value in the neighborhood of $600,000.

223.    At the hearing, Diaz began to sweat uncontrollably, his face flushed, he began to tremble and shake experienced severe difficulty breathing. Mr. Diaz tried to stand up and he blacked out in court as a result of being threatened and extorted by Diana Gomez of Sonoma County Counsel's office. The next thing Mr. Diaz was aware of was that he was in the back of an ambulance and was on his way to the hospital.

224.    This behavior by the County of Sonoma was egregious in that the charge brought against Mr. Diaz and his LLC was for unlawful cannabis cultivation, and for building a greenhouse without a permit. In fact, Diaz was a hundred percent innocent of growing cannabis; he was growing peppers. His land is zoned agricultural and residential; there is a home there, and he has a place where he grows peppers. Further, it should be noted that a greenhouse implies a commercial structure. What Diaz had on the property was a hoophouse, a temporary tunnel with a stretched membrane type cover of plastic, woven fabric, shade clothe, or the like.

225.    As to his own personal background, Plaintiff Diaz is from Mexico, and grew up working up on a farm alongside his father where he learned all aspects of farming. Peppers are a great high-end crop that can be grown in a micro-enterprise manner on small farms, so they make for an excellent local business.

First Amended Complaint

226.     The County of Sonoma fully trampled on his rights by declaring the peppers to be marijuana plants. Now, that could be an honest mistake, and one would think that once it was cleared up by simply examining the plants and figuring out that they weren't cannabis, that the County would have gone away, but that was not the case. The County's inspection efforts were unreasonable.  Had Diaz been home on the Friday afternoon they showed up without notice to inform him he was cultivating cannabis in violation of the County codes, he could have invited them into the property to inspect.  They called him to notify him they were at his gate at around 3:30 pm, when Diaz he was working at a job site over an hour away; had he stopped work and rushed home, it would have taken him 2.5 hours to get there in commute traffic.  Then the County set the next opportunity for an inspection to verify and close the notice of violation out past the opportunity to verify and close without penalties of $10,000 per day. So, by the time the County could verify the plants were peppers and not cannabis, the fines reached $56,000.  This is a pattern and practice by Permit Sonoma.

227.     Instead, the County doubled down in its anger over having been foiled by the truth that Diaz was innocent of cannabis cultivation, so it found a hoophouse system that Diaz used to protect the pepper plants from the cold. The County declared the tent-like hoop system, which is is temporary in nature, but is fixed in place and cannot be picked up and moved, to be a fixed greenhouse system built without a permit. The charge was wholly without merit. These temporary tent-like structures are not greenhouses, which typically involve engineered commercial structures made of steel and glass, and require specialists to install. It was a hoophouse, which are built in place with minimal

First Amended Complaint

infrastructure – PVC pipes anchored and bent to allow a plastic cover to be fastened. The County has Membrane Structure Permit guidelines, but at that point in time the County did not provide clear instructions on membrane structures, the information was widely dispersed in various code and Code Enforcement seemed to purposefully withhold guidance as a way to entrap those being enforced upon. The guidelines are dispersed in multiple locations, engineering and fire code, Permit Sonoma purposely withholds information on hoophouse permit guidelines and information to leave them to their own devices and/or at worst to trap people because they attribute them to cannabis cultivation. The hoophouse Mr. Diaz used is a common agricultural system, and is easy to install.

228.    The County also found various other violations that are described in the Stipulated Judgment that was signed by Mr. Diaz on his day of trial March 7, 2023, a copy of which is attached hereto as Exhibit M. The violations listed on page 2 of that stipulation include the following:

A.  June 12, 2012 [Previously adjudicated in an administrative hearing with the County selected hearing officer

      • Violation: VPL12-0l 67 -Unlawful zoning - non-operational vehicles, junkyard conditions, occupied recreational vehicle, contractor's storage yard

B.    May 17, 2013 [Previously adjudicated in an administrative hearing with the County selected hearing officer that ruled in Diaz's favor].

      • Violation: VBU13-0186 -construction without permit - garage illegally converted to an illegal dwelling unit with a porch;

      • Violation: VBU13-0187 -construction without permit -covered patio;

First Amended Complaint

- Violation: VBU13-0188 -construction without permit -Accessory structure with plumbing and electrical;
- Violation: VPL13-0084-unlawful zoning-garage illegally converted to an illegal dwelling unit with a porch.

C.     January 12, 2018,

- Violation: VBU18-0095 thru VBU 18-0100·-Construction without permit -6 greenhouses
- Violation: VPLI 8-0010 -Unlawful zoning -commercial cannabis -1st violation

D. July 23, 20I9

- Violation: VBU19-0589 -Hazardous electrical to gate [legitimate, but was the result of Code Enforcement splitting up and searching the property to identify any violation they could muster.  And "Hazardous" sure sounds dire, the actual conditions were minor];
- Violation: VBU19-0590 -Hazardous electrical to well head [legitimate, but was the result of Code Enforcement splitting up and searching the property to identify any violation they could muster.  And "Hazardous" sure sounds dire, the actual conditions were minor];
- Violation: VBU19-0583-VBU19-0588-6 greenhouses [These are the hoophouses with peppers.  By its own language the County is conflating the charge];
- Violation: VPLl 9-0635 -Unlawful zoning commercial cannabis -2nd violation [Alleged; peppers were verified after the fines were levied due to their denial of a closing inspection during the window/grace period];

First Amended Complaint

168

1

- Violation: VPL 19-0650 -Unlawful zoning -Non-operative motor vehicle; storage

2

yard [Every car was registered and started when they inspected, one vehicle had a

3

dead battery];

4

- Violation: VPL19-0651 -Unlawful zoning -Junkyard conditions [There was some

5

debris and junk, but essentially he had materials piles that consisted of brick

6

pavers, stone, lumber, and fire wood that exceeded the 10 sq ft of space his ranch

7

is allowed by zoning for such staged materials];

8

- Violation: VPL 19-0652 -Unlawful zoning -Non-permitted contractors storage

9

yard [Same violation issued to exacerbate their claims. His materials piles

10

exceeded the 10 sq ft allotted by zoning right.].

11

12

13

229.    The County's behavior in adding on a series of fourteen other charges can be seen

14

as a direct outgrowth of the reality it faced that the initial charge of unlawful cannabis

15

cultivation was simply a false charge. The County actually went so far as to supply false,

16

fabricated evidence to support the cannabis claim. Years ago, there was a tenant residing

17

on the property who did actually grow some unlawful cannabis. The County had photos

18

of that cannabis growth from years back when Mr. Diaz did not reside at the premises.

19

The County brought a case against that tenant. The County then used photos from that old

20

case to be brought forward to be used against Mr. Diaz in a new case. The cannabis of the

21

old case had absolutely nothing to do with Mr. Diaz's pepper growing. The evidence

22

submitted was false evidence, and constitutes a violation of the following penal codes

23

regarding false and fabricated evidence: California Penal Code section 141:

24

25

First Amended Complaint

"(a) Except as provided in subdivisions (b) and (c), a person who knowingly, willfully, intentionally, and wrongfully alters, modifies, plants, places, manufactures, conceals, or moves any physical matter, digital image, or video recording, with specific intent that the action will result in a person being charged with a crime or with the specific intent that the physical matter will be wrongfully produced as genuine or true upon a trial, proceeding, or inquiry, is guilty of a misdemeanor.

(b) A peace officer who knowingly, willfully, intentionally, and wrongfully alters, modifies, plants, places, manufactures, conceals, or moves any physical matter, digital image, or video recording, with specific intent that the action will result in a person being charged with a crime or with the specific intent that the physical matter, digital image, or video recording will be concealed or destroyed, or fraudulently represented as the original evidence upon a trial, proceeding, or inquiry, is guilty of a felony punishable by two, three, or five years in the state prison.

(c) A prosecuting attorney who intentionally and in bad faith alters, modifies, or withholds any physical matter, digital image, video recording, or relevant exculpatory material or information, knowing that it is relevant and material to the outcome of the case, with the specific intent that the physical matter, digital image, video recording, or relevant exculpatory material or information will be concealed or destroyed, or fraudulently represented as the original evidence upon a trial, proceeding, or inquiry, is guilty of a felony punishable by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years.

(d) This section does not preclude prosecution under both this section and any other law."

First Amended Complaint

230.     See also, i.e., Probate Code section 135: "A person who, knowing that any book, paper, record, instrument in writing, digital image, video recording owned by another, or other matter or thing, is about to be produced in evidence upon a trial, inquiry, or investigation, authorized by law, willfully destroys, erases, or conceals the same, with the intent to prevent it or its content from being produced, is guilty of a misdemeanor."

231.     Similarly on point is the federal criminal code, 18 USC section 1519, which prohibits falsification of evidence:

"Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both."

232.     It is true that the County took photos from the case against the previous tenant on Diaz's property, and submitted them into evidence in support of their more recent case against Esteban. The exhibit is County Trial Exhibit Binder Exhibit 38.

233.     That exhibit shows the exterior of the tent greenhouse structure that had previously been built by the tenant. The photo also shows the interior of that tent. The following specifics should be noted:

First Amended Complaint

234.    First, it could be seen by the status of the plants themselves that this would not have been a photo during April, springtime, because the plants simply would not have been that large. This was a photo that was in the period approximately September or October of whatever year it was taken.

235.    Second, the hoophouse system is taller than Diaz's fence. This should be distinguished from the tent system that Diaz made, which is actually lower than his fence. The tenant built the tent system in the County's Trial Exhibit 38. Later he was ordered to take it down. It was taken down, and apparently the County agreed it had been adequately taken down.

236.    After that, in 2019, Diaz built hoophouses for peppers as he only thought the permit requirements were related to the excessive regulations associated with cannabis. So, the photos of Diaz's pepper plants show his tent system that he built, which is not at all the tent system shown in Exhibit 38.

237.    The bottom line is the County used fabricated, dishonest evidence to assert their claims of cannabis growth by Diaz, when in fact Diaz was factually innocent of growing cannabis. Instead, he was growing peppers.

238.    The County knows way better than to engage in such conduct, and yet in the case of Mr. Diaz, did so willfully, intentionally, and with full knowledge that its conduct and behavior was fraudulent, constituted fabrication of evidence, constituted a felony, and yet

First Amended Complaint

172

1    proceeded that way nevertheless, toward its overall goal of exacting as much fees as

2    possible against Mr. Diaz and his LLC.

3

4    239.     The County was motivated in part by an overall goal of County code enforcement

5    that is expressed in a memo that has become a public memo, in that it is circulated among

6    quite a few individuals and entitled County of Sonoma Agenda Item Summary Report"

7    dated March 7, 2017 ["Agenda Report"], a copy of which is attached hereto as Exhibit C.

8    In the agenda report, the code enforcement division of the County of Sonoma government

9    made a sales pitch to the County Board of Supervisors that it needed more money to

10   bankroll its operations, and that one way it could do so would be to step up enforcement

11   activities and use the County Counsel's office as a weapon to drag people into court,

12   exact huge per diem and other fines under the guise of abatement expenses, and use those

13   monies to fund code enforcement. The concept was to make code enforcement basically a

14   profit center. Also attached as part of Exhibit C is a copy of the county of Sonoma Board

15   of Supervisors resolution dated March 7, 2017 adopting the proposal made in code

16   enforcement's agenda report and establishing funding for a new person to be hired to go

17   out and implement the code enforcement strategies set forth in the code enforcement

18   agenda report. The resolution went to effect March 8, 2017.

19

20

21   240.     The County of Sonoma is the one receiving the financial benefit. The financial

22   inflows in terms of huge fines, resultant foreclosures and taking of property, and

23   ownership of property, all goes to the County. The county is the one that benefits. And it

24

25

First Amended Complaint

uses these fruits of corruption to fund its code enforcement operations. The people doing the acts basically get a job and paychecks out of it.

241.    The following quotations from the County of Sonoma code enforcement agenda report are quoted to show the Court what the county is actually doing: At pages 1-2 of the agenda report [Exhibit C], it states:

"The Code Enforcement Section of Permit Sonoma works as a team with the County Counsel's Office to address citizen complaints of building, zoning, septic, and other County code violations. These joint efforts are essential to meeting the Board's strategic priorities, including watershed protection, safeguarding communities, and protecting public and private property. Aggressive code enforcement actions can also serve as an upstream investment by providing immediate resolution of environmental damage and property damages and by deterring future violations and neighborhood degradation.

The code enforcement program needs to be enhanced to address the severe case backlog, the increase in serious health and safety violation complaints, and the need for increased enforcement in the areas of riparian corridors, vacation rentals and cannabis. This Board item includes preliminary personnel, resource, and policy modifications as a first step to improve program effectiveness. Additionally, this item recognizes the effectiveness of quick and aggressive litigation to resolve violations that threaten public health and safety, and allocates resources to allow completion of serious cases for the current fiscal year and to begin to place the County Counsel's Office in the position to continue this level of effort in the future. Finally, a number of minor policy modifications and delegations are requested to increase timeliness of response and streamline the administrative process."

First Amended Complaint

174

242.     Not mentioned in the report is that a pattern and practice is for the County to

engage in egregious behavior by summarily rejecting (e.g. not even allowing to be filed)

permit applications. This places homeowners such as Mr. Diaz into a very bad position,

where he's been cited for a code violation. He's a contractor, so he knows how to go about

applying for a building; he actually hired specialists, including licensed professionals, to

assist him in the process of preparing building permit applications to fix up the code

violations asserted by the County. The County refused to allow those permit applications

in part due to their contention that Mr. Diaz could not apply for any permits until he first

paid off all the fines for the cannabis growth; in other words, the County cites people like

Mr. Diaz and his LLC for code violations, and then actively and aggressively blocks them

from obtaining building permits necessary to cure the code violations alleged.


243.     As bizarre as this may seem, we point out the following other cases showing a

pattern and practice by the County of Sonoma in willfully blocking the submission of

building permits against landowners in Sonoma County, and then filing civil complaints

for abatement of the code violations imposing extortionistic and unconscionable

abatement fees and expenses that add up to hundreds of thousands of dollars, all with the

help of County Counsel, a weaponized part of the agenda report, Exhibit C hereto, to

bring about landowners certain and perhaps selective demise in the County of Sonoma.


244.     Excerpts of an Excel spreadsheet showing the County of Sonoma code

enforcement citations and proceedings are attached to this complaint as **Exhibit AA** (the

start of the Excel document, and the end of the Excel document). The Excel spreadsheet

First Amended Complaint

shows that from 2017-2020 period, the number of code enforcement actions and proceedings increased to 5005 cases (see the last page of the excel document, showing 5005 code enforcement citations and proceedings).

245.    The Excel spreadsheet, excerpts of which are attached as Exhibit AA hereto, show that after the Board of Supervisors approved the unholy alliance between County Counsel, County Code Enforcement, and the County Superior Court to jack up abatement fees and run a weaponized system involving the executive branch through code enforcement and County Counsel, the legislative branch in the form of an approval of the agenda report by the Board of Supervisors, and the judicial branch in the form of judges who regularly rule that blockage of building permits is not a defense to a county abatement proceeding, and that gigantic abatement fees which will often result in a foreclosure a receiver and a full loss of the entire property, are the way of business in Sonoma County.

246.    The circumstances regarding the hugely improper conduct of Tyra Harrington in abusing the citation process can be further shown by the following description of events between Tyra Harrington of Sonoma County Code Enforcement and her counterpart in City of Santa Rosa, Kelley Aboudara. A detailed statement made by Esteban Diaz in the form of a signed declaration lays out the entire story. A felony criminal complaint was also filed by the Sonoma County District Attorneys office against Ms. Aboudara for similar conduct toward other victims. A shorter summary of what happened is described as follows:

First Amended Complaint

247.    Kelley Aboudara, code enforcement officer for Santa Rosa CA, inspected Diaz at

the request of Tyra, and forced him to show her several other properties. Tyra called Ms.

Aboudara and got her involved.

248.    Ms. Aboudara told Esteban "you were trying to be smart my friend, huh, telling

her you have chili peppers" within days of the County showing up on his property on a

notice of·violation on approximately July 19, 2019 posted on Diaz's gate at his property.

and showed up at Diaz's house on July 19, 2019, via an unknown inspector from County

Code Enforcement (a Friday about 3:30 pm) and stated in a phone call at the gate of

Diaz's home (on July 19). Diaz was not home at the time and was working several hours

away. Diaz offered to meet on the following Monday. Hoffman said on the phone that he

would start charging him $10,000 per day for cannabis growth. Tyra Harrington was

involved in this because Diaz had met with her on July 22, 2019, about a demolition

permit, and to present them with evidence that he is growing chili peppers, not cannabis.

249.    During the July 22, 2019 meeting, he ends up at the code enforcement window,

and Tyra Harrington comes out. The entire staff is present. She says we will not process

your demolition permit for the so-called greenhouse, until you pay the fines for the

cannabis. Diaz says he is growing chili peppers, which makes the entire code

enforcement staff laugh.

250.    On July 22, 2019, he gets a written inspection notice from the City of Santa Rosa

that they need to inspect immediately. On the 23rd, Kelley Aboudara said "you tried to be

smart with my friend," which a reasonable inference meant Tyra. Tyra was the only

person Diaz told at the County that he was growing chili peppers Tyra told him "You

think this is funny? I promise you I am going to watch you like a hawk, I'm going to be

after you and all your properties, I'm going to get you." The next business day, he

received the written notice. A week later, on a Monday, Ms. Aboudara showed up and

insisted that he had moved the cannabis and replaced it with chili peppers, and forced him

to show her his other properties.


251.    The Sonoma County District Attorney's office felony complaint against Santa

Rosa Code Enforcement Officer Kelley Aboudara filed on May 24, 2023.. The felony

complaint charges Ms. Aboudara with the following felony counts:

   1. April 1, 2022- June 6, 2022: Attempted Theft From Elder Or Dependent Adult in

      violation of PC664/PC368(d), a Felony

   2. June 6, 2022  Attempted Theft From Elder Or Dependent Adult in violation of

      PC664/PC368(d), a Felony


252.    The district attorney's criminal complaint is about a victim that is not Esteban

Diaz. The incident of April 1, 2022 – June 6, 2022 show relevant other wrongful conduct

admissible in this action under Evidence Code section 1101(b), to show Tyra

Harrington's intentionally corrupt behavior and pattern, practice, planning, wrongful

intent lack of mistake, in extorting excessive fines from Esteban Diaz.

2. The case of Thomas H. Lutge

First Amended Complaint

253.    First, as the County Counsel may recall, current counsel for Mr. Diaz represented

Mr. Thomas H. Lutge in a case that has many similar elements, the main one being the

blockage of a permit application [*Sonoma v. Lutge*, Case No. SCV-272556]. Attached

hereto as **Exhibit N** are Excerpts of the Declaration of Mark Benda in Support of

Opposition to Motion for Summary Judgment

254.    Attached as **Exhibit O** hereto are a Memo of pages of interest of transcript of

February 26, 2025 hearing on County of Sonoma's Motion for Summary

Judgment/Summary Adjudication. After the hearing, Judge decides to adopt his tentative

ruling to fully grant the County of Sonoma's motion for summary judgment as to its

claims to enforce code violations and to fully eliminate Thomas Lutge's Cross Complaint

for Nuisance Tort based inverse condemnation based on the County's placement of a

culvert pipe that drained sewage into the Petaluma River; and Excerpts of Transcript of

February 26, 2025 Hearing showing the pages of interest stated in the memo.

255.    The Sonoma County Superior Court issued a judgment against Mr. Lutge on

March 28, 2025 [**Exhibit P** hereto], which is now on appeal to the California First

District Court of Appeals.

256.    Unfortunately, it appears to be that the Court has become a team member of the

County agenda report [Exhibit C hereto]. The County has the executive branch in the

form of the code enforcement division it has the executive branch in the form of County

Counsel and it has the judicial branch in the form of the Sonoma County Superior Court

all teamed up against homeowners. Basically, the Superior Court officially rejects as a defense to code violation abatement complaints brought by the County through the County Counsel's office that the County Permit division refused to permit the landowner homeowner, or commercial property owner as the case may be, from submitting and bringing forward a building permit application. This was the case in Mr. Lutge's instance, where his filed Answer to the County's complaint based on estoppel was stricken by the Court. Lutge's defense that the County blocked his attempt to fix the problems was rejected by the Court, and held to be not a defense at all, notwithstanding the fact that Mr. Lutge had direct eyewitness testimony on this point. This eyewitness testimony was rejected at the summary judgment level, notwithstanding fundamental summary judgment law that requires a denial of the motion for summary judgment upon a showing of admissible evidence that the defendant has a valid defense to the claim. Basically, the Court found that the blocking of a permit application and denial of the ability to cure the pertinent violations is not a defense.

2.  The case of Keni Meyer

257.  The case of *County of Sonoma v. Keni Meyers*, Sonoma County Action No. SCV-267880.  On March 13, 2020, Ms. Meyers entered into an abatement agreement. The abatement agreement required her to pay a cash sum of $17,000 to the county and to then fix up a series of different items. For example, there was a problem with an unpermitted fence that was over three feet tall and was within 45 feet of the middle of the county road. The solution was going to be to demolish that fence. She attempted to

1    get a demolition permit, but it wasn't granted and instead what she did was just

2    physically move the fence to a spot that complied with the 45-foot set-back rule. Thus,

3    that problem is solved but the County refuses to remove it as a violation. Another

4    problem cited was an incline around a septic area that was declared by the County to

5    be somehow illegal, unlawful, unsafe or something along those lines. She solved this

6    problem by hiring an engineer, a former engineer for the county, who came out and

7    did a study on it. It was his conclusion that there was no problem with regards to the

8    septic incline issue, and that there was nothing to fix. Keni advises that her report was

9    duly admitted into evidence during the course of her trial. There was no contrary

10    report submitted into evidence by the County. Nevertheless, at her trial the Court

11    found against her on this key issue, despite the fact that there was zero evidence

12    supporting it. She advised Plaintiff's counsel that they did not have any kind of

13    witness talk about that problem. The Court basically just accepted it as a done deal,

14    even though it was incorrect. Attached hereto as **Exhibit Q** is the April 5, 2022 Notice

15    of Entry of Order/Judgment and March 25, 2022 Judgment

16

17

18    258.    Keni Meyer did get some emails produced by the County of Sonoma that were

19    between Holly Rickett and Code Enforcement Supervisor Tyra Harrington and Thomas

20    Hoffman, Code Enforcement Inspector II, and other employees of the County of Sonoma

21    Code Enforcement regarding her case/the citations issues against her/her property. See

22    **Exhibit R** hereto, email dated October 27, 2020 from County Counsel Holly Rickett,

23    Esq. to Code Enforcement Supervisor Tyra Harrington and Thomas Hoffman, Code

24

25

Enforcement Inspector II, where she states in part: "I don't see her bringing the violations into compliance for lack of funds and she is a complete scatter brain."

259.    We note the following definition of the word scatterbrain from Merriam Webster's dictionary: "scatterbrained

adjective

scat·ter·brained 'ska-tər-ˌbrānd

Synonyms of scatterbrained

informal: having or showing a forgetful, disorganized, or unfocused mind : having the characteristics of a scatterbrain"

260.    Further, Sharmalee Rajakamaran, assistant County Counsel met with Keni about two months before filing the County's February 21, 2021 complaint. She stated words to the effect "we are not going to re initiate the abatement agreement because you failed to fulfill it, so we are going to sue you."

261.    Keni submitted around 4 applications for building permits. Multiple people assisted her in the process of preparing the permit applications. One application requested a demolition permit for the fence. Norm Detels, her contractor, prepared it and submitted it. As far as Keni knows, it was duly filed. Norm told Keni there were a series of reasons it was rejected, including that the County didn't like the map of the property. Norm told her about the plan check issues, but she doesn't recall them all. Norm tried to fix them all,

First Amended Complaint

but came to the conclusion that they were just interested in blocking the permit

application. He wrote a letter chastising them for blocking her attempt to get a permit.

262.    Another application was for the stairway problem. Norm prepared and submitted

the paperwork for that permit. The permit was filed on August, 4 2022, but it was

withdrawn (no movement for six months).

263.    Keni Meyer sought a use permit. Ryan Petterly (code enforcement) told her she

needed a use permit for the commercial dog training facility (that she wasn't running). No

fee was paid, which means it was summarily rejected and not filed. It got blocked.

Planning Department people said words to the effect you can't have a dog training

facility. It's not zoned for a dog training facility.

264.    A grading permit application was prepared and submitted by Hogan, a well-

respected engineer. Grading and drainage of horse arena. This issue had been previously

closed, but then it got re-opened later on by Todd Hoffman, Code Enforcement. After it

was re-opened, Keni hired Hogan and had a grading permit application prepared and

submitted. On June 7, 2022 grading permit issued. A permit official came out and

inspected. He said "what these people are doing is evil. that permit official (can't recall

name but inspection date was Oct. 20, 2022) later quit working for the county.

265.    A further application was for a well and septic leach field permit. Keni had an

environmental specialist come out and do a report, Mike Treinan. He prepared the report

First Amended Complaint

says there is no problem. The report is not in Keni's exhibit binder, but she recalls the report was submitted into evidence.

3.  The case of Ron Cupp

266.    Ron Cupp's circumstance is in the example of an obstruction of justice by retaliating against a person who is in the category of a witness and a professional helper who assists people who are victims of the county of Sonoma's behavior and blocking permits and exacting huge fines and going through a process where the county becomes the owner of their homes. The end game for the County is to rip them all down.

267.    The further end game of the County is to fund the County of Sonoma's code enforcement and permits budget as is reflected in the agenda item attached as **Exhibit C** to this complaint.

268.    What the County of Sonoma is doing is in the category of an unlawful tax on landowners. The fines are as stated above in excess of any actual costs incurred by the County to bring about the abatement of code violations, and are thus excessive. The excessive nature of the fines imposed by the County with the assistance of county counsel and the Sonoma County Superior Court are unlawful in that they violate the US Constitution, 8th Amendment, as described above, and are in effect a tax that has not been approved by the State of California through the normal process of legislation put through the Assembly and the Senate, and approved by the Governor. The only "law" on

First Amended Complaint

this issue is that the County Board of Supervisors approved the Code Enforcement agenda report (Exhibit C hereto).

269.    This taxation scheme to fund the operational budget of the County of Sonoma's Code Enforcement Department is thus an unlawful tax.

270.    It should be noted that in this case, the Castagnolas have not been shy about litigating their various issues. They informed the Sonoma court that Mark Adams had borrowed $880,000. The court did not seem to care.

271.    Instead, for example, during the recent status conference of August 14, 2025, the court basically green lights everything Mark Adams wishes to do. He demolished the buildings, even though they were all fine, with no problem.

272.    Mark Adams evicted the Mr. Castagnola, a retired battalion fire chief with decades of service to the City and County of San Francisco, and a longtime resident of Sonoma County, from his own home and then was rendered homeless. This was challenged. The Court rejected the challenge. See the January 24, 2024 minute order, Exhibit G-3 hereto; Michael King was there to defend the County's position, and Mark Adams's position that the Castagnolas were properly evicted and taken out of their property.

273.     Plaintiffs know the contradiction from the receivership appointment order

attached as Exhibit H hereto, page 7, paragraph 11, which specifies:

"To temporarily or permanently relocate the Property's occupants (if any). The receiver

shall pay relocation expenses as provided in Sec. 7262 in the Government Code. To this

end. the Receiver may institute ancillary actions for unlawful detainer relating to the

Property and may employ the services of an attorney to represent him in connection with

any such unlawful detainer proceeding."

274.     Plaintiffs note in the case of Mr. Lutge, that he brought forward solid evidence to

Judge Broderick of the County's behavior by by defendant Tyra Harrington, and other

Sonoma County employees in blocking Mr. Lutge's attempts to legalize a group of

structures on real property he owned in Petaluma, California. Exhibit N to this complaint

excerpts of a declaration of a Mark Benda that contains clear and direct evidence of Mr.

Lutge's attempt to submit a series of building permits, which were absolutely without a

doubt, summarily blocked by Tyra Harrington and Michael Carey of Permit Sonoma.

That blockage was fully supported by Diana Gomez, Robert Pittman and Michael King in

the Lutge matter. That blockage was completely allowed by the Sonoma County Superior

Court, who, through Judge Broderick, granted a motion for summary judgment,

notwithstanding absolutely solid evidence that the County had blocked Mr. Lutge's

attempts to legalize the property.

275.     Keni Meyer has the same problem. She had a judgment against her obtained

following trial. In that case, the county inaccurately and falsely advised the Court in a

process and manner that constitutes obstruction of justice, use of false evidence, and use

First Amended Complaint

of false statements in court that she did not appeal the citations issued to her on various code violations, and as such, could not litigate the issue of whether she was innocent of those violations. The County didn't provide witnesses to support the violations; according to the County, it didn't need to. Bottom line, she didn't appeal. Therefore, there was no issue about liability.

276.     Attached as **Exhibit S** to this complaint are copies of two appeals of the citations that Keni Myers's previous lawyer did file. It was absolutely a false statement and obstruction of justice for the County to take that position. But that's the position the County took. That's what it did. And as a result, the County obtained a gigantic judgment against Keni Meyer. And as a result of that judgment, she got a hard money loan that she could not pay off, her house was foreclosed on, and lost her home. Attached as **Exhibit T** to this complaint is a photo of Keni Meyer's former home. As the Court can immediately see, it's an absolutely beautiful home.

277.     Because of County Counsel's behavior and specifically a problem that they did also to Mr. Castagnola and also to Mr. Lutge, and they did to Keni Meyer, they put a lien on the property that's a code enforcement lien.

278.     Mr. Castagnola's lien is in the form of a *lis pendens*, Exhibit D hereto. The problem with that *lis pendens* is it's not simply a *lis pendens* of an amount due. If it was simply an amount due, a loan transaction could occur whereby a demand for payment would be made by the *lis pendens* holder for a sum certain, and the lender could then pay

1   it knowing full well that the *lis pendens* would thereby be resolved and withdrawn. No

2   lender wants to loan money on a property that has a code enforcement *lis pendens*. Code

3   Enforcement is not just an amount due, it's an event due the property must be legalized

4   and you can't just fix that through a loan escrow. It has to be fixed outside of escrow, in

5   the form of a legalization process, and therein lies the rub. The County blocks the

6   legalization process as a result of that. For example, Mr. Castagnola could not obtain loan

7   funding to pay off the $89,990.00 because of that *lis pendens*. Lenders won't loan when

8   there's a code enforcement list pendens. So, the County sets the people up for this

9   disaster. They'll issue and obtain legalization judgments, and then block people from

10  legalizing the property, and then block people from borrowing the monies needed to pay

11  off abatement fines, and then foreclose on the property, take the property, or in the case

12  of Mr. Castagnola, appoint a receiver who then demolishes the property, leaving the

13  owner homeless. This is an outrageous event and should never be allowed.

14

15

16  279.    The foregoing other events are clarified in this case to all involve a blockage to

17  the process of legalization of the subject properties. They all involve some of the same

18  basic parties. It should be noted who have since left the county. We don't know why they

19  left but we know they left Tyra Harrington is no longer with the county. Some of the

20  other individuals that are involved across the board include a gentleman by the name of

21  Todd Hoffman. These people have done their bad deeds and have left the County.

22

23  280.    This complaint then seeks to get the house back. Mr. Castagnola's house is still

24  standing. He needs his house back. He needs court/judicial intervention at a federal level

25

First Amended Complaint

1    to cause that to happen. The Superior Court of Sonoma County is unfortunately in

2    cahoots with the County. The Court fully supports everything the County did. It fully

3    supports everything Mark Adams did.

4

5    281.    If you can just sit back for a moment and imagine somebody borrowing $880,000

6    to purportedly fix a house, when all they actually did was mow it down. The hard part to

7    imagine is that the judicial branch of the State of California's government in the form of

8    the Sonoma County Superior Court would stand idly by and allow all that to happen, and

9    also to allow it to occur without the normal law and motion practice or trial practice. For

10   example, Mark Adams just shows up at a status conference and submits requests for

11   orders.

12   282.    Michael King of the County Counsel's office fully supports those orders and says

13   "yes, please grant them."  The Court doesn't need a notice of motion. The court does not

14   need a trial, for example, on the unlawful detainer eviction issue, and instead just grants it

15   on a kind of ex parte basis, rejecting any and all arguments in opposition to the eviction

16

17   process, to the demolition process, to the huge amounts of loans taken against the

18   properties.

19

20   283.    The Court just didn't care and allowed it all to happen. The Sonoma County

21   Superior Court is part of the corrupt behavior of the county. It basically rubber stamps

22   and green lights all of it. The only reason it is not a defendant in these actions is because

23   of judicial immunity. However, it is in the category of a named co-conspirator. Although

24   we may not be able to sue the Superior Court, we can state the facts that it's in on it, and

25

First Amended Complaint

1    that it fully supports the process of benefiting the County through the receipt of gigantic

2    fines that are then used to fund county code enforcement and permit Sonoma operations,

3    as was made clear in their agenda memo submitted by the County of Sonoma to the

4    Board of Supervisors of the County of Sonoma who approved it.

5

6    284.    Citizens and residents of Sonoma County have this problem where the three

7    branches of government, the judiciary, the executive branch, and the legislative branch

8    through the Board of Supervisors of Sonoma have all banded together in a dangerous

9    scheme to ruin the lives of residents with trumped up fines, blockage to attempts to

10    legalize properties, and the end result to demolish the properties, to take the properties, to

11    evict the residents, render them homeless, and eliminate their ownership of these

12    properties.

13

14

15    285.    As fantastical as that may sound, that is exactly what is going on in Sonoma

16    County and that is exactly the point of this lawsuit to bring about an end to it. We can't

17    trust the local courts to do it, so we've come to the federal court and request this court to

18    intervene and to bring about appropriate injunctive relief forbidding the County from

19    doing these things to anyone else ever again.

20

21    4.    Facts Regarding Similar Abusive Tactics by the County of Sonoma Against Other Elders

22    [ Michael Castagnola, Linda Ludwig, Keith Alden, Barbara Scalabrini, Karen Koelker, Jaqueline King

23

24    286.    It has come to Plaintiffs' attention that unfortunately the County preys on elders

25    as well, and state this information so the Court can understand the depths of corruption

First Amended Complaint

190

1    the county has sunk to, in order to succeed in its general goal set out in its meeting

2    agenda (Exhibit C hereto) to raise revenues for the operational budget of Sonoma County

3    Code Enforcement.

4

5    287.    Plaintiff Michael Castagnola is an example on point. He is an elder, over the age

6    of 65 [he is age 74].

7

8    288.    Further, Keni Meyer is currently 60 years old. She is also aware of about five

9    cases at least brought by the County of Sonoma in the pattern of abuse described in this

10    action (imposing huge fines on minor violations, blocking parties from obtaining building

11    permits to cure the violations; obtaining draconian judgments and eventually taking the

12    house and land away from the victim citizens). Some examples she can cite are:

13    • *County of Sonoma v. Linda Ludwig*, Sonoma County Case No. SCV264422.

14    Ludwig is 78 years old.

15    • *County of Sonoma v. Keith Alden (Golden Branch Trust)*, Sonoma County

16    Case No. SCV266259 [exact age unknown, but in excess of 65],

17    • *County of Sonoma v. Barbara Scalabrini*, Sonoma County Case No.

18    24CV05977. Note: She's in a senior living center and they took her property.

19    She has no idea. She is 86 years old.

20    • *County of Sonoma v. Karen Koelker*, Sonoma County Case No. 24CV07293.

21    She is 85 years old.

22    • *County of Sonoma v. Jaqueline King*, Sonoma County Case No. SCV267010;

23    She is 71 years old.

24

25

First Amended Complaint

289.     In addition, Exhibit A to this complaint gives a list of other individuals, all in the category of elders that the County has engaged in similar conduct with.

290.     These collective individuals constitute a showing of a pattern and practice created by the County of Sonoma and done by the County of Sonoma through its code enforcement officials sued herein individually, through its permit Sonoma individuals sued herein, and through County Counsel. All done, we might add with the further culprit not sued herein due to questionable judicial immunity, the Sonoma County Superior Court.

291.     What the County of Sonoma is doing is in the category of an unlawful tax on landowners. The fines are as stated above in excess of any actual costs incurred by the County to bring about the abatement of code violations, and are thus excessive. The excessive nature of the fines imposed by the County with the assistance of county counsel and the Sonoma County Superior Court are unlawful in that they violate the US Constitution, 8th Amendment, as described above, and are in effect a tax that has not been approved by the State of California through the normal process of legislation put through the Assembly and the Senate, and approved by the Governor. The only "law" on this issue is that the County Board of Supervisors approved the Code Enforcement agenda report (Exhibit E hereto).

292.     This taxation scheme to fund the operational budget of the County of Sonoma's Code Enforcement Department is thus an unlawful tax.

First Amended Complaint

5. <u>Retaliatory Code Enforcement Proceedings Brought Against People Providing Assistance to Code Enforcement Victims</u>

293.    Another unfortunate category of victims of Sonoma County Code Enforcement proceedings are victims who have regularly provided assistance to other victims of code enforcement, who then became targets of code enforcement proceedings. Plaintiff Esteban Diaz relies on information supplied to him and his counsel by Keni Meyer, who has the following information about this retaliatory code enforcement scheme.

294.    First, Carmen Cortez and his wife Emma, who live in Santa Rosa, CA off of Guerneville Highway: Carmen and his wife are Spanish speaking persons, who provide professional services to other Spanish speaking members of the Santa Rosa and nearby communities, who have been victimized by Sonoma County Code Enforcement in the manner as described above by other victims, including Esteban Diaz.

295.    Mr. Diaz actually worked with Carmen Cortez to assist him in dealing with his issues. Carmen helps with permit applications, explaining what the claimed violations, and explaining how they can be cured. Carmen became the target of Sonoma County Code Enforcement proceedings during 2023-2024, but may have started as early as 2022. The citations involved claims of junkyard and other related issues, in which fines in the range of $500,000 were issued. During the week of April 2 2025, Keni Meyer was present in a trial setting court hearing involving Ms. Cortez, during which the Sonoma County Superior Court Judge, Hon. James Gaskell asked County Counsel Diane Gomez words to the effect "How did the fines get to be $500,000?" Diane Gomez responded with

First Amended Complaint

193

1    words to the effect "Well, we got a million dollars off of the Elias Stavrinides case."

2    Judge Gaskell then stated words to the effect "I'm familiar with that case."

3

4    296.    Elias Stavrinides is one of the first big cases dating to 2017, before Hon. Patrick

5    Broderick, Department 16, imposed the whopper fines against Elias Stavrinides. There

6    are ongoing legal proceedings about the case as of this writing.

7

8    297.    the March 21, 2022 Judgment of the Sonoma County Superior Court in *County of*

9    *Sonoma v. Elias Stavrinides*, Sonoma County Action no. SCV-265109, issued by Hon.

10   Patrick Broderick, Department 16, was in the amount of $1,056,880, listing a series of

11   gigantic and obviously excessive fines in violation of the United States Constitution's 8th

12   Amendment but given anyway by the Court, because the County Counsel and code

13   enforcement asked for it, and the Court basically gives them whatever exorbitant amount

14   they request without filtering it for constitutional legality. This violated the holding of

15   *Corrine Thomas et al. v. County of Humbolt et al.*, 23-15847 _____ F.4th _____, (9th Cir.

16   2024), discussed above, (The 8th Amendment prohibition Excessive fines clause applies

17   to administrative fines, and enumerating a standard test to determine legality). This

18   whopper judgment was then bragged about by Diana Gomez of the County Counsel's

19   office when she was explaining why Carmen Cortez received a half a million dollar fine.

20

21

22   298.    These two cases of Carmen Cortez and Elias Stavrinides show the extreme abuse

23   by Code Enforcement, County Counsel, and the court system who have come together in

24   this unholy alliance described above to severely abuse the citizens of Sonoma County.

25

First Amended Complaint

299.    Ronald Cupp is another professional helping out persons victimized by County of

Sonoma Code Enforcement. He provides the following services: he has paralegal skills,

and assists people in writing responses to court actions involving code enforcement. He

became targeted by Sonoma County Code Enforcement, in the following manner: They

cited him during 2022 or so, for numerous code violations about his residence. The

County accused him of cannabis growth, using unlawful drone searches, and other add on

citations. His residence is located in Santa Rosa. A Sonoma County Superior Court case

was filed against him, which was assigned to Hon. Oscar Pardo. The case is still pending.

The level of fines sought by the County on charges of cannabis growth and other add on

violations is in the range of $300,000.

300.    Attached to this complaint as **Exhibit U** is a copy of a United States District

Court decision dated September 26, 2023 in the case of *Ronald Cupp v. County of

Sonoma et al.*, USDC NDCA Case No. 23-cv-01007-JST, Granting in Part and Denying

in part County of Sonoma and individual defendants named in the case's Motion to

Dismiss on a civil rights action brought by Mr. Cupp, alleging that the County is

engaging in an unlawful policy of drone flyovers of property to investigate them for

cannabis growth and other code violations.

301.    What is noteworthy about the federal court decision is that the County's motion to

dismiss the entirety of the case was denied. The part that stuck was what is referred to as

a *Monell* claim, a claim against the County itself for unconstitutional use of drones to

First Amended Complaint

conduct surveillance of people and property, including Mr. Cupp. The court's decision

states at page 5:

"The County argues that Cupp has not alleged that it a policy or practice under the second

and to which the Individual Defendants acted pursuant to the fourth prong. The Court

disagrees. In Mateos-Sandoval v. County. of Sonoma, the court found that the plaintiffs

sufficiently alleged a policy because they "specif[ied] the content of the policies" and

because "it [was] inherently plausible that Plaintiffs' . . . claims . . . arose as a result of"

those policies. Id. Here, Cupp alleges that on or about September 10, 2019, the County,

acting through the Permit Department, promulgated a drone policy through a document

entitled "7.0 Standard Operating Procedures on the Use of Unmanned Aircraft Systems."

("drone policy"). ECF No. 1 ¶ 43; ECF No. 1-1 at 42 45. He further alleges that the

Permit Department executed a contract with a private drone operator to conduct aerial

surveillance over private properties in the County of Sonoma, that the drone policy and

contract with the drone operator allow County officials to engage in warrantless searches,

and that the Defendants conducted warrantless searches using drones pursuant to the

drone policy. ECF No. 1 ¶¶ 50, 57, 86. These allegations, taken as true, suffice to

demonstrate the existence of a policy, pursuant to which Cablk and Hoffman acted in

surveilling Cupp's property."

302.    When it came to naming the particular defendants as being behind this unlawful

policy, Mr. Cupp named the County Counsel's office and other code enforcement officers

and alleged a damaged claim against them, the claim was subject to the County's motion

to dismiss based on qualified immunity. The Court found in dismissing the claims against

1   the individual defendants that there was no precedent out there holding that drone

2   flyovers are unlawful, and accordingly there could be no damage claim asserted against

3   the individuals. The County's successful defense in its individual members in the Cupp

4   lawsuit was based on a claim of ignorance of the law. Amazingly it worked. The Court

5   ruled at pages 6-7:

6   "Cupp has not shown that the rights he alleges were violated are clearly established. As to

7   Cupp's Fourth Amendment claim, the Fourth Amendment does not automatically protect

8   against aerial surveillances of private property. See California v. Ciraolo, 476 U.S. 207,

9   215 (1986) ("The Fourth Amendment simply does not require the police traveling in the

10  public airways at [1,000 feet] to obtain a warrant in order to observe what is visible to the

11  naked eye."); Florida v. Riley, 488 U.S. 445, 450 (1989) ("Nor on the facts before us,

12  does it make a difference for Fourth Amendment purposes that the helicopter was flying

13  at 400 feet when the officer saw what was growing in the greenhouse through the

14  partially open roof and sides of the structure. . . .This is not to say that an inspection of

15  the curtilage of a house from an aircraft will always pass muster under the Fourth

16  Amendment simply because the plane is within the navigable airspace specified by

17  law."). Cupp identifies no cases in which courts have held conduct of the sort alleged to

18  violate the Fourth Amendment, the Court is aware of none. As to Cupp's Fourteenth

19  Amendment claim, Cupp neither alleges any deprivation of life, liberty, or property as a

20  result of Cablk's and Hoffman's conduct, nor does he identify any cases in which courts

21  have held warrantless arial surveillance to violate the Due Process Clause of the

22  Fourteenth Amendment. Therefore, Cupp has not demonstrated that the rights allegedly

23  violated were clearly established. The Court will dismiss these claims."

24

25

First Amended Complaint

303.    The good news for Mr. Cupp is that he may actually obtain that legal precedent that the Court notes is absent from the legal landscape. The good news for the County individual defendants in that case is their ignorance of the law claim which normally does not apply to citizens did apply to them in the context of a federal civil rights action defense and they got let go from the case. The point being made here is that the county is generally speaking able to get away scot-free with this kind of abuse of its citizens. Hopefully the *Cupp* decision will create the legal precedent that is missing from the legal landscape and thereafter county officials can be held liable and accountable for damages.

304.    A second motion to dismiss in the *Cupp* case resulted in a decision dated March 19, 2025 (copy attached as **Exhibit V**), in which the Court again upheld Cupp's *Monell* claim based on the unconstitutional drone custom policy and practice. At page 12-13 of the District Court's March 19, 2025 Memorandum and Decision on the Second Motion to Dismiss Cupp's case, the court states:

"Cupp is not making a respondeat superior argument. Instead, Cupp alleges a *Monell* claim based on two separate theories: (1) the existence of an unconstitutional custom or policy; and (2) failure to train or supervise code enforcement officers. ECF No. 49 ¶¶ 113–124. Defendants' motion does not address these theories or the other elements of a *Monell* claim listed above. Indeed, the County's reply brief virtually concedes the point by stating that "no basis for a *Monell* claim is stated *with possible exception of Drone Policy.*" ECF No. 63 at 5 (emphasis added). The Court therefore rejects this argument. The County's second argument fares no better. The County argues that "[it] may be called to answer a Section 1983 claim in federal court only if the complaint plausibly

First Amended Complaint

alleges a pattern, practice, or custom of constitutional violations," and that Cupp has not done so. ECF No. 50 at 17. The County ignores that Cupp may also plead a *Monell* claim by alleging that "a city employee committed the alleged constitutional violation pursuant to a formal governmental policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir. 1992). Here, Cupp has done so by alleging that the alleged violations were committed pursuant to the County's Drone Policy.

The Defendants' motion to dismiss Cupp's *Monell* claim concerning the 2019 Drone Policy is denied."

305.    The case of Ronald Cupp and Carmen Cortez are both examples where County of Sonoma has blocked permit applications to obtain building permits to cure violations; have imposed hugely excessive fines; have filed *lis pendens* against their properties, thus choking them off of funding to do construction expenses and/or defend themselves from aggressive litigation tactics deployed by the County Counsel's office; and similar behaviors as described above with respect to the other victims.

306.    In the meantime, the foregoing cases involved the county retaliating against people who were helping other people deal with code enforcement and once those people got a bit too vocal and too helpful the County went after them with a vengeance.

307.    Keni Meyer has been monitoring Sonoma County Code Enforcement cases brought by the Sonoma County Counsel's office before Department 16, Judge Broderick,

First Amended Complaint

for years, since during 2022, which has stepped up since 2024 to include almost a substantial portion of the Code Enforcement cases in Department 16, and has seen first-hand one repetitive outcome: The County always, always wins, and wins big. Keni Meyer estimates the number of cases she has monitored to be 80 and climbing. This violated the holding of *Corrine Thomas et al. v. County of Humbolt et al.*, 23-15847 _____ F.4th _____ , (9th Cir. 2024), discussed above, regarding the legal test under the Eighth Amendment prohibiting for an excessive administrative fines.

# VIII.
## ADDITIONAL INJUNCTIVE RELIEF CLAIMS RE THE CASTAGNOLA RESIDENCE

308.    Plaintiff Michael Castagnola on behalf of himself and by and through his family trust entitled The Michael L. Castagnola Revocable Trust Agreement dated September 15, 2016, and in his capacity as trustee of that trust, seeks further equitable relief in the form of a restraining order and preliminary injunction and permanent injunction enjoining the defendant County of Sonoma and defendants Robert Pittman, Diana Gomez, Tyra Harrington, Susan Gorin, David Rabbitt, Chris Coursey, James Gore, Lynda Hopkins, and Jessie Cablk and Mark Adams as receiver from imposing any further encumbrances on the real property located at 12778 Dupont Road Sebastopol, CA 95472-8934; enjoining the same defendants from causing the filing or recording of any further liens against the property located at 12778 Dupont Road Sebastopol, CA 95472-8934; enjoining the defendants including Mark Adams from completing any sale or transfer of the property to another third party; and or such other equitable relief as the court may deem just and appropriate.

First Amended Complaint

309.    To the extent the transactions become completed prior to a hearing on a motion

for injunctive relief, Plaintiffs request the further relief of a rescission of those

transactions based on fraud illegality, including embezzlement, wire fraud, and other

offenses described in the attached status conference statement submitted before the

Sonoma County Superior Court on July 21, 2025, Exhibit E hereto, and in the supplement

to that status conference statement filed on August 12, 2025, attached as Exhibit F, which

set forth the following offenses by Mark Adams done at the connivance, facilitation,

encouragement, approval, and ratification by the County defendants:

1. Embezzlement. Quite clearly, Mark Adams has committed an embezzlement within the

empowerment of his receivership status given to him by the court at the request of

Sonoma County Counsel and at the urging of Code Enforcement. He has embezzled

$880,000 and has literally stolen the house belonging to Michael Castagnola in the

process. This is a major, major embezzlement.

2. Wire fraud. Mark Adams has committed wire fraud in the process of obtaining a bunch

of fake loans in the process of boosting up the loan balances to $880,000 in the process of

e-filing items with the court to convince the court that he's actually spent these monies.

The Court has ratified what he's done by approving these. He did these at the request of

County Counsel and at the request of Code Enforcement.

3. Mail Fraud. It is not clear to us at this point whether Mark Adams ever uses the mail in

the process of obtaining these fake loans, pretending to have loans, obtaining his LLC

shells companies that run out of his office and purportedly loaned money to these

properties. As can be seen from the news articles, he does this as a pattern of practice. It

First Amended Complaint

is quite probable that somewhere in his activities, he actually uses the mails and as such has committed a further offense of mail fraud.

4. Evidence tampering. Mark Adams has manipulated the circumstances and factual showings that he's made in this case to make it appear as though he legitimately went out and borrowed $880,000 to cure the Code Enforcement violations on the property. It's a total lie. He has tampered with evidence. He has tampered with witnesses to assist him in his deeds. He has done this at the request of Sonoma County Counsel, at the request of Sonoma County Code Enforcement and with the ratification and approval by the Sonoma County Superior Court.

5. Obstruction of Justice. Mark Adams's conduct also included Falsifying evidence, giving false statements, and interfering with the execution of court orders.

310.    It bears mentioning here that during the commission of the above-stated offenses, Michael Castagnola is an elder within the meaning of Welfare & Institutions Code section 15610.27: "Elder" means any person residing in this state, 65 years of age or older."

311.    Defendant Mark Adams recently stated in a status conference statement in the Sonoma County Superior Court that he submitted on August 7, 2025 that a sale of the property is imminent and about to occur. Thus, there is a substantial probability and likelihood of a sale going forward.

312.    Plaintiffs do not know the name of the buyer, and will seek leave to amend to add the name of any buyer and name/s the buyer/s as Doe 1 for purposes of giving some

First Amended Complaint

1  identification to them. Plaintiffs do not accuse that buyer of the wrongdoings described

2  herein, but would claim that they are a necessary party to this action in that their title to

3  the property would be impacted.

4

5                                        **IX.**
   **ALLEGATIONS REGARDING QUALIFIED IMMUNITY**

6

7  313.        In reaching a compromise with Michael Castagnola regarding his real property

8  located at 12778 Dupont Road Sebastopol, CA 95472-8934, Sonoma County, California

9  as reflected in the stipulation for judgment and judgment attached as Exhibit K hereto,

10 the County basically struck a bargain with Michael Castagnola that required him to

11 legalize the property. As can be seen from the terms of the ensuing judgment, the basic

12 problem that the County cited and adjudged through the judgment Michael Castagnola as

13 liable for was his conduct in constructing a number of improvements to the real property,

14 without having first obtained a building permit.

15

16 314.        Therefore, Michael Castagnola recognized that offense and owned up to it by

17 signing the stipulation for judgment in which he agreed and the county agreed that he

18 would legalize the property and that he would pay the county a fine constituting

19 abatement expenses and attorney's fees and abatement costs of $89,999.00. See Exhibit

20 K, stipulation for Judgment and Judgment and in particular page 7, paragraph 3

21 regarding the $89,900. The legalization language is found as an example at page 3,

22 paragraph 2A. of the judgment and states with respect to the barn structure:

23 "2. DEFENDANTS shall abate the Code violations on the Property as follows:

24 A. Unpermitted Habitable Structure (Barn) with electrical, plumbing and mechanical

25 (VBUI 7-0234):

First Amended Complaint

203

1    1) DEFENDANTS shall legalize the Barn by submitting to the County a complete permit

2    application to abate the building code violation, including any required building,

3    electrical, septic, or other required applications and all supporting documents and plans

4    no later than August 21, 2020 and obtaining final inspection within 120 days of the

5    issuance of the building permit.

6    a. Legalizing (VBU17-0234) includes each and every of the following: obtaining

7    issuance of any necessary building, sewage and septic, and approvals from the County,

8    including paying any necessary fees, completing all necessary work required under each

9    permit, and obtaining final inspection approval by the County. No penalty permit

10   multiplier will be applied to this permit."

11

12   315.    This was a bilateral agreement that has two sides to it. The two sides are this:

13   Michael Castagnola is required to legalize the property; the County is required to let him

14   legalize the property.

15

16   316.    In a story that is told many times in the County of Sonoma, including the cases

17   and victims noted above, for example, Thomas Lutge, Keni Meyer, Esteban Diaz, the

18   County has this schizophrenic personality whereby on the one hand, they want abatement

19   of public nuisances that constitute code enforcement violations; but on the other hand,

20   they block people such as plaintiff Michael Castagnola and victims Thomas Lutge, Keni

21   Meyer, Esteban Diaz from obtaining the permits needed to legalize the property. This

22   type of schizophrenic behavior constitutes an inherently inconsistent position taken by

23   the County of Sonoma that rises to the level of a substantive due process violation

24   pursuant to the published legal precedent of *Chalmers versus City of Los Angeles*, 762

25

First Amended Complaint

1    F.2d 753, 758 (9th Cir. 1985) [internally inconsistent ordinances were held to constitute a

2    substantive due process violation]:

3    "We do not hold that the ordinance scheme itself was necessarily a violation of due

4    process. Rather, the due process violation occurred in the manner in which this

5    inconsistent scheme was implemented and enforced. We do not hold that the ordinance

6    scheme itself was necessarily a violation of due process. Rather, the due process violation

7    occurred in the manner in which this inconsistent scheme was implemented and

8    enforced."

9

10    317.    In this case, we have an internally inconsistent judgment requiring legalization of

11        the property while the county prohibited legalization of the property. The deception

12        involved as described above in parts V and VI of this complaint constitutes the level of

13        deception that resulted in a substantive due process violation under the 14th Amendment

14        found in the case of *Herrington v. County of Sonoma*, 834 F.2d 1488 (9th Cir. 1988).  In

15        that case, the County basically lied about a general plans application to a project

16        development and refused to permit the development required permits and allowances to

17        allow the property owner to build the development envisioned by the property owner.

18

19    318.    See also the following cases cited  in the *Herrington* case as supporting liability

20        under the Federal Civil Rights Act: *Kinzli v. City of Santa Cruz*, 818 F.2d 1449, 1453 n.

21        4 (9th Cir.1987); *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 106 S.Ct.

22        2561, 91 L.Ed.2d 285 (1986), and *Williamson County Regional Planning Commission v.*

23        *Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

24

25                                         .

Case 3:25-cv-03624-JD    Document 18    Filed 09/22/25    Page 109 of 230

319.    The County has quite a history of doing this kind of behavior and unfortunately, it
is a story rampant throughout the state of California. By way of one of the most
unfortunate examples, the county of Los Angeles is refusing to grant permits to
homeowners and Pacific Palisades to rebuild their homes. This is a significant problem in
the state of California and especially in Sonoma County that really does necessitate
federal court intervention to tell the county of Sonoma to stop it and to allow people to
legalize properties and to allow people to keep their properties.

320.    The problem when the County is given their own free will is shown quite clearly
by exactly what happened to Michael Castagnola and Carly Castagnola. Michael
Castagnola literally lost his home to this problem. This is an $89,999 problem on a home
worth well in excess of $1 million dollars.

321.    Carly Castagnola's stake in it is not as owner of the premises, but she does have a
stake in it as a person with a right to occupy a yurt rent-free and to live on the property
pursuant to a verbal agreement given by her father Michael Castagnola. So, she has a
stake here and lost her tenancy when Mark Adams decided that he would not legalize the
properties and would instead just bulldoze them down. We point out the photos of the
property Exhibit L hereto, to show the court that this is a beautiful property. This is a
wonderful place. It is literally storybook in character. Then, some guy from LA, a lawyer,
is hired by the county to mow it all down.

322.    It's outrageous. It was based on deception. It was based on a two-faced
schizophrenic stipulation for judgment requiring legalization, when all the while the
County's idea was to disallow legalization and act in this internally inconsistent and

First Amended Complaint

1    inherently contradictory manner that rises to a level when combined with the deception of

2    a violation of the substantive due process rights of both Michael Castagnola as owner of

3    the premises and Carly Castagnola as a person with a free life estate in the premises.

4

5    323.    As such, defendants have committed intentional willful violations of plaintiff's

6    substantive due process rights arising under the 14th Amendment to the United States

7    Constitution. They do not enjoy any form of qualified immunity based on the published

8    precedent of *Chalmers versus City of Los Angeles* prohibiting internally inconsistent

9    operations of law as a violation of the due process clause of the 14th Amendment and

10   based on the published case of *Herrington v. Sonoma,* 834 F.2d 1488 (9th Cir. 1988), in

11   which Sonoma obviously knew about because they're the defendant in that action and

12   learned the hard way following a jury trial that as a county government you are not

13   allowed to lie, cheat, and steal your way through the permit process. You have to be

14   honest and proper.

15

16   324.    The County doesn't want to be that way still, notwithstanding the judgment of

17   *Herrington.* They need to be checked on this. One of the dilemmas is that the County

18   Board of Supervisors has approved the agenda of the county to fund code enforcement

19   operations with rough and tough code enforcement operations in which homeowners are

20   raked over the coals, are given whopper fines over problems that actually are eminently

21   solvable with the simple issuance of a proper permit.

22

23   325.    The County is being intentionally impossible in its permitting process because it

24   wants to fund itself and is doing so by exacting whopper fines from homeowners as laid

25   out in the agenda document Exhibit C hereto and discussed above. Defendants conducted

First Amended Complaint

1   themselves deliberately indifferently to and with conscious disregard of the plaintiff's

2   substantive due process rights. Defendants' unconstitutional behavior was done by them

3   individually and personally under color of legal authority as noted above.

4

5
### X.
### ALLEGATIONS DISCUSSING THE LITIGATION PRIVILEGE

6

7   326.    *Kimes v. Stone*, 84 F.3d 1121 (9th Cir. 1996) reaffirms California's litigation

8   privilege does not immunize parties from federal section 1983 liability:

9   "Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. §

10  1983 or § 1985(3) cannot be immunized by state law. A construction of the federal statute

11  which permitted a state immunity defense to have controlling effect would transmute a

12  basic guarantee into an illusory promise; and the supremacy clause of the Constitution

13  insures that the proper construction may be enforced."

14

15  327.    This same rule would apply to the RICO claims as well.

16

17  328.    The state law claims also negate the litigation privilege. See *City of Santa Monica*

18  *v. Gonzalez* (2008), 43 Cal.4[th] 905; *Shannon v. Superior Court* (1990) 217 Cal.App.3d

19  986; and *Garris v. Mitchell* (1935) 7 Cal.App.2d 430, court-appointed receivers are still

20  liable for conduct that violates their fiduciary duty and duty to the court as well as the

21  parties to the action. In particular, the case of *Garris* holds that a receiver may be sued by

22  a litigant.

23

24

25

First Amended Complaint

## XII.
## PRAYER FOR RELIEF

The Plaintiff respectfully requests

1. For a Judgment in their favors as to all claims for relief, and as against all defendants.

2. Compensatory damages for the value of the loss of Michael Castagnola's residence located at 12778 Dupont Road, Sebastopol, CA 95472-8934, estimated to be in excess of $1 million.

3. Compensatory damages suffered by Michael Castagnola for the demolition of a group of structures on the building, which is estimated to be in the amount of $362,285.70.

4. Compensatory damages suffered by Carly Castagnola for the demolishment or the demolition of the yurt that she resided in which caused her to lose the value of her life tenancy rent free in that year, as well as all of her personal belongings that she kept in that yurt in an amount according to proof, and Carly Castagnola's loss of her free life estate which has a value of in excess of $400,000 dollars or at least approximately $2,000 a month times 12 months = $24,000 a year for 20 years = $480,000, depending on how long she would live. The compensatory damages are in the range somewhere of $400,000 and $500,000.

5. For other compensatory damages in an amount according to proof. For general damages in amount according to proof but in excess of $5 million for Michael Casstagnola, and $5 million for Carly Castagnola.

First Amended Complaint

6.  For such other general and special damages in amounts according to proof.

7.  For equitable relief in the form of a restraining order and preliminary injunction and permanent injunction enjoining the defendant County of Sonoma and defendants Robert Pittman, Diana Gomez, Tyra Harrington, Susan Gorin, David Rabbitt, Chris Coursey, James Gore, Lynda Hopkins, and Jessie Cablk and Mark Adams as receiver from imposing any further encumbrances on the real property located at 12778 Dupont Road Sebastopol, CA 95472-8934; enjoining the same defendants from causing the filing or recording of any further liens against the property located at 12778 Dupont Road Sebastopol, CA 95472-8934; enjoining the defendants including Mark Adams from completing any sale or transfer of the property to another third party; and or such other equitable relief as the court may deem just and appropriate.

8.  To the extent the transactions become completed prior to a hearing on a motion for injunctive relief, Plaintiffs request the further relief of a rescission of those transactions based on fraud illegality, including embezzlement, wire fraud, and other offenses described in the attached status conference statement submitted before the Sonoma County Superior Court on July 21, 2025, Exhibit E hereto, and in the supplement to that status conference statement filed on August 12, 2025, attached as Exhibit F, which set forth the following offenses by Mark Adams done at the connivance, facilitation, encouragement, approval, and ratification by the County defendants:

First Amended Complaint

2110

9. For injunctive relief after the fact requiring the County and Mark Adams to give back what they have improperly stolen return the home and pay for damages sufficient to allow plaintiffs to rebuild what the defendants have mowed down.

10. Declaratory relief in the form of a declaration by the court that a judge's the defendants as having violated the Federal Civil Rights Act 42 USC section 1983 and specifically the substantive due process clause of the 14th amendment by their conduct and behavior as described herein, or such other declaratory relief as the court deems just and appropriate.

11. Total damages are in the neighborhood of $5 million dollars or according to proof at the trial. Plaintiffs seek these $5 million dollars each for a total of $10 million for violation of the federal RICO statute, 18 USC section 1964(c);

12. Total damages are in the neighborhood of $5 million dollars or according to proof at the trial. Plaintiffs seek these $5 million dollars each for a total of $10 million for violation of California Penal Code section 186 et. seq.;

13. For a trebling of these damages under the Federal RICO statue pursuant to 18 USC section 1964(c);

14. An award Plaintiffs attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988, as well as any other costs and fees that are legal and equitable.

15. An award of Plaintiffs attorneys' fees, costs, and expenses pursuant to 18USC section 1964(c), as well as any other costs and fees that are legal and equitable

16. Award Plaintiffs attorneys' fees, costs, and expenses pursuant to Welfare & Institution Code section 15657.5, as well as any other costs and fees that are legal and equitable.

17. For Reformation of Deed based on Fraud and Embezzlement pursuant to Civil Code 3399, Reformation of Deed

18. For Quiet Title pursuant to CCP section 760.020.

19. An award any further legal or equitable relief as the Court deems just and proper.

Respectfully Submitted,

//s// Herman Franck, Esq.

Date: September __22__ , 2025

_____
Herman Franck, Esq.
Attorneys for Plaintiffs Michael Castagnola;
Michael Castagnola as Trustee of The Michael L. Castagnola
Revocable Trust Agreement dated September 15, 2016;
and Carly Castagnola

First Amended Complaint

1

2                          **DEMAND FOR JURY TRIAL**

3

4    Plaintiffs Michael Castagnola, Michael Castagnola as Trustee of The Michael L. Castagnola

5    Revocable Trust Agreement dated September 15, 2016, and Carly Castagnola. Each and both

6    demand a jury trial as to all claims for relief tribal to a jury.

7

8

9    Respectfully Submitted,

10   //s// Herman Franck, Esq.

11   _____              Date: September __22__ , 2025
     Herman Franck, Esq.
12   Attorneys for Plaintiffs Michael Castagnola;
     Michael Castagnola as Trustee of The Michael L. Castagnola
13   Revocable Trust Agreement dated September 15, 2016;
     and Carly Castagnola
14

15

16

17

18

19

20

21

22

23

24

25

First Amended Complaint

**VERIFICATION OF MICHAEL CASTAGNOLA AND TRUSTEE OF THE MICHAEL L. CASTAGNOLA REVOCABLE TRUST AGREEMENT DATED SEPTEMBER 15, 2016**

I, Michael Castagnola, declare and state that I am a Plaintiff in the foregoing action, and I'm also the Trustee of The Michael L. Castagnola Revocable Trust Agreement dated September 15, 2016, listed as a co-Plaintiff herein, and am authorized to make this verification on its behalf.

I further state and declare that the allegations and statements made of my Verified First Amended Complaint are true and correct, and that this verification was signed under oath and under penalty of perjury on September _22_ , 2025 at Sebastopol, California.

Michael Castagnola

Michael Castagnola as Trustee of The Michael L. Castagnola Revocable Trust Agreement dated September 15, 2016

First Amended Complaint

225

214

1

### VERIFICATION OF CARLY CASTAGNOLA

2

I, Carly Castagnola, declare and state that I am a Plaintiff in the foregoing action.

3

4

I further state and declare that the allegations and statements made of my verified complaint are

5

true and correct, and that this verification was signed under oath and under penalty of perjury

6

on September 22nd, 2025 at Sebastopol, California.

7

8

9

Carly S. Castagnola

10

Carly Castagnola

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

First Amended Complaint

1

**LIST OF EXHIBITS**

2

3      Exhibit A: List of Sonoma County cases

4      Exhibit B: Minute Order dated March 12, 2025 approving Carly Castognola's request to proceed
       with a lawsuit against Mark Adams;
5      Exhibit C: County of Sonoma Agenda Item Dated March 7, 2017; and March 8, 20227
       ratification of it by the County Board of Supervisor
6

7      Exhibit D: Lis Pendens filed by the County of Sonoma in the underlying action *Sonoma v.
       Castagnola*, Sonoma County Superior Court Case No. SCV-265714
8

       Exhibit E: Initial Status Conference Statement dated July 21, 2024
9              Attachment A: Series of press articles showing Mark Adams is a crook:
               1. May 17, 2023 article entitled "Evictions, homelessness, debt: Skid Row Housing
10             Trust receiver has checkered history" by Liam Dillon and Doug Smith from the *Los
               Angeles Times*
11             2. June 12, 2023 article entitled "One Of Skid Row's Largest Housing Providers Veered
               Toward Financial Collapse. New Issues Are Surfacing After A City-Led Takeover" by
12             Nick Gerda for the *Los Angeles Times*
               3. June 15, 2023 article entitled "Judge Removes 7 Buildings From Troubled
13             Skid Row Housing Receiver's Portfolio" by David Wagner for the Los Angeles
               Times
14             4. July 17, 2025 article entitled "Sonoma County family loses their home after yearslong
               battle over permits, court appointed cleanup company", by Marisa Endicott and Phil
15             Barber for the *Sonoma Press Democrat*
16
               Attachment B: Chronology prepared by Carly Castagnola showing a series of loans that
17             Mark Adams has taken out on this property, totaling a staggering $880,000.
18
               Attachment C: A 24-page chronology prepared by Carly Castagnola that chronicles the
19             series of incredible behaviors that Mark Adams did, that the County Counsel approved
               of, and that this Court approved of.
20
               Attachment D: Excerpts from a recently-filed [Not yet served], federal complaint in
21             which there is a claim for relief regarding Mark Adams' completely unlawful, self-help
               eviction of Carly Castagnola from a yurt she was living in on Michael Castagnola's
22             property.
23
               Attachment E: A list prepared by Carly Castagnola of structures formerly on Michael
24             Castagnola's home that Mark Adams has demolished.
25
               Attachment F: May 23/May 29, 2025 Arbitration Award re Natures Way LLC v
               Respondent Mark Adams

First Amended Complaint

Exhibit F: Supplement Status Conference Statement
    Attachment 1: Affidavit of Truth and Rebuttal of False Statements, Misrepresentations, and Contempt Breaches of Fiduciaries in Order Appointing Receiver
    Attachment 2: Affidavit of Fraudulent Trust Creation of Deed of Trust of Real Property: Rebuttal of Self-Dealing Receivership Estate, invocation of Equity Redemption, and Application of Legacy Laws for Property Recovery

Exhibit G: Memo re List of Eviction Related-Orders and Writ of Possession and the actual orders
1. October 31 2023 Order After Hearing for Judgment of Possession and Contempt
2. February 29, 2024 Revised Order After Hearing for Judgment of Possession
3. January 24, 2024 Minute Order re Mr. Castagnola's attempt to challenge the eviction related orders

Exhibit H: May 25, 2022 Order Appointing Mark Adams as Receiver

Exhibit I: Excerpts of Title report from Lawyers Title Co dated December 3, 2024 on

Exhibit J: Legal Description of 12778 Dupont Road, Sebastopol, CA 954

Exhibit K: July 24, 2020 Stipulated Judgment in *Sonoma v. Castagnola*, Sonoma County Superior Court Case No. SCV-265714

Exhibit L: Series of Photos [with sub exhibits]
1. Photo of Entry to the Property
2. Photos of Carly Castagnola's Yurt
3. Photos of Seed Barn:
4. Photos of Greenhouse
5. Photos of Bulldozed remains/rubble after Mark Adams's Team demolished the structure

Exhibit M: Stipulation for Entry of Judgment and Stipulated Judgment in *County of Sonoma v. Esteban Diaz et al.*, Sonoma County Superior Court Case No. SCV-265769

Exhibit N: Excerpts of the Declaration of Mark Benda in Support of Opposition to Motion for Summary Judgment in *County of Sonoma v. Lutge*, Sonoma County Case No. SCV-272556.

Exhibit O: Memo of pages of interest of transcript of February 26, 2025 hearing on County of Sonoma's Motion for Summary Judgment/Summary Adjudication and Transcript of the Hearing

Exhibit P: March 28, 2025 Judgment in *County of Sonoma v. Lutge*, Sonoma County Case No. SCV-272556

Exhibit Q: April 5, 2022 Notice of Entry of Order/Judgment and March 25, 2022 Judgment in *County of Sonoma v. Keni Meyers*, Sonoma County Action No. SCV-267880

Exhibit R: Email dated October 27, 2020 from County Counsel Holly Rickett, Esq. to Code Enforcement Supervisor Tyra Harrington and Thomas Hoffman, Code Enforcement Inspector II re Keni Meyer

Exhibit S: Two appeals of the citations that Keni Myers's previous lawyer did file.

Exhibit T: Photo of Keni Meyer's former home

Exhibit U: United States District Court decision dated September 26, 2023 in the case of *Ronald Cupp v. County of Sonoma et al.*, USDC NDCA Case No. 23-cv-01007-JST

Exhibit V: March 19, 2025 Memorandum and Decision on the Second Motion to Dismiss in *Ronald Cupp v. County of Sonoma et al.*, USDC NDCA Case No. 23-cv-01007-JST

Exhibit W: List of Short Summaries of Series of Monthly Expense Reports E-Filed by Mark Adams to the Sonoma County Superior Court Seeking Approval for Payment to Mark Adams of the Listed Amounts

Exhibit X: List of Other Orders Requested by Mark Adams via E-File Submission to the Sonoma County Superior Court

Exhibit Y: September 10, 2024 Trustee's Deed for Sale

Exhibit Z: List prepared by Carly Castagnola of structures formerly on Michael Castagnola's home that Mark Adams has demolished.

Exhibit AA: Excerpts of an Excel spreadsheet showing the County of Sonoma code enforcement citations and proceedings

Exhibit BB: Further memo prepared by Mark Castagnola's daughter, Carly Castagnola, in which she notes a series of further improprieties with respect to the process in which Mark Adams borrowed more than $880,000 to supposedly legalize the property, and actually didn't legalize anything, with the following series of sub exhibits:

    Exhibit A: First Receivership Certificate filed 9/16/22 File # 20220399956 $30,000-$60,000

Exhibit B:Recorded Receivership Certificate 6/26/2023 file # 2023028373

Exhibit C: 6/22/23 file #2023027908 signed by Judge $316,160.00 to $466,660.00

Exhibit D: 6/15/23 a Notice was sent, Declaration OF ADENA MOSESIAN KASHANI Super Priority Receiver's Certificate reached maturity. Notice sent via email Date: June 15, 2023 that on May 1, 2023, an important development occurred as the Super Priority Receiver's Certificate reached maturity.

Exhibit E: 6/26/2023 Filed #2023023748 AMENDMENT TO SUPER-PRIORITY DEED OF TRUST 6/22/2023 states the $466,,660.00 the certificate #4 shall reach

First Amended Complaint

1    maturity 9/22/2023 claiming the whole DOT rights as now he surpassed previous owners
      mortgage debt value.
2    Exhibit F: Picture Taken SOS/Website Glan Investment LLC Statement of Information
      showing Confirmed Suspension lapse, including the change of Manager and Address
3    during this lapse.
      Exhibit G: Glan Investments LLC 10/18/2021Filing
4    Exhibit H: Glan Investments LLC 6/7/2024 Filing
      Exhibit I: 6/20/2024 Receivership Funding LLC filed SOS CA
5    Exhibit J: 3/12/2024 Receivership Financing LLC filed SOS CA
      Exhibit K: 7/8/2024 Mark Adams Receivership Funding LLC filed (San Juan Capistrano,
6    "Receivership Loans") SOS CA
      Exhibit L: 6/14/2024 Receivership Funding LLC filed (all members) SOS CA
7    Exhibit M: 3/28/2024 NOD: $532k default to Receivership Funding LLC (Adams
      signs).Activity in suspension window—invalid if tied to Glan, extortion stealing
8    residence.
      Exhibit N: SUMMARIES OF SERIES OF MONTHLY EXPENSE REPORTS E-FILED
9    BY MARK ADAMS TO SONOMA COUNTY SUPERIOR COURT SEEKING
      APPROVAL FOR PAYMENT TO MARK ADAMS OF THE LISTED AMOUNTS
10   Exhibit O: Timeline Of Events Case SCV-265714
      Exhibit P: 9/10/24 Trustee Deed Upon Sale
11   Exhibit Q: 8/06/24 GRANT DEED GRANTOR MICHAEL LOUIS CASTAGNOLA
      Trustee under the MLC REV TRUST
12   Exhibit R: 9/01/24 Notice of Trustee Sale.
      Exhibit S: ASSIGBMENT OF DEED OF TRUST file date 3/21/24 # 2024011916 signed
13   as Executed 3/18/24 (LAPSE PERIOD CLAN INVESTMENTS LLC)
14
15
16
17
18
19
20
21
22
23
24
25

First Amended Complaint

# ATTACHMENT I

**Pages of Interest re Applicable Dates for Statutes of Limitations**

May 22, 2022 – June 2025: Mark Adams amassed $880,000 in expenditures against the property
See FAC, Exhibit E thereto, July 21, 2025 status conference, Attachment B thereto - Chronology
prepared by Carly Castagnola showing a series of loans that Mark Adams has taken out on this
property, totaling a staggering $880,000]

September 9, 2024: Writ of Possession
See FAC, Exhibit G-2: February 29, 2024 Revised Order After Hearing for Judgment of
Possession
related orders; see also See FAC, Exhibit E thereto, July 21, 2025 status conference, Attachment
B thereto - Chronology prepared by Carly Castagnola showing a series of loans that Mark Adams
has taken out on this property, totaling a staggering $880,000]

September 10, 2024: Mark Adams obtained ownership of the property [See FAC, Exhibit I,
Excerpts of Title report from Lawyers Title Co dated December 3, 2024, page 2: "Primary
Owner names: Receivership Financing, LLC"

January 8, 2025: eviction of Michael and of Carly Castagnola:
See FAC, Exhibit E thereto, July 21, 2025 status conference, Attachment B thereto - Chronology
prepared by Carly Castagnola showing a series of loans that ]Mark Adams has taken out on this
property, totaling a staggering $880,000]

January 8, 2025: physical destruction of Carly Casanova's yurts
See FAC, Exhibit E thereto, July 21, 2025 status conference, Attachment B thereto - Chronology
prepared by Carly Castagnola showing a series of loans that Mark Adams has taken out on this
property, totaling a staggering $880,000

These dates are set forth in the attached excerpts of the FAC:

General allegations of the complaint, page 25, paragraphs 114-117 [re writ of possession and
ownership of property] and in section V., page 42, paragraphs 155-158.

They are to some extent set forth in the first claim for relief for violation of the Federal Civil
Rights Act, page 114, paragraph 339

They are set forth in the Eleventh Claim for Relief for violation of the federal RICO statute
[FAC, page 153, paragraph 482, and page 158, paragraphs 500-501].

See also the Fifteenth Claim for Relief for state tort claim of wrongful foreclosure, wrongful eviction, and breach and violation of plaintiff Michael Castagnola in his individual capacity and as trustee of his family trust for violation of his right to quiet enjoyment of the premises, page 204, paragraphs 628-629

1  Herman Franck, Esq. SBN 123476
   Elizabeth Betowski, Esq., SBN 245772
2  Franck & Associates
   1750 Prairie City Road, Ste. 130, #254
3  Folsom, CA 95630
   Tel: 916-256-6266
4  Email: franckhermanlaw88@yahoo.com
   Attorneys for Plaintiffs Michael Castagnola;
5  Michael Castagnola as Trustee of The Michael L. Castagnola
   Revocable Trust Agreement dated September 15, 2016;
6  and Carly Castagnola

7              UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
8                [San Francisco Division]

9  MICHAEL CASTAGNOLA; MICHAEL          Case No: 25-cv-03624-JD
10 CASTAGNOLA AS TRUSTEE OF THE MICHAEL L.
   CASTAGNOLA REVOCABLE TRUST          **VERIFIED**
11 AGREEMENT DATED SEPTEMBER 15, 2016;  **FIRST AMENDED COMPLAINT**
   CARLY CASTAGNOLA,
12                                      **FOR VIOLATION OF THE FEDERAL
13 Plaintiffs,                          CIVIL RIGHTS ACT, FEDERAL
                                        R.I.C.O. ACT; RELATED STATE LAW
14 v.                                   CLAIMS INCLUDING AN ACTION
                                        FOR REFORMATION OF DEED AND
15                                      QUIET TITLE**

16 MARK ADAMS in his capacity as Receiver;
   ROBERT PITTMAN in his capacity as Sonoma County
17 Counsel;
   DIANA GOMEZ, in her capacity as Sonoma Deputy
18 County Counsel;
   MICHAEL KING, in his capacity as Sonoma Deputy
19 County Counsel
   COUNTY OF SONOMA;
20 TYRA HARRINGTON in her capacity as Manager of
   Code Enforcement Permit Sonoma;
21 SUSAN GORIN in her capacity as Supervisor;
   DAVID RABBITT in his capacity as Supervisor;
22 CHRIS COURSEY in his capacity as Supervisor;
   JAMES GORE in his capacity as Supervisor;
23 LYNDA HOPKINS in her capacity as Supervisor;
   JESSIE CABLK in his capacity as employee of Permit
24 Sonoma;

25

112.   There is no evidence to support Defendant Adams, acting as a general contractor, being bonded and insured for the job as required under California State Worker Compensation Program and Unemployment Insurance, and as such, Adams was and continues to be required by California Law to have obtained bids from licensed and bonded contractors to support the Rehabilitation Plan and Cost Estimate.

113.   But one thing remained constant, and that was Defendant Adams billing about $4,000.00 every month, reading emails and making a couple telephone calls regarding the now dormant property on Dupont Road.

114.   Weeks later, on September 9th, 2024, The County of Sonoma perfected their judgment against the Plaintiff and took possession of the property through a writ of possession.

115.   This possession didn't last long as they immediately lost the property to their lender as Defendant Adams had intentionally defaulted on the note, losing it to foreclosure.

116.   The Receiver "managed" to buy back the property after a non-judicial foreclosure under the alias of another of his 90 companies, this one just recently created RECEIVERSHIP FINANCING LLC.

117.   The Receiver now owns the Plaintiffs' one and half million-dollar property for allegedly $525,000.00.

First Amended Complaint

153.    He went and submitted them and that the county refused to grant the permits. They have paperwork on this, including the actual permit application submitted and the letters from Code Enforcement or Permit Sonoma, giving them a runaround and declining to issue the requested building permit. They basically did everything they could do to get those permits by hiring a professional to assist them.

154.    That professional, Jim Huntington, is extremely experienced in submitting building permits to Sonoma County, totally knows what he's doing, prepared the drawings, the application forms, did everything he's supposed to do, submitted them all, then got an endless runaround, the result of which a permit was never granted

155.    There were certain events that happened that day, but mainly the sheriff came out with eviction papers and ordered them to leave, and they left. They were given some kind of 15-day window in which to do it. It was kind of like a similar notice letter that Keni Meyer obtained, but basically on the date certain, they had to go and they left.

156.    So their eviction was done by the sheriff himself on January 8, 2025. It was after that date that the process of bulldozing everything happened. The way Carly put it is the sheriff came and the bulldozers were right behind the sheriff

157.    Mike Castagnola's date of eviction was January 8, 2025. The sheriff came with the paperwork to vacate. they gave him a 15-day period

158.    The date for eviction as to Carly Castagnola was January 8, 2025 as well.

First Amended Complaint

225

337.  The Plaintiffs ended up passing Administrative Hearings and going straight to Superior Court where he was greeted by County Counsel with a Receiver waiting in the wings.

338.  The Receiver kept billing on the property, supposedly borrowing $550,000.00 for the years' work on the 3-acre property until the foreclosure sale was ready, then the bulldozers came out and cleaned up all the "health and safety" hazards.

339.  The writ of possession and order of judgment was issued on September 10th, the property was foreclosure sale two weeks later, and the Receiver managed to buy it for a newly formed LLC before the end of the month.

340.  Sonoma County, through its agents, County Counsel's office, Robert Pittman, Diana Gomez, Permit Sonoma Code Enforcement Manager Tyra Harrington and the Superior Court officer of the Court, Mark Adams, with malicious intent deprived the Plaintiff and his family of his retirement home under the color of state law.

341.  The Plaintiffs are entitled to damages and punitive damages for the actions of the defendants and the Court should issue an injunction against Sonoma County bypassing the Due Process protections of the Administrative Courts.

First Amended Complaint

226

attached as attachment A1, A2, A3, and A4 to the status conference statement Exhibit E hereto, and those listed above in Section VI.

482.    During October 31, 2023, Mark Adams further committed wire fraud and obstruction of justice by submitting to the Sonoma County Superior Court, on October 31, 2023, Order After Hearing for Judgment of Possession and Contempt, which led to the issuance of a September 9, 2024, Writ of Possession issued by the Sonoma County Superior Court Clerk. The judgment was further modified on February 29, 2024 in a document called Revised Order After Hearing for Judgment of Possession. These three items are attached to the complaint as Exhibits G-1, G-2, and G-3, and constitute wire fraud and obstruction of justice in that Mark Adams' contention that he had a right to evict Mike Castagnola and Carly Castagnola was based on a pack of lies embedded in the series of accounting reports leading to Mark Adams taking out, in a manner that constitutes embezzlement, loans totaling $880,000 and then declaring those loans in default and using that default to obtain a September 10, 2024 foreclosure on the property in the form of a trustee foreclosure attached as **Exhibit Y** hereto.

483.    Before obtaining that deed, he falsely advised the court in his written submissions given via the court's e-file system and thus constituting wire fraud and in a false manner thus further constituting obstruction of justice that he declared the property his and or under his control and that he thereby had a right to evict the true owner, Michael Castagnola family trust, from the property. In doing so, he quite literally stole the property and the house from these residents. Plaintiffs note that this is his pattern and

499.    The items have a replacement cost, which constitute the special economic

damages claimed in this matter for the demolishing of the items stated above. That

replacement cost estimate for each of the items has been prepared and tallied up by

plaintiffs, and is attached as Exhibit Z to this complaint and totals: $362,285.70.

500.    Plaintiffs seek further damages equal to the economic value of the right to live

and occupy the real property premises, in an amount according to proof. For Carly

Castagnola she had a right to reside their rent free, which means the economic value is

worth at least the amount of rental expenses she avoided each month to live there for free.

This amount is in the range of $2000 per month for the period beginning as of the date

she was evicted, January 8, 2025 [the date Mark Adams demolished the yurt, through to

the present and into the future, as the free rent arrangement was with her father, plaintiff

Michael Castagnola, and was perpetual in nature.

501.    Similarly, Michael Castagnola as per of this property rights inherent in being the

owner of the property was the right to live in and use the property. This property right

was lost as of the date of his eviction, January 8, 2025, and was likewise perpetual in

nature. This right is worth approximately $5000 per month for each month he was

evicted, or such other amount according to proof, but currently at the level of $40,000

[$5000 x 8 months = $40,000].

502.    Plaintiffs further seek attorney's fees pursuant to 18USC section 1964(c)"

First Amended Complaint

628.    That professional, Jim Huntington, is extremely experienced in submitting building permits to Sonoma County, totally knows what he's doing, prepared the drawings, the application forms, did everything he's supposed to do, submitted them all, then got an endless runaround, the result of which a permit was never granted. Their eviction was done by the sheriff himself on January 8, 2025. It was after that date that the process of bulldozing everything happened. The way Carly put it is the sheriff came and the bulldozers were right behind the sheriff.

629.    Michael Castagnola's date of eviction was January 8, 2025. The sheriff came with the paperwork to vacate. they gave him a 15 day period

630.    The date for eviction as to Carly Castagnola was January 8, 2025 as well.

631.    Mark Adams never attempted to obtain a building permit, which had he done so would have solved the abatement violations. Instead he did nothing visible for about a year, They did put a surveillance camera outside on the driveway. Then Mark Adams proceeded to bull doze the other structures but not Carly's yurt during July 24, 2023. He bulldozed Carly's yurt during January 8, 2025 right after the sheriff ordered them to leave.

632.    On January 24, 2023 there was an initial series of demolitions done by Mark Adams to the following buildings: a yurt occupied by an elder not a party to this lawsuit. Mark Adams also demolished a bathroom laundry connected to the yurt that was

First Amended Complaint



PROPERTY DETAILS

Lawyers Title

| Subject Property Location | Foreclosure Activity | | Report Date: 12/03/2024 |
|---|---|---|---|
| Property Address | 12778 DUPONT RD | | Order ID: R167658491 |
| City, State & Zip | SEBASTOPOL, CA 95472-8934 | | |
| County | SONOMA COUNTY | | |
| Mailing Address | | Property Use | Rural/Agricultural Residence |
| Census Tract | 1536.02 | Parcel Number | 074-020-015-000 |
| Thomas Bros Pg-Grid | | Latitude | 38.423145 |
| | | Longitude | -122.919049 |

Legal Description Details  Brief Description: UNINCORP COUNTY CA

## Current Ownership Information    *Source of Ownership data: Recorder Information*

| | | | |
|---|---|---|---|
| Primary Owner Name(s) | RECEIVERSHIP FINANCING LLC. | Sale Price | $565,181 |
| | | Sale Date | |
| | | Recording Date | 09/10/2024 |
| Vesting | | Recorder Doc # | 2024041588 |
| | | Book/Page | |

## Latest Full Sale Information
Details beyond coverage limitations

**Financing Details at Time of Purchase**
No financing details available

## Property Characteristics

| | | | | | |
|---|---|---|---|---|---|
| Bedrooms | 3 | Year Built | 1902 | Living Area (SF) | 1,957 |
| Bathrooms/Partial | 1 | Garage/No. of Cars | Detached Garage/2 | Price ($/SF) | |
| Total Rooms | 7 | Stories/Floors | 2 Stories | Lot Size (SF/AC) | 130,680/3 |
| Construction Type | Wood | No. of Units | | Fireplace | Yes |
| Exterior Walls | | No. of Buildings | | Pool | |
| Roof Material/Type | | Basement Type/Area | | Heat Type | None |
| Foundation Type | | Style | | A/C | |
| Property Type | Residential | View | | Elevator | |
| Land Use | Rural/Agricultural Residence | | | Zoning | |

## Assessment & Taxes

| | | | | | |
|---|---|---|---|---|---|
| Assessment Year | 2024 | Tax Year | 2024 | Tax Exemption | |
| Total Assessed Value | $272,521 | Tax Amount | $33,284.10 | Tax Rate Area | 96-039 |
| Land Value | $137,808 | Tax Account ID | | | |
| Improvement Value | $134,713 | Tax Status | No Delinquency Found | | |
| Improvement Ratio | 49.43% | Delinquent Tax Year | | | |
| Sales Value | | | | Market Improvement Value | |
| Market Land Value | | | | Market Value Year | |

## Lien History

| Trans. ID | Recording Date | Lender | Amount | | Purchase Money |
|---|---|---|---|---|---|
| No details available | | | | | |

## Loan Officer Insights
No details available

# ATTACHMENT J

1  Herman Franck, Esq. SBN 123476
   Elizabeth Betowski, Esq., SBN 245772
2  Franck & Associates
   1750 Prairie City Road, Ste. 130, #254
3  Folsom, CA 95630
   Tel: 916-256-6266
4  Email: franckhermanlaw88@yahoo.com
   Attorneys for Plaintiffs Michael Castagnola;
5  Michael Castagnola as Trustee of The Michael L. Castagnola
   Revocable Trust Agreement dated September 15, 2016;
6  and Carly Castagnola

7              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
8                  [San Francisco Division]

9  MICHAEL CASTAGNOLA; MICHAEL            Case No: 25-cv-03624-JD
10 CASTAGNOLA AS TRUSTEE OF THE MICHAEL L.
   CASTAGNOLA REVOCABLE TRUST              VERIFIED
11 AGREEMENT DATED SEPTEMBER 15, 2016;     FIRST AMENDED COMPLAINT
   CARLY CASTAGNOLA,
12                                         FOR VIOLATION OF THE FEDERAL
13                                         CIVIL RIGHTS ACT, FEDERAL
   Plaintiffs,                            R.I.C.O. ACT; RELATED STATE LAW
                                          CLAIMS INCLUDING AN ACTION
14 v.                                     FOR REFORMATION OF DEED AND
                                          QUIET TITLE
15

16 MARK ADAMS in his capacity as Receiver;
   ROBERT PITTMAN in his capacity as Sonoma County
17 Counsel;
   DIANA GOMEZ, in her capacity as Sonoma Deputy
18 County Counsel;
   MICHAEL KING, in his capacity as Sonoma Deputy
19 County Counsel
   COUNTY OF SONOMA;
20 TYRA HARRINGTON in her capacity as Manager of
   Code Enforcement Permit Sonoma;
21 SUSAN GORIN in her capacity as Supervisor;
   DAVID RABBITT in his capacity as Supervisor;
22 CHRIS COURSEY in his capacity as Supervisor;
   JAMES GORE in his capacity as Supervisor;
23 LYNDA HOPKINS in her capacity as Supervisor;
   JESSIE CABLK in his capacity as employee of Permit
24 Sonoma;

25

First Amended Complaint

8. Michael King was also directly involved in approving and ratifying the October 31 2023 Order After Hearing for Judgment of Possession and Contempt (**Exhibit G-1**), the February 29, 2024 Revised Order After Hearing for Judgment of Possession (**Exhibit G-2**), the opposing Castagnola's attempt to challenge the eviction related orders on January 24, 2024 (See January 24, 2024 Minute Order, **Exhibit G-3 hereto**).

9. There is a symbiotic relationship between the County of Sonoma in seeking to exact payments under its judgment to be paid the huge fines imposed by the County against the property and Mr. Castagnola and Mr. Castagnola's family trust, The Michael L. Castagnola Revocable Trust Agreement dated September 15, 2016 [the owner of the property ] and that Mark Adams actually carries out the desires and purposes of the county of Sonoma with regard to the Castagnola property. Further details of the behavior of Mark Adams and this symbiotic relationship are set forth in Section V of this complaint.

10. Defendant Robert Pittman, was a resident of Sonoma County during the events of action and is still an employee of Sonoma County, California. He acted under color of legal authority in connection with his position as a lawyer in the County of Sonoma's County Counsel's office. He is sued herein in his individual and personal capacity for conduct he personally did.

11. Defendant Diana Gomez, is a resident and an employee of Sonoma County. She acted under color of legal authority in connection with her position as a lawyer in the County of

First Amended Complaint

Sonoma's County Counsel's office. She is sued herein in her individual and personal capacity for conduct she personally did.

12. Defendant Michael King is a resident and an employee of Sonoma County. He acted under color of legal authority in connection with his position as a lawyer in the County of Sonoma's County Counsel's office. He is sued herein in his individual and personal capacity for conduct he personally did. He has been directly involved in status conferences, including up to and including August 14, 2025, as recently as August 14, 2025 stated in court at a status conference before the Sonoma County Superior Court Department 19, that he requested that the court permit Mark Adams to complete the tasks that Mark Adams wanted to do. This was after Plaintiffs had submitted to the Court the status conference statement and the supplemental status conference statements, Exhibits E and F hereto, informing the Court and County Counsel of Mark Adams's extremely checkered·past,, and of the fact that Mark Adams had embezzled approximately $880,000 out of the property in a series of convoluted and fake loans that resulted in Mark Adams seizing control of the property, foreclosing on the property, and evicting Michael Castagnola and Carly Castagnola from the premises.

13. Michael King was also directly involved in approving and ratifying the October 31 2023 Order After Hearing for Judgment of Possession and Contempt (Exhibit G-1), the February 29, 2024 Revised Order After Hearing for Judgment of Possession (Exhibit G-2), and opposing Mr. Castagnola's attempt to challenge the eviction related orders on January 24, 2024 (See minute Order, Exhibit G-3).

First Amended Complaint

7

14. Defendant County of Sonoma is a general-law county within California.

15. Defendant Sonoma County Supervisors are elected officials of Sonoma County.

16. Defendant Tyra Harrington is sued in her capacity as Manager of County of Sonoma Code Enforcement. She acted under color of legal authority in connection with her position as Code Enforcement Manager with Sonoma County. She is sued herein in her individual and personal capacity for conduct she personally did.

17. Defendant Susan Gorin, was an elected official of the County of Sonoma. She acted under color of legal authority in connection with her position as a member of the Sonoma County Board of Supervisors. She is sued herein in her individual and personal capacity for conduct she personally did.

18. Defendant David Rabbit, is an elected official of the County of Sonoma. He acted under color of legal authority in connection with her position as a member of the Sonoma County Board of Supervisors. He is sued herein in his individual and personal capacity for conduct he personally did.

19. Defendant Chris Coursey, is an elected official of the County of Sonoma. He acted under color of legal authority in connection with her position as a member of the Sonoma County Board of Supervisors. He is sued herein in his individual and personal capacity for conduct he personally did.

First Amended Complaint

20. Defendant James Gore, is an elected official of the County of Sonoma. He acted under color of legal authority in connection with her position as a member of the Sonoma County Board of Supervisors. He is sued herein in his individual and personal capacity for conduct he personally did.

21. Defendant Lynda Hopkins, is an elected official of the County of Sonoma. She acted under color of legal authority in connection with her position as a member of the Sonoma County Board of Supervisors. She is sued herein in her individual and personal capacity for conduct she personally did.

22. Defendant Jessie Cablk is an employee of the County of Sonoma Permit Department. She acted under color of legal authority in connection with her position as Permit Sonoma. She is sued herein in her individual and personal capacity for conduct she personally did.

23. Defendant California Receivership Group Inc. is a California Corporation that is also the alter ego of Mark Adams, and was set up and established by Mark Adams in Mark Adams own office as a front entity to run loans through and to give loans the appearance of propriety when in fact they were completely illegitimate loans and done outside the scope of the limited authority given in the receivership order, a copy of which is attached as Exhibit H to this complaint, and provides at page 5, paragraph 4, the following limited legal authority to obtain loans:

> "4. To borrow funds to pay for repairs and clean-up necessary to correct the conditions cited in the Stipulated Judgment entered on July 24, 2020, and any

First Amended Complaint

1    additional conditions the Receiver finds on the Property which violate the

2    County's code or State law or .,...hich renders the property substandard. and secure

3    that debt with a super-priority lien on the Property."

4

5    24. Defendant Receivership Financing, LLC is a California limited liability company also an

6        alter ego of Mark Adams and as in the case of defendant California Receivership Group,

7        Inc, was set up as a prop and a front entity to make it appear that loans and loan related

8        activities were legitimate when in fact they were not at all legitimate.

9

10   25. At all times relevant to the facts of this case, Sonoma County and its officials, agents, and

11       employees have acted under color of state law. The actions that give rise to Plaintiffs'

12       claims are, unless otherwise indicated, taken pursuant to the policies, practices, and

13       customs of the County at the direction of, with the knowledge of, and through the actions

14       of its former and current policymakers, including its Board of Supervisors and its

15       Planning and Permit Building Department.

16

17   26. Does 1-10 is a person or persons, whose true identities are not known to Plaintiffs, but

18       are, according to Mark Adams, individual or individuals that are intending to purchase

19       the property. At a court appearance on August 14, 2025, Mark Adams reported that these

20       buyers were well aware of the whole entanglement of the County of Sonoma, the

21       judgment against Michael Castagnola, and the fact that Mark Adams has taken out all

22       these loans against the property, and with full knowledge of this entanglement, seek only

23       to absolve themselves from any liability for what the county has done against the

24       property. Does 1 , 2, 3, 4, 5, 6, 7, 8, 9, and 10 are named herein as being parties to the

25       Twenty-First Claim for Relief for Reformation and Quiet Title, and are in the categories

First Amended Complaint

1   Defendant was the agent and / or employee of the co-defendants and each of them acting

2   at all relevant times herein under color of authority of f a governmental entity under the

3   statutes, ordinances, regulations, customs and usage of the State of California and /or the

4   United States Constitution and related laws.

5

6                                             **IV.**
                    **LEGAL AND FACTUAL BASIS FOR THIS LAWSUIT**

7

8   32. The Plaintiff, while serving 39 years as a fireman and retiring as a Captain in the San

9       Francisco Fire Department, purchased the property on Dupont Road in 1987.

10

11  33. On March 7th, 2017, the Sonoma Board of Supervisors and Sonoma County Counsel

12      made a conscious decision to "clean up" Western Sonoma County by giving Permit

13      Sonoma free reign to aggressively cite residents for permit violations. (**Exhibit C,**

14      County of Sonoma Agenda Item Dated March 7, 2017; and March 8, 2017 ratification of

15      it by the County Board of Supervisors)

16

17  34. The Supervisors added $300,000 to $450,000.00 to Permit Sonoma's budget over several

18      years and added in 2017 Tyra Harrington at $8,200 a month as Manager of Code

19      Enforcement at Permit Sonoma.

20

21

22  35. To assist Defendant Harrington in her new job, the Sonoma Board of Supervisors, in a

23      unanimous vote, authorized Permit Sonoma and the County Counsel to bypass the

24      administrative hearings for individuals who have been accused of code violations that

25      concern health and safety. (**Exhibit C**)

First Amended Complaint

36. County Counsel outlined to the Board of Supervisors in 2017 a plan to "improve" Sonoma and create "upmarket" value by targeting certain homeowners, streamlining the legal process (doing away with Administrative hearings) and the insertion of a private contractor to manage the final aspect of the plan (the receiver).

37. This plan has caused over 176 evictions across Sonoma in year 2020 with the Plaintiffs case dragging out longer than most.

38. As Pittman's plan to the Board of Supervisors outlined, the recently hired Director of Permit Sonoma targeted the Plaintiff for 20-year-old unpermitted structures on his property and accused him of growing cannabis.

39. The Plaintiff happened to be one of the first properties receiving the attention of Defendant Harrington, on May 17, 2017.

40. The Plaintiff received a letter from Defendant Harrington stating that she wanted to inspect his property for cannabis violations and an unpermitted greenhouse. (

41. The Plaintiff contacted the Permit Department and arranged for a June 8th, 2017 date for the inspection.

42. On June 8th, 2017, Harrington walked the three acres, noting code enforcement violations, taking photos of the property, including photos of the Plaintiff and his

First Amended Complaint

174.    Carly Casgtagnolas's report, Exhibit BB, attaches a series of supporting

documents identified as sub-exhibits A-S. One of the exhibits attached the report, is

Exhibit N: Summaries of Series of Monthly Expense Reports E-Filed by Mark Adams to

Sonoma County Superior Court Seeking Approval for Payment to Mark Adams of the

Listed Amounts. That report tracks Mark Adams's expense reports filed with the Sonoma

County Superior Court, which are summarized as follows:

"-The $880,196.00 includes all of the Recorded Receivership Certificates,

-The NOD $532,695.73 recorded 3/27/2024, signed Adams, HUD-exempt lie)

-The $347,501 Unpaid Fees/Advances (May 2025)

Grand Total Liability is $880,196 ($532k NOD + $347k fees)".


## VI.
## PLAINTIFFS DO NOT DISPUTE OR TAKE ISSUE WITH THE STIPULATED JUDGMENT

175.    The following facts are stated in light of the *Rooker-Feldman* Doctrine, which

"prevents the lower federal courts from exercising jurisdiction over cases brought by

'state-court losers' challenging 'state-court judgments" rendered before the district court

proceedings commenced" [*Lance v. Dennis*, 546 U.S. 459, 460, 126 S. Ct. 1198, 1199

(2006) (per curiam) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S.

280, 284, 125 S. Ct. 1517 (2005)).]


176.    The point of departure of the claimed wrongdoings of the County of Sonoma and

its various officials from code enforcement [Defendant Tyra Harrington] County Counsel

[Defendants Robert Pittman, Diana Gomez, and Michael King], Permit Sonoma [Jessie

Cablk, Lynda Hopkins], Board of Supervisors [Susan Gorin, David Rabbit, Chris Coursey, and James Gore] is the stipulation and judgment that was entered into between Michael Castagnola and the County on July 24, 2020, a copy of which is attached as **Exhibit K** hereto.

177.    We point out to the Court published case law showing that the litigation privilege does not apply to RICO obstruction of justice claims. See *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002) [criminal action for mail fraud, 18 USC section 1623; filing false affidavits in court held to be predicate mail fraud under RICO]. See also similar analysis for federal civil rights Claim: *Kimes v. Stone*, 84 F.3d 1121 (9th Cir. 1996) [reaffirming California's litigation privilege does not immunize parties from federal section 1983 liability].

178.    The following clarifications will be made in this section of the complaint to make it clear to the defendants and to the Court that by bringing this lawsuit, the Plaintiffs are not attempting any form of a *de facto* appeal or collateral attack on the stipulation for a judgment and the judgment itself. That judgment was reached pursuant to a bargain and compromise process between the parties.

179.    There is a factual basis for the judgment in that Mr. Castagnola acknowledges the basic series of violations that are specified at page two of the judgment, a listing of 10 items on his property that he constructed without obtaining a building permit. He agreed to those violations. He agreed to make it right as is specified in the Judgment [**Exhibit K**], page 3, paragraph 2.A.1:

"DEFENDANTS shall legalize the Barn by submitting to the County a complete

of them, which are done in a solid manner, are entirely livable, as is evidenced by the fact that Carly lived without complaint, without issue in her yurt for years. There was no problem.

205.      The only problem is it didn't have a building permit. The judgment itself doesn't say the yurts need to be torn down. In fact, the judgment doesn't mention that they should be demolished.

206.      What the judgment says is legalize it. And there basically are two choices. A, get a permit, or B, you have to tear it down.

207.      Plaintiff reiterates the allegations concerning the Seed Barn described in Section V above as a further example of improper conduct by the County of Sonoma. The County of Sonoma, through its permit officials, code enforcement officials, and with the assistance, cooperation, approval, and ratification of its County Counsel officials and Board of Supervisors, stood by and approved the demolishing of the various structures on the building knowing full well that all of the structures would be able to be legalized with appropriate funding levels.

208.      The County also, through its officials named as defendants herein, took the position that yurts are simply unacceptable and would not allow a permit on the yurts at all. Plaintiff had even suggested that the yurts be converted into storage facilities, in which case they could have been kept. The county was against any use of the yurts and required them to simply be demolished.

First Amended Complaint

proceeded that way nevertheless, toward its overall goal of exacting as much fees as possible against Mr. Diaz and his LLC.

239.    The County was motivated in part by an overall goal of County code enforcement that is expressed in a memo that has become a public memo, in that it is circulated among quite a few individuals and entitled County of Sonoma Agenda Item Summary Report" dated March 7, 2017 ["Agenda Report"], a copy of which is attached hereto as Exhibit C. In the agenda report, the code enforcement division of the County of Sonoma government made a sales pitch to the County Board of Supervisors that it needed more money to bankroll its operations, and that one way it could do so would be to step up enforcement activities and use the County Counsel's office as a weapon to drag people into court, exact huge per diem and other fines under the guise of abatement expenses, and use those monies to fund code enforcement. The concept was to make code enforcement basically a profit center. Also attached as part of Exhibit C is a copy of the county of Sonoma Board of Supervisors resolution dated March 7, 2017 adopting the proposal made in code enforcement's agenda report and establishing funding for a new person to be hired to go out and implement the code enforcement strategies set forth in the code enforcement agenda report. The resolution went to effect March 8, 2017.

240.    The County of Sonoma is the one receiving the financial benefit. The financial inflows in terms of huge fines, resultant foreclosures and taking of property, and ownership of property, all goes to the County. The county is the one that benefits. And it

First Amended Complaint

shows that from 2017-2020 period, the number of code enforcement actions and

proceedings increased to 5005 cases (see the last page of the excel document; showing

5005 code enforcement citations and proceedings).

245.     The Excel spreadsheet, excerpts of which are attached as Exhibit AA hereto, show

that after the Board of Supervisors approved the unholy alliance between County

Counsel, County Code Enforcement, and the County Superior Court to jack up abatement

fees and run a weaponized system involving the executive branch through code

enforcement and County Counsel, the legislative branch in the form of an approval of the

agenda report by the Board of Supervisors, and the judicial branch in the form of judges

who regularly rule that blockage of building permits is not a defense to a county

abatement proceeding, and that gigantic abatement fees which will often result in a

foreclosure a receiver and a full loss of the entire property, are the way of business in

Sonoma County.

246.     The circumstances regarding the hugely improper conduct of Tyra Harrington in

abusing the citation process can be further shown by the following description of events

between Tyra Harrington of Sonoma County Code Enforcement and her counterpart in

City of Santa Rosa, Kelley Aboudara. A detailed statement made by Esteban Diaz in the

form of a signed declaration lays out the entire story. A felony criminal complaint was

also filed by the Sonoma County District Attorneys office against Ms. Aboudara for

similar conduct toward other victims. A shorter summary of what happened is described

as follows:

First Amended Complaint

says there is no problem. The report is not in Keni's exhibit binder, but she recalls the
report was submitted into evidence.

3.  The case of Ron Cupp

266.    Ron Cupp's circumstance is in the example of an obstruction of justice by
retaliating against a person who is in the category of a witness and a professional helper
who assists people who are victims of the county of Sonoma's behavior and blocking
permits and exacting huge fines and going through a process where the county becomes
the owner of their homes. The end game for the County is to rip them all down.

267.    The further end game of the County is to fund the County of Sonoma's code
enforcement and permits budget as is reflected in the agenda item attached as **Exhibit C**
to this complaint.

268.    What the County of Sonoma is doing is in the category of an unlawful tax on
landowners. The fines are as stated above in excess of any actual costs incurred by the
County to bring about the abatement of code violations, and are thus excessive. The
excessive nature of the fines imposed by the County with the assistance of county counsel
and the Sonoma County Superior Court are unlawful in that they violate the US
Constitution, 8th Amendment, as described above, and are in effect a tax that has not
been approved by the State of California through the normal process of legislation put
through the Assembly and the Senate, and approved by the Governor. The only "law" on

First Amended Complaint

this issue is that the County Board of Supervisors approved the Code Enforcement agenda report (Exhibit C hereto).

269.     This taxation scheme to fund the operational budget of the County of Sonoma's Code Enforcement Department is thus an unlawful tax.

270.     It should be noted that in this case, the Castagnolas have not been shy about litigating their various issues. They informed the Sonoma court that Mark Adams had borrowed $880,000. The court did not seem to care.

271.     Instead, for example, during the recent status conference of August 14, 2025, the court basically green lights everything Mark Adams wishes to do. He demolished the buildings, even though they were all fine, with no problem.

272.     Mark Adams evicted the Mr. Castagnola, a retired battalion fire chief with decades of service to the City and County of San Francisco, and a longtime resident of Sonoma County, from his own home and then was rendered homeless. This was challenged. The Court rejected the challenge. See the January 24, 2024 minute order, Exhibit G-3 hereto; Michael King was there to defend the County's position, and Mark Adams's position that the Castagnolas were properly evicted and taken out of their property.

to cause that to happen. The Superior Court of Sonoma County is unfortunately in cahoots with the County. The Court fully supports everything the County did. It fully supports everything Mark Adams did.

281.    If you can just sit back for a moment and imagine somebody borrowing $880,000 to purportedly fix a house, when all they actually did was mow it down. The hard part to imagine is that the judicial branch of the State of California's government in the form of the Sonoma County Superior Court would stand idly by and allow all that to happen, and also to allow it to occur without the normal law and motion practice or trial practice. For example, Mark Adams just shows up at a status conference and submits requests for orders.

282.    Michael King of the County Counsel's office fully supports those orders and says "yes, please grant them." The Court doesn't need a notice of motion. The court does not need a trial, for example, on the unlawful detainer eviction issue, and instead just grants it on a kind of ex parte basis, rejecting any and all arguments in opposition to the eviction process, to the demolition process, to the huge amounts of loans taken against the properties.

283.    The Court just didn't care and allowed it all to happen. The Sonoma County Superior Court is part of the corrupt behavior of the county. It basically rubber stamps and green lights all of it. The only reason it is not a defendant in these actions is because of judicial immunity. However, it is in the category of a named co-conspirator. Although we may not be able to sue the Superior Court, we can state the facts that it's in on it, and

that it fully supports the process of benefiting the County through the receipt of gigantic

fines that are then used to fund county code enforcement and permit Sonoma operations,

as was made clear in their agenda memo submitted by the County of Sonoma to the

Board of Supervisors of the County of Sonoma who approved it.

284.    Citizens and residents of Sonoma County have this problem where the three

branches of government, the judiciary, the executive branch, and the legislative branch

through the Board of Supervisors of Sonoma have all banded together in a dangerous

scheme to ruin the lives of residents with trumped up fines, blockage to attempts to

legalize properties, and the end result to demolish the properties, to take the properties, to

evict the residents, render them homeless, and eliminate their ownership of these

properties.

285.    As fantastical as that may sound, that is exactly what is going on in Sonoma

County and that is exactly the point of this lawsuit to bring about an end to it. We can't

trust the local courts to do it, so we've come to the federal court and request this court to

intervene and to bring about appropriate injunctive relief forbidding the County from

doing these things to anyone else ever again.

4.  <u>Facts Regarding Similar Abusive Tactics by the County of Sonoma Against Other Elders
[ Michael Castagnola, Linda Ludwig, Keith Alden, Barbara Scalabrini, Karen Koelker,
Jaqueline King</u>

286.    It has come to Plaintiffs' attention that unfortunately the County preys on elders

as well, and state this information so the Court can understand the depths of corruption

289.    In addition, Exhibit A to this complaint gives a list of other individuals, all in the category of elders that the County has engaged in similar conduct with.

290.    These collective individuals constitute a showing of a pattern and practice created by the County of Sonoma and done by the County of Sonoma through its code enforcement officials sued herein individually, through its permit Sonoma individuals sued herein, and through County Counsel. All done, we might add with the further culprit not sued herein due to questionable judicial immunity, the Sonoma County Superior Court.

291.    What the County of Sonoma is doing is in the category of an unlawful tax on landowners. The fines are as stated above in excess of any actual costs incurred by the County to bring about the abatement of code violations, and are thus excessive. The excessive nature of the fines imposed by the County with the assistance of county counsel and the Sonoma County Superior Court are unlawful in that they violate the US Constitution, 8th Amendment, as described above, and are in effect a tax that has not been approved by the State of California through the normal process of legislation put through the Assembly and the Senate, and approved by the Governor. The only "law" on this issue is that the County Board of Supervisors approved the Code Enforcement agenda report (Exhibit E hereto).

292.    This taxation scheme to fund the operational budget of the County of Sonoma's Code Enforcement Department is thus an unlawful tax.

First Amended Complaint

inherently contradictory manner that rises to a level when combined with the deception of a violation of the substantive due process rights of both Michael Castagnola as owner of the premises and Carly Castagnola as a person with a free life estate in the premises.

323.    As such, defendants have committed intentional willful violations of plaintiff's substantive due process rights arising under the 14th Amendment to the United States Constitution. They do not enjoy any form of qualified immunity based on the published precedent of *Chalmers versus City of Los Angeles* prohibiting internally inconsistent operations of law as a violation of the due process clause of the 14th Amendment and based on the published case of *Herrington v. Sonoma,* 834 F.2d 1488 (9th Cir. 1988), in which Sonoma obviously knew about because they're the defendant in that action and learned the hard way following a jury trial that as a county government you are not allowed to lie, cheat, and steal your way through the permit process. You have to be honest and proper.

324.    The County doesn't want to be that way still, notwithstanding the judgment of *Herrington.* They need to be checked on this. One of the dilemmas is that the County Board of Supervisors has approved the agenda of the county to fund code enforcement operations with rough and tough code enforcement operations in which homeowners are raked over the coals, are given whopper fines over problems that actually are eminently solvable with the simple issuance of a proper permit.

325.    The County is being intentionally impossible in its permitting process because it wants to fund itself and is doing so by exacting whopper fines from homeowners as laid out in the agenda document Exhibit C hereto and discussed above. Defendants conducted

First Amended Complaint

1    home. Probably nothing short of death would rise to such a huge offense as committed by

2    the defendants in this case in terms of taking a person's home away and mowing it down

3    with bulldozers. Plaintiffs request exemplary damages according to proof.

4

5    358.    Plaintiffs request injunctive relief requiring and enjoining the defendants from

6        engaging in this brutal behavior anymore and requiring the defendants to undo what they

7        have done in the case of *Herrington v. County of Sonoma*. Injunctive relief was granted

8        after the fact and pretty much solved the entire problem. We seek the same relief

9        comparable to that granted in the *Herrington* matter here.

10

11   359.    Injunctive relief after the fact requiring the County and Mark Adams to give back

12       what they have improperly stolen return the home and pay for damages sufficient to

13       allow plaintiffs to rebuild what the defendants have mowed down. Exhibit Z hereto gives

14       a series of estimates prepared by the plaintiffs about the replacement costs of what was

15       ruined which add up to a total of $362,285.70 in damages for replacement costs and

16       rebuilding are requested as special damages herein in the amount of $ $362,285.70

17       pursuant to Exhibit Z hereto, or such other amount as according to proof.

18

19   360.  The County of Sonoma through its Board of Supervisors, its County Counsel, its

20       Permit Sonoma Department and the Superior Court in 2017 concocted a plan to take

21       properties from residents of Sonoma and they put it in writing.

22

23   361.  With no prior history of behaving in such a predatory manner the residents of

24       Sonoma County were not prepared for what the County Counsel and the rest of

25       Sonoma County government had in plan for them.

412.    Plaintiffs reallege and incorporate the allegations in the foregoing paragraphs as though set forth in full in this claim for relief.

413.    The Defendants, with deliberation and intent, decided that the Plaintiff wasn't one of the residents they wanted in their "new Sonoma.

414.    As the Defendants plans, created and published on the Board of Supervisors for Sonoma web page, they used the powers of the Permit department without the hinderance of traditional Due Process protections to create "up market potential" by eliminating those that didn't fit their vision for Sonoma.

415.    The Defendants directed their force for change, Defendant Harrington to begin the process of railroading the Plaintiff out of his property where he lived for thirty years.

416.    Harrington prevented the Plaintiff from saving his property by paying off or abating the code violations so the "independent contractor" Mark Adams would take over the gutting of the Plaintiffs home value with excessive loans and a final eviction.

417.    Their success in ignoring Constitutional law protections has caused great grief to a retired firefighter, costing him his home and forcing him to move from family member to family member.

424. The governing body of Sonoma, the Board of Supervisors approved of this process.

425. Then Defendants Pittman and Harrington came up with a second scheme where they could themselves identity health and safety regulations without input from the Board of Supervisors.

426. The governing body of Sonoma, the Board of Supervisors approved of this process.

427. Without any oversight or supervision, Defendant Pittman and Harrington could then pick any property, the Plaintiffs for example, and claim "health and safety" violations.

428. The process of litigation would begin immediately, with the Plaintiff being unable to stop it.

429. Once in Superior Court, a "Receiver" would be appointed by Defendant Pittman who would insure that the property would not leave the "process".

430. The property after a period of time, and excessive billable hours on behalf of the Receiver, would then be lost to a hard money lender from Los Angeles that the Receiver had been taking loans out on from the property.

First Amended Complaint

474.    The County of Sonoma is not only the enterprise through which this activity occurred, but it's also the beneficiary of flows of funds to the County as it is through an agenda of the County to impose exorbitant code enforcement fines against homeowners in Sonoma as a means toward funding the operations of Code Enforcement. This is reflected in an agenda document Exhibit C hereto, in which code enforcement made a proposal to the County of Sonoma Board of Supervisors to step up Code Enforcement and to increase activity of imposing exorbitant fines through the use of County Counsel's office. Thus, the County of Sonoma is itself the beneficiary of the predicate offenses, in that code enforcement fines go to it and are used by the County to fund its own code enforcement operations.

475.    The County was motivated in part by an overall goal of County code enforcement that is expressed in a memo that has become a public memo, in that it is circulated among quite a few individuals and entitled County of Sonoma Agenda Item Summary Report" dated March 7, 2017 ["Agenda Report"], a copy of which is attached hereto as Exhibit C. In the agenda report, the code enforcement division of the County of Sonoma government made a sales pitch to the County Board of Supervisors that it needed more money to bankroll its operations, and that one way it could do so would be to step up enforcement activities and use the County Counsel's office as a weapon to drag people into court, exact huge per diem and other fines under the guise of abatement expenses, and use those monies to fund code enforcement. The concept was to make code enforcement basically a profit center. Also attached as part of Exhibit C is a copy of the County of Sonoma Board of Supervisors resolution dated March 7, 2017 adopting the proposal made in code

enforcement's agenda report and establishing funding for a new person to be hired to go out and implement the code enforcement strategies set forth in the code enforcement agenda report. The resolution went to effect March 8, 2017.

476.     The County of Sonoma is the one receiving the financial benefit. The financial inflows in terms of huge fines, resultant foreclosures and taking of property, and ownership of property, all goes to the County. The county is the one that benefits. And it uses these fruits of corruption to fund its code enforcement operations. The people doing the acts basically get a job and paychecks out of it.

477.     The following quotations from the County of Sonoma code enforcement agenda report are quoted to show the Court what the County is actually doing: At pages 1-2 of the agenda report [Exhibit C], it states:

"The Code Enforcement Section of Permit Sonoma works as a team with the County Counsel's Office to address citizen complaints of building, zoning, septic, and other County code violations. These joint efforts are essential to meeting the Board's strategic priorities, including watershed protection, safeguarding communities, and protecting public and private property. Aggressive code enforcement actions can also serve as an upstream investment by providing immediate resolution of environmental damage and property damages and by deterring future violations and neighborhood degradation. The code enforcement program needs to be enhanced to address the severe case backlog, the increase in serious health and safety violation complaints, and the need for increased enforcement in the areas of riparian corridors, vacation rentals and cannabis. This Board

1    529.    The defendants herein have each individually participated in the wrongdoings

2         described in this claim for relief including the specifications of wrongdoing set forth in

3         the above-stated claims for relief, and also as further specified in the recently-filed status

4         conference statements before the Sonoma County Superior Court.

5

6    530.    The County of Sonoma is not only the enterprise through which this activity

7         occurred, but it's also the beneficiary of flows of funds to the County as it is through an

8         agenda of the County to impose exorbitant code enforcement fines against homeowners

9         in Sonoma as a means toward funding the operations of Code Enforcement. This is

10        reflected in an agenda document Exhibit C hereto, in which code enforcement made a

11        proposal to the county of Sonoma Board of Supervisors to step up Code Enforcement and

12        to increase activity of imposing exorbitant fines through the use of County Counsel's

13        office. Thus, the County of Sonoma is itself the beneficiary of the predicate offenses, in

14        that code enforcement fines go to it and are used by the county to fund its own code

15        enforcement operations

16

17    531.    The County was motivated in part by an overall goal of County code enforcement

18        that is expressed in a memo that has become a public memo, in that it is circulated among

19        quite a few individuals and entitled County of Sonoma Agenda Item Summary Report"

20        dated March 7, 2017 ["Agenda Report"], a copy of which is attached hereto as Exhibit C.

21        In the agenda report, the code enforcement division of the County of Sonoma government

22        made a sales pitch to the County Board of Supervisors that it needed more money to

23        bankroll its operations, and that one way it could do so would be to step up enforcement

24        activities and use the County Counsel's office as a weapon to drag people into court,

25        exact huge per diem and other fines under the guise of abatement expenses, and use those

First Amended Complaint

1   monies to fund code enforcement. The concept was to make code enforcement basically a

2   profit center. Also attached as part of Exhibit C is a copy of the county of Sonoma Board

3   of Supervisors resolution dated March 7, 2017 adopting the proposal made in code

4   enforcement's agenda report and establishing funding for a new person to be hired to go

5   out and implement the code enforcement strategies set forth in the code enforcement

6   agenda report. The resolution went to effect March 8, 2017.

7

8   532.     The County of Sonoma is the one receiving the financial benefit. The financial

9   inflows in terms of huge fines, resultant foreclosures and taking of property, and

10  ownership of property, all goes to the County. The county is the one that benefits. And it

11  uses these fruits of corruption to fund its code enforcement operations. The people doing

12  the acts basically get a job and paychecks out of it.

13

14

15  533.     The following quotations from the County of Sonoma code enforcement agenda

16  report are quoted to show the Court what the county is actually doing: At pages 1-2 of the

17  agenda report [Exhibit C], it states:

18  "The Code Enforcement Section of Permit Sonoma works as a team with the County

19  Counsel's Office to address citizen complaints of building, zoning, septic, and other

20  County code violations. These joint efforts are essential to meeting the Board's strategic

21  priorities, including watershed protection, safeguarding communities, and protecting

22  public and private property. Aggressive code enforcement actions can also serve as an

23  upstream investment by providing immediate resolution of environmental damage and

24  property damages and by deterring future violations and neighborhood degradation.

25

First Amended Complaint

1    the above-stated claims for relief, and also as further specified in the recently-filed status

2    conference statements before the Sonoma County Superior Court.

3

4    563.    The County of Sonoma is not only the enterprise through which this activity

5    occurred, but it's also the beneficiary of flows of funds to the County as it is through an

6    agenda of the County to impose exorbitant code enforcement fines against homeowners

7    in Sonoma as a means toward funding the operations of Code Enforcement. This is

8    reflected in an agenda document Exhibit C hereto, in which code enforcement made a

9    proposal to the county of Sonoma Board of Supervisors to step up Code Enforcement and

10    to increase activity of imposing exorbitant fines through the use of County Counsel's

11    office. Thus, the County of Sonoma is itself the beneficiary of the predicate offenses, in

12    that code enforcement fines go to it and are used by the county to fund its own code

13    enforcement operations.

14

15    564.    The County was motivated in part by an overall goal of County code enforcement

16    that is expressed in a memo that has become a public memo, in that it is circulated among

17    quite a few individuals and entitled County of Sonoma Agenda Item Summary Report"

18    dated March 7, 2017 ["Agenda Report"], a copy of which is attached hereto as Exhibit C.

19    In the agenda report, the code enforcement division of the County of Sonoma government

20    made a sales pitch to the County Board of Supervisors that it needed more money to

21    bankroll its operations, and that one way it could do so would be to step up enforcement

22    activities and use the County Counsel's office as a weapon to drag people into court,

23    exact huge per diem and other fines under the guise of abatement expenses, and use those

24    monies to fund code enforcement. The concept was to make code enforcement basically a

25    profit center. Also attached as part of Exhibit C is a copy of the county of Sonoma Board

First Amended Complaint

1    of Supervisors resolution dated March 7, 2017 adopting the proposal made in code

2    enforcement's agenda report and establishing funding for a new person to be hired to go

3    out and implement the code enforcement strategies set forth in the code enforcement

4    agenda report. The resolution went to effect March 8, 2017

5

6    565.    The County of Sonoma is the one receiving the financial benefit. The financial

7    inflows in terms of huge fines, resultant foreclosures and taking of property, and

8    ownership of property, all goes to the County. The county is the one that benefits. And it

9    uses these fruits of corruption to fund its code enforcement operations. The people doing

10    the acts basically get a job and paychecks out of it.

11

12

13    566.    The following quotations from the County of Sonoma code enforcement agenda

14    report are quoted to show the Court what the county is actually doing: At pages 1-2 of the

15    agenda report [Exhibit C], it states:

16    "The Code Enforcement Section of Permit Sonoma works as a team with the County

17    Counsel's Office to address citizen complaints of building, zoning, septic, and other

18    County code violations. These joint efforts are essential to meeting the Board's strategic

19    priorities, including watershed protection, safeguarding communities, and protecting

20    public and private property. Aggressive code enforcement actions can also serve as an

21    upstream investment by providing immediate resolution of environmental damage and

22    property damages and by deterring future violations and neighborhood degradation.

23    The code enforcement program needs to be enhanced to address the severe case backlog,

24    the increase in serious health and safety violation complaints, and the need for increased

25    enforcement in the areas of riparian corridors, vacation rentals and cannabis. This Board

First Amended Complaint

# ATTACHMENT K

**RECORDING REQUESTED BY:**
Orange Coast Title Company
1551 N Tustin Ave., Ste 840
Santa Ana, CA 92705

**WHEN RECORDED MAIL DOCUMENT AND TAX STATEMENT TO:**
Blake Scott Azcarate Bascherini, TTEE
Vanessa Mercedes Valera Bascherini, TTEE
12778 Dupont Rd
Sebastopol, CA 95472

APN: 074-020-015-000
TITLE ORDER NO.: 150-2434952-06
ESCROW NO.: 2434952-maq

| Page 1 of 2 |

\*\*This document was electronically submitted to the County of Sonoma for recording\*\*

# 2025047697

Official Records of Sonoma County
Deva Marie Proto
10/03/2025 02:42 PM
ORANGE COAST TITLE COMPANY CA

DEED 2 Pgs

Fee: $27.00
County Tax: $704.00



THIS SPACE FOR RECORDER'S USE ONLY

## GRANT DEED

The undersigned Grantor(s) declare(s) that the **DOCUMENTARY TRANSFER TAX IS: $ 704.00 County; $ 0.00 City**
XX Unincorporated area: **Unincorporated area of Sebastopol**      City of
XX computed on the full value of the interest of property conveyed, or
___ computed on the full value less the value of liens or encumbrances remaining thereon at the time of sale.
___ OR transfer is EXEMPT from tax for the following reason:

| THE UNDERSIGNED | | Exempt from the fee per GC 27388.1 (a) (2); This document is subject to Documentary Transfer Tax |
|---|---|---|
| Signature of declarant or agent determining tax | Firm Name | |

**FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,** RECEIVERSHIP FINANCING, LLC, a California limited liability company

**HEREBY GRANT(S) to** Blake Scott Azcarate Bascherini and Vanessa Mercedes Valera Bascherini, as Trustees of the Blake Scott Azcarate Bascherini and Vanessa Mercedes Valera Bascherini Revocable Living Trust, dated September 1, 2021

All that real property situated in the Unincorporated area of Sebastopol, County of Sonoma, State of California, described as:

Being a parcel of land located in Section 25, Township 7 North, Range 10 West Mount Diablo Base and Meridian, in the County of Sonoma, State of California, more particularly described as follows: for point of commencement, begin at an iron pipe monument set at the common Southerly corner of the Tract described in deed from Elia J. Pieroni to Beverly Tweedy Ansell, dated March 23, 1942, recorded March 23, 1942 in Book 548 of official records, at Page 233, and the Tract described in the deed from Best and Feaks, A Co-partnership to Frank D. Hill and Gladys M. Hill, dated July 20, 1942, and recorded July 21, 1942 in Book 557 of official records, at Page 225; thence South 0° 30' West 60 feet to an iron pipe monument for the actual point of commencement of the Tract to be herein described; Thence from said point of commencement South 0° 30' West 629.4 feet to a point in the center line of the county road as established by Ed Peugh survey made in September 1922, from which point an iron pipe monument bears South 8° 30' West 14 feet distant thence along the center line North 73° 18' East 141.4 feet and North 89° 13' East 17.9 feet to a point, from which an iron pipe monument bears South 12° 42' West 19 feet distant; thence leaving said center line and running North 12° 42' East 606 feet to an iron pipe monument set in the ground at a point which would be intersected by a line drawn North 89° 30' East from the point of commencement; thence South 89° 30' West 281.1 feet to the point of commencement.

Assessor's Parcel Numbers(s): 074-020-015-000

**Commonly Known As:** 12778 Dupont Road, Sebastopol, CA 95472

MAIL TAX STATEMENTS AS DIRECTED ABOVE

DOC #2025047697  Page 2 of 2

September 29, 2025

RECEIVERSHIP FINANCING, LLC, a California limited
liability company

By: _____

Yehudah Fersht,  Manager

---

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

STATE OF CALIFORNIA
COUNTY OF _____ Los Angeles _____

On ____ 09/29/2025 _____, before me, _____ Arthur Minh Lai _____, a Notary Public

personally appeared ____ Yehudah Fersht _____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____    (SEAL)

ARTHUR MINH LAI
Notary Public • California
Los Angeles County
Commission # 2468663
My Comm. Expires Oct 28, 2027

262

# ATTACHMENT L



← **Back to search**    ⌂ **Zillow**    ♡ Save    ⬆ Share    ••• More

Home value    Cost calculator    Home details    Neighborhood

Map data ©2025 Imagery ©2025 Airbus, Maxar Technologies | Report a map error

# Getting around

**Walk Score®**
**3** / 100
Car-Dependent

**Bike Score®**
**16** / 100
Somewhat Bikeable

# Nearby homes    ‹ · ›



**$1,512,000**
**3** bd. | **2** ba | **2.5k** sqft
12770 Dupont Rd,...
Off Market



**$798,000**
**2** bd | **1** ba | **1.5k** sqft
12808 Dupont Rd,...
Off Market



**$781,000**
**3** bd | **1** ba | **1.7k** sqft
12696 Dupont Rd,...
Off Market



**$2,286,800**
**4** bd | **4** ba | **5.1**
12670 Dupont Rd,.
Off Market

# Nearby schools

**GreatSchools rating**

**Harmony Elementary School**
Grades: **K-1**  Distance: **2.5 mi**

264

 Back to search     Zillow     Save     Share    ooo More



Sold for $640,000 on 10/03/25

View

# $640,000

12778 Dupont Rd, Sebastopol, CA 95472

**3** beds    **1** baths    **1,957** sqft

Est. refi payment: $3,909/mo    Refinance your loan

 SingleFamily     Built in 1902     3 Acres Lot 

 $640,500.Zestimate®    $327/sqft    $3,484 Estimated rent

# Home value

Zestimate®
**$640,500**



265

# ATTACHMENT M



OFF MARKET— SOLD OCT 2025 FOR $640,000

**$552,792** Redfin Estimate

**3 bd · 1 ba · 1,957 sq ft**

12778 DuPont Rd, Sebastopol, CA 95472



| **I own 12778 DuPont Rd**<br>Claim home to manage this property | View dashboard | Edit facts | Manage photos |

Estimated sale price

**$526,000 – $636,000**

Reach more buyers when you sell with Redfin. Plus, you'll save **$5,528** in fees. ⊙

Schedule a selling consultation

Get an in-depth report about your home value and the Sebastopol market.

Request a free analysis

**Rates have dropped**
Lower mortgage rates could mean more buyers and higher sale prices.
Learn more

## About this home

12778 DuPont Rd is a 1,957 square foot house on a 3 acre lot with 3 bedrooms and 1 bathroom. - It last sold on October 03, 2025 for $640,000. Based on Redfin's Sebastopol data, we estimate the home's value is $552,792.

| 🏠 **Single-family**<br>Property Type | 💲 **1902**<br>Year Built | **3 acres**<br>Lot Size |
| 🏷 **$282**<br>Est. Price/Sq.Ft. | 🚗 **4 spaces**<br>Parking |

Source: Public Records

## Redfin Estimate



# $552,792

▼ **$87K** since sold in October 2025    ▲ **$26K** since October

🕘 Recently sold homes    📈 Estimate history    🗋 Homes for sale



**$1,080,000**

3 beds 2 baths 1,795 sq ft
10954 Cherry Ridge Rd,...

**$1,005,000**

2 beds 1 bath 2,044 sq ft
3750 Acreage Ln, Sebastopol...

**$1,250,000**

3 beds 2 baths 2,059 sq ft
13500 Graton Rd, Sebastopol...








Claim this home to receive a free report every month with insights on the changing estimate.

[ I own 12778 DuPont Rd ]

## Estimated sale earnings

Desired selling price ⓘ

$552,792

Remaining mortgage ⓘ

-$511,000

Est. closing costs:        -$32,399 ⌄

Sell with a Redfin agent        +$2,764 ⌄

**Estimated profit**        **$12,157**

## Market trends in 95472, CA

Last updated October 2025



Buyer's Market     Seller's Market

**Seller's market**

| Sale-to-List Price | Median sale price |
|---|---|
| **99.6%** ↓140.9% MoM | **$1.1M** ↑$71K MoM |

| Avg. days on market | Recently sold homes |
|---|---|
| **44d** ↑10.5 days MoM | **69** ↑3 MoM |

### New listings for sale

  

**$2,495,000**

4 beds 3 baths 2,450 sq ft
789 Pleasant Hill Rd, Sebastopol,...

**$269,500**

2 beds 2 baths 1,100 sq ft
6781 Evergreen Ave, Sebastopol,...

**$1,099,000**

3 beds 3 baths 2,236 sq ft
3590 Burnside Rd, Sebastopol, C...

## Estimated earnings

 **Rental estimate**
Est. $3,788 per month, based on comparable rentals    ›

269

## Sale history for 12778 DuPont Rd

### Today

| | | |
|---|---|---|
| Oct 3, 2025 | Sold (Public Records) | $640,000 |
| Date | Public Records | Price |

### Jun, 2025

| | | |
|---|---|---|
| Jun 5, 2025 | Price Changed | $899,000 |
| Date | BAREIS #325044241 | Price |
| May 14, 2025 | Listed (Active) | $1,099,000 |
| Date | BAREIS #325044241 | Price |

## Tax history for 12778 DuPont Rd

| Year | Property Tax | Land + | Additions = | Assessed Value ⓘ |
|---|---|---|---|---|
| 2025 | $3,635 (-89.1%) | $140,564 | $137,407 | $277,971 |
| 2024 | $33,284 (-4.0%) | $140,564 | $137,407 | $277,971 |
| 2023 | $34,675 (+32.5%) | $137,808 | $134,713 | $272,521 |
| 2022 | $26,165 (-20.2%) | $135,106 | $190,036 | $325,142 |
| 2021 | $32,799 | $132,457 | $186,310 | $318,767 |

Show more tax history ⌄

## Property details

### Interior

**Bathroom Information**
- # of Full Baths: 1

**Fireplace Information**
- # of Fireplaces: 1
- Has Fireplace

**Room Information**
- # of Rooms: 7

### Exterior

**Exterior Information**
- Building Style Type: U-Shape
- Construction Type: Wood/Steel
- Building Construction Quality: Average

**Property Information**
- Living Sq. Ft: 1,957
- Ground Floor Sq. Ft: 1,457

**Parking & Garage Information**
- Garage/Parking Sq. Ft: 400

**Lot Information**
- # of Buildings: 1
- Land Sq. Ft: 130,680
- Acres: 3
- Zoning Code: AR10

270

**Show all property details** ⌄

## Refinance

## Around this home

🏃 3/100 Car-Dependent    🚲 16/100 Somewhat bikeable

🏫 Schools        🛒 Places        🚆 Transit

-/10   **Harmony Elementary School**                           ›
       Public, K-1 • Assigned • 2.4mi

8/10   **Analy High School**                                   ›
       Public, 9-12 • Assigned • 5.1mi

Provided by GreatSchools

## Climate risks

Most homes have some risk of natural disasters, and may be impacted by climate change due to rising temperatures and sea levels.

271

**Flood Factor – Minimal**
Unlikely to flood in next 30 years                    >

**Fire Factor – Major**
9% chance of being in a wildfire in next 30 years     >

**Heat Factor – Minor**
8 days above 88° expected this year, 15 days in 30 years    >

**Wind Factor – Minimal**
Minimal risk of severe winds over next 30 years       >

**Air Factor – Severe**
12 unhealthy days expected this year, 12 days in 30 years    >

**View full report**

Provided by First Street ●

## Nearby similar homes

**$645,000**

2 beds   2 baths   — sq ft
123 Redwood Ave, Camp Meeker, CA 95419

**$399,000**

3 beds   1 bath   668 sq ft
11777 Madrona Rd, Forestville, CA 95436

**$95,000**

1 bed   1 bath   568 sq ft
9190 Rio Dell Ct, Forestville, CA 95436

**$749,000**

2 beds   1 bath   1,242 sq ft
582 Live Oak Ave, Sebastopol, CA 95472

**$1,795,000**

3 beds   3 baths   3,357 sq ft
3415 Harrison Grade Rd, Sebastopol, CA 95472

**$799,950**

2 beds   1 bath   1,080 sq ft
6640 1st St, Forestville, CA 95436

    View more homes

## New listings for sale in 95472

272

NEW 19 HRS AGO

NEW 29 HRS AGO

**$2,495,000**

4 beds   3 baths   2,450 sq ft
789 Pleasant Hill Rd, Sebastopol, CA 95472

**$269,500**

2 beds   2 baths   1,100 sq ft
8781 Evergreen Ave, Sebastopol, CA 95472

**$1,099,000**

3 beds   3 baths   2,236 sq ft
3590 Burnside Rd, Sebastopol, CA 95472

**$950,000**

4 beds   2.5 baths   2,004 sq ft
4633 Maddocks Rd, Sebastopol, CA 95472

**$199,000**

2 beds   1 bath   800 sq ft
8800 Green Valley Rd #4, Sebastopol, CA 95472

3D WALKTHROUGH

**$499,000**

2 beds   2 baths   1,095 sq ft
7088 Fircrest Ave, Sebastopol, CA 95472

(510) 742-8800

**$1,175,000**

3 beds   2.5 baths   1,864 sq ft
8091 Hill Dr, Sebastopol, CA 95472

**$1,995,000**

4 beds   4.5 baths   4,516 sq ft
2550 Hwy 116 S, Sebastopol, CA 95472

**$749,000**

2 beds   1 bath   1,242 sq ft
582 Live Oak Ave, Sebastopol, CA 95472

## Home values near 12778 DuPont Rd

Data from public records.

**$325,000**

1.5   2.5
8090 Hill Dr, S

Show more ⌄

## More real estate resources

Redfin  >  California  >  Sebastopol  >  12778 DuPont Rd, Sebastopol, CA 95472

| Cities | Neighborhoods | Zip Codes | Popular Searches |
|---|---|---|---|

Healdsburg homes for sale
Santa Rosa homes for sale
Petaluma homes for sale

**Join us**

**Become an Agent**

**Get referrals**

**Careers**

Find homes faster





**About us**

**Why Redfin?**

**Community Impact**

**Diversity & Inclusion**

**Life at Redfin**

Press

Investors

Blog

**Real Estate News**

**Find us**

Contact Us

Help Center

Advertise



Subsidiaries

Rent.

ApartmentGuide

**Affiliated Business**

**Rocket Close**

**Rocket Mortgage**

Countries

🇺🇸 United States

🇨🇦 Canada

Copyright: © 2025 Redfin. All rights reserved.

Updated September 2025: By searching, you agree to the Terms of Use, and Privacy Policy.

**Do not sell or share my personal information.**

REDFIN and all REDFIN variants, WALK SCORE, and the R logos, are trademarks of Redfin Corporation, registered or pending in the USPTO.

California DRE #01521930

Redfin is licensed to do business in New York as Redfin Real Estate. NY Standard Operating Procedures

New Mexico Real Estate Licenses.

TREC: Info About Brokerage Services, Consumer Protection Notice

All mortgage lending products and information are provided by Rocket Mortgage, LLC | NMLS #3030; www.NMLSConsumerAccess.org; Licensed in 50 states. This site is not authorized by the New York State Department of Financial Services for mortgage solicitation or loan applications activities related to properties located in the State of New York.

Redfin Corporation is an affiliated business of Rocket Limited Partnership. Each company, and their subsidiaries, are separate legal entities operated and managed through its own management and governance structures.

If you are using a screen reader, or having trouble reading this website, please call Redfin Customer Support for help at 1-844-759-7732.

**REDFIN IS COMMITTED TO AND ABIDES BY THE FAIR HOUSING ACT AND EQUAL OPPORTUNITY ACT. READ REDFIN'S FAIR HOUSING POLICY AND THE NEW YORK STATE FAIR HOUSING NOTICE.**

GreatSchools Ratings provided by **GreatSchools.org.**

274

# ATTACHMENT N

1  Herman Franck, Esq. SBN 123476
   Elizabeth Betowski, Esq., SBN 245772
2  Franck & Associates
   1750 Prairie City Road, Ste. 130, #254
3  Folsom, CA 95630
   Tel: 916-256-6266
4  Email: franckhermanlaw88@yahoo.com

5  Attorney for Defendant Michael Castagnola;
   Michael Castagnola as Trustee of The Michael L. Castagnola
6  Revocable Trust Agreement dated September 15, 2016;

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA
                     FOR THE COUNTY OF SONOMA
8

9  COUNTY OF SONOMA                    Case No. SCV-265714

10 Plaintiff,                          DEFENDANT MICHAEL CASTAGNOLA,
                                        INDIVIDUALLY AND AS TRUSTEE FOR
11 v.                                   THE MICHAEL L CASTAGNOLA
                                        REVOCABLE TRUST AGREEMENT
12 MICHAEL CASTAGNOLA, TRUSTEE OF       DATED SEPTEMBER 15, 2016'S NOTICE
   THE MICHAEL L. CASTAGNOLA           OF MOTION AND MOTION FOR ORDER
13 REVOCABLE TRUST; MICHAEL L.         PERMITTING FEDERAL LAWSUIT
   CASTAGNOLA REVOCABLE TRUST          AGAINST COURT-APPOINTED RECEIVER
14                                      MARK ADAMS; FOR ORDER MODIFYING
15 Defendant.                          PREVIOUSLY-GIVEN ORDER
                                        PERMITTING CARLY CASTAGNOLA TO
16                                      FILE LAWSUIT AGAINST COURT-
                                        APPOINTED RECEIVER, ALLOWING HER
17                                      TO FILE FEDERAL CASE AGAINST MARK
                                        ADAMS IN FEDERAL COURT; AND FOR
18                                      ORDER TERMINATING THE
                                        RECEIVERSHIP
19
                                        Date: March 6, 2026
20                                      Time: 3:00pm
                                        Dept: 19
21
22                                      Hon. Oscar A. Pardo

23 _____

24

25 To all parties herein, and their counsel of record:

                                                                    1

Amended Notice of Motion and Moton for Order Permitting Federal Lawsuit etc.

1    TAKE NOTICE of this amended notice of motion and motion setting a hearing date of March 6,

2    2026 at 3 p.m. in department 196 of the Sonoma County Superior Court, 9 before Hon. Oscar A.

3    Prado.

4

5    The motion papers were previously filed by moving party Michael Castagnola, individually and

6    as trustee of Trustee of The Michael L. Castagnola Revocable Trust Agreement dated September

7    15, 2016 on bracket date of filing in bracket.

8

9    Yesterday, January 6, 2026, we received from the clerk of the Sonoma County Superior Court a

10    return of the filed notice of motion and motion in which the clerk set the hearing date as noted

11    above.

12

13    The purpose of this amended notice is to simply apprise the involved parties and their counsel of

14    record that the clerk has set the hearing date as indicated above. A copy of the previously-filed

15    notice of motion with the clerk's imprinting of the hearing date, time, and department is attached

16    to this amended notice as Attachment A.

17

18    Respectfully Submitted,

19

20    //s// Herman Franck, Esq                          Date: January _7_, 2026
      _____
21    Herman Franck, Esq.
      Attorney for Defendant Michael Castagnola
22

23

24

25

2

Amended Notice of Motion and Moton for Order Permitting Federal Lawsuit etc.

277

### LIST OF ATTACHMENTS

Attachment A: Filed Notice of Motion and Motion for order permitting federal lawsuit against Court-Appointed receiver Mark Adams; for Order Modifying Previously-Given Order Permitting Carly Castagnola to File Lawsuit against Court-Appointed Receiver, allowing her to File Federal Case against Mark Adams in Federal Court; and for Order Terminating the Receivership

Amended Notice of Motion and Moton for Order Permitting Federal Lawsuit etc.

3

278

ELECTRONICALLY FILED
Superior Court of California
County of Sonoma
12/17/2025 3:03 PM
By: Janie Dorman, Deputy Clerk

Herman Franck, Esq. SBN 123476
Elizabeth Betowski, Esq., SBN 245772
Franck & Associates
1750 Prairie City Road, Ste. 130, #254
Folsom, CA 95630
Tel: 916-256-6266
Email: franckhermanlaw88@yahoo.com

Attorney for Defendant Michael Castagnola;
Michael Castagnola as Trustee of The Michael L. Castagnola
Revocable Trust Agreement dated September 15, 2016;

1
2
3
4
5
6

7          SUPERIOR COURT OF THE STATE OF CALIFORNIA
8                    FOR THE COUNTY OF SONOMA

9  | COUNTY OF SONOMA | Case No. SCV-265714 |
10 | Plaintiff, | DEFENDANT MICHAEL CASTAGNOLA, INDIVIDUALLY AND AS TRUSTEE FOR THE MICHAEL L CASTAGNOLA |
11 | v. | REVOCABLE TRUST AGREEMENT DATED SEPTEMBER 15, 2016'S NOTICE |
12 | MICHAEL CASTAGNOLA, TRUSTEE OF THE MICHAEL L. CASTAGNOLA | OF MOTION AND MOTION FOR ORDER PERMITTING FEDERAL LAWSUIT |
13 | REVOCABLE TRUST; MICHAEL L. CASTAGNOLA REVOCABLE TRUST | AGAINST COURT-APPOINTED RECEIVER MARK ADAMS; FOR ORDER MODIFYING |
14 | | PREVIOUSLY-GIVEN ORDER |
15 | Defendant. | PERMITTING CARLY CASTAGNOLA TO FILE LAWSUIT AGAINST COURT- |
16 | | APPOINTED RECEIVER, ALLOWING HER |
17 | | TO FILE FEDERAL CASE AGAINST MARK ADAMS IN FEDERAL COURT; AND FOR |
18 | | ORDER TERMINATING THE RECEIVERSHIP |
19 | | |
20 | | Date: 3/06/2026 |
21 | | Time: 3:00 PM |
22 | | Dept: 19 |

Date: 3/06/2026
Time: 3:00 PM
Dept: 19

TENTATIVE RULINGS may be obtained between 2:00 p.m. and 4:00 p.m. on the court day prior to the scheduled hearing at www.sonoma.courts.ca.gov OR by phone at (707) 521-6606

25  To all parties herein, and their counsel of record:

1

Notice of Motion and Moton for Order Permitting Federal Lawsuit etc.

1

2    TAKE NOTICE that on  March 6, 2026  at 3:00 PM in Department 19 of the above-entitled

3    court, located at 3055 Cleveland Avenue, Santa Rosa, CA 95403, Defendant Michael

4    Castagnola, individually and as Trustee for the Michael L. Castagnola Revocable Trust

5    Agreement dated September 15, 2016 will and hereby do move pursuant to the courts inherent

6    and express equitable powers under CCP section 128(a)(8) [To amend and control its process

7    and orders so as to make them conform to law and justice] and other inherent powers, and Health

8    & Safety Code §17980.7(c)(14)["This section shall not be construed to deprive an owner of a

9    substandard building of all procedural due process rights guaranteed by the California

10   Constitution and the United States Constitution, including, but not limited to, receipt of notice of

11   the violation claimed and an adequate and reasonable period of time to comply with any orders

12   that are issued by the enforcement agency or the court."], to grant the following series of orders

13   concerning the court-appointed receiver in this matter Mr. Mark Adams:

14      1.  For an order permitting Michael Castagnola individually and as Trustee of the Michael L.

15          Castagnola Revocable Trust to proceed with a presently-existing federal lawsuit in the

16          case entitled *Michael Castagnola; Michael Castagnola as Trustee of the Agreement*

17          *dated September 15, 2016; and Carly Castagnola v. Mark Adams et al.*, United States

18          District Court action 25-cv-03624-JD, currently before Hon. James Donato, United States

19          District Court judge in San Francisco, against the court-appointed receiver Mark Adams

20          asserting a series of civil claims against Mark Adams and his related LLC's by the name

21          of California Receivership, Inc. and Receivership Financing, LLC, and including the

22          following series of claims for relief, more specifically described in the accompanying

23          declaration of moving parties counsel Herman Franck:

24              a.  First Claim for Relief: 42 USC Section 1983 14th Amendment Due Process;

25

2

Notice of Motion and Moton for Order Permitting Federal Lawsuit etc.

280

1    b. Second Claim for Relief: Monell Doctrine

2    c. Third Claim for Relief: The State Created Danger Doctrine;

3    d. Fourth Claim for Relief: 14th Due Process Prosecution/Advisor;

4    e. Fifth Claim for Relief: Unjust Enrichment;

5    f. Sixth Claim for Relief: Improper Appointment of Receiver;

6    g. Seventh Claim for Relief: Intentional Infliction of Emotional Distress;

7    h. Eighth Claim for Relief: Conversion 5th Amendment and Takings Clause;

8    i. Ninth Claim for Relief: Breach of Fiduciary Duty;

9    j. Tenth Claim for Relief: 14th Amendment due process illegal eviction;

10    k. Eleventh Claim for Relief: Violation of Federal RICO Act;

11    l. Twelfth Claim for Relief: Violation of State of California RICO Act;

12    m. Thirteenth Claim for Relief: Reformation of Deed and Quiet Title Action;

13    n. Fourteenth Claim for Relief: Fraudulent Conveyance;

14    o. Fifteenth Claim for Relief: Violation for right to quiet enjoyment to residential

15     premises and wrongful foreclosure and wrongful eviction;

16    p. Sixteenth Claim for Relief: Willful Destruction of improvements on real property

17    q. Seventeenth Claim for Relief: for Elder Abuse Based on Fraud;

18    r. Eighteenth Claim for Relief: Breach of the Fiduciary Duty.

19

20  2. For an order to likewise modify its previous March 12, 2025 ruling granting Carly

21   Castagnola's motion to intervene in this matter, to permit her to proceed as a plaintiff

22   asserting civil claims against Mark Adams and his related LLC's California Receivership,

23   Inc. and Receivership Financing, LLC, as opposed to filing them in the present action

24

25

3

Notice of Motion and Moton for Order Permitting Federal Lawsuit etc.

3. For an order terminating or closing the receivership in this matter on the basis that the receiver on October 3, 2025 sold the Castagnola residence to buyers Blake Scott Azcarate Bascherini and Vanessa Mercedes Valera Bascherini, as Trustees of the Blake Scott Azcarate Bascherini and Vanessa Mercedes Valera Bascherini Revocable Living Trust, dated September 1, 2021. As such, there are no further properties assets or other issues concerning the receivership. In the alternative, to give such other partial terminations as the Court deems just and appropriate.

4. For such other related orders as the Court deems just and appropriate.

These motions are based on this notice of motion and motion; on the accompanying memorandum of points and authorities; on the accompanying Declaration of Herman Franck, counsel for moving parties herein and counsel for the Castagnolas in their independent federal action; on the files and pleadings herein and on such other matters as the Court may permit during the hearing on this motion.

Respectfully Submitted,

//s// Herman Franck, Esq.                                         Date: December _3_, 2025

_____

Herman Franck, Esq.
Attorney for Defendant Michael Castagnola

Notice of Motion and Moton for Order Permitting Federal Lawsuit etc.

282

1

## PROOF OF SERVICE

2

I, Elizabeth Betowski, declare as follows: That I am an adult over the age of 18, and reside in
Folsom, California, and am not a party to the present action. On the date signed below, I served
by electronic mail, the following documents:

3

4

   1. **Defendant Michael Castagnola, Individually and as Trustee for the Michael L
      Castagnola Revocable Trust Agreement dated September 15, 2016's Notice of
      Motion and Motion for order permitting federal lawsuit against Court-Appointed
      receiver Mark Adams; for Order Modifying Previously-Given Order Permitting
      Carly Castagnola to File Lawsuit against Court-Appointed Receiver, allowing her to
      File Federal Case against Mark Adams in Federal Court; and for Order
      Terminating the Receivership**

5

6

7

8

   2. **Memorandum of Points and Authorities in support of Defendant Michael
      Castagnola, Individually and as Trustee for the Michael L Castagnola Revocable
      Trust Agreement dated September 15, 2016's's Notice of Motion and Motion for
      order permitting federal lawsuit against Court-Appointed receiver Mark Adams;
      for Order Modifying Previously-Given Order Permitting Carly Castagnola to File
      Lawsuit against Court-Appointed Receiver, allowing her to File Federal Case
      against Mark Adams in Federal Court; and for Order Terminating the
      Receivership**

9

10

11

12

13

   3. **Declaration of Herman Franck in support of Defendant Michael Castagnola,
      Individually and as Trustee for the Michael L Castagnola Revocable Trust
      Agreement dated September 15, 2016's Notice of Motion and Motion for order
      permitting federal lawsuit against Court-Appointed receiver Mark Adams; for
      Order Modifying Previously-Given Order Permitting Carly Castagnola to File
      Lawsuit against Court-Appointed Receiver, allowing her to File Federal Case
      against Mark Adams in Federal Court; and for Order Terminating the
      Receivership**

14

15

16

17

18

   4. **Compendium of Federal Authorities in support of Defendant Michael Castagnola,
      Individually and as Trustee for the Michael L Castagnola Revocable Trust
      Agreement dated September 15, 2016's Notice of Motion and Motion for order
      permitting federal lawsuit against Court-Appointed receiver Mark Adams; for
      Order Modifying Previously-Given Order Permitting Carly Castagnola to File
      Lawsuit against Court-Appointed Receiver, allowing her to File Federal Case
      against Mark Adams in Federal Court; and for Order Terminating the
      Receivership**

19

20

21

22

23

24

The above-listed documents were served on all parties by personal delivery to the following
addressees:

25

5

Notice of Motion and Moton for Order Permitting Federal Lawsuit etc.

283

1  Michael A. King, Esq.
   Sonoma County Counsel
   575 Administration Drive, Room 105A
2  Santa Rosa, California 95403
   Telephone: (707) 565-2421
3  Fax: (707) 565-2624
   Michael.King@sonomacounty.gov
4  *Attorneys for County of Sonoma*

5

6  Mark S. Adams
   California Receivership Group
7  3435 Ocean Park Blvd., Suite 107
   Santa Monica, CA 90405
8  Tel. (310) 471-8181
   Fax (310) 471-8180
9  madams@calreceivers.com
   *Court-Appointed Receiver*
10

11

12 I declare under oath and under penalty of perjury that the foregoing is true and correct and that
   this Declaration was executed in Folsom, California, on December _3__, 2025.
13

14 //s// Elizabeth Betowski

15 _____
   Elizabeth Betowski
16

17

18

19

20

21

22

23

24

25

                                                                                          6

   Notice of Motion and Moton for Order Permitting Federal Lawsuit etc.

1          **PROOF OF SERVICE**

2    I, Elizabeth Betowski, declare as follows: That I am an adult over the age of 18, and reside in
     Folsom, California, and am not a party to the present action. On the date signed below, I served
3    by electronic mail, the following documents:

4       1. **Defendant Michael Castagnola, Individually and as Trustee for the Michael L**
5          **Castagnola Revocable Trust Agreement dated September 15, 2016's AMENDED**
           **Notice of Motion and Motion for order permitting federal lawsuit against Court-**
6          **Appointed receiver Mark Adams; for Order Modifying Previously-Given Order**
           **Permitting Carly Castagnola to File Lawsuit against Court-Appointed Receiver,**
7          **allowing her to File Federal Case against Mark Adams in Federal Court; and for**
           **Order Terminating the Receivership**
8
     The above-listed documents were served on all parties by personal delivery to the following
9    addressees:

10   Michael A. King, Esq.
11   Diana Gomez, Esq.
     Sonoma County Counsel
12   575 Administration Drive, Room 105A
     Santa Rosa, California 95403
13   Telephone: (707) 565-2421
     Fax: (707) 565-2624
14   Michael.King@sonomacounty.gov
     Diana.Gomez@sonomacounty.gov
15   *Attorneys for County of Sonoma*

16   Mark S. Adams
17   California Receivership Group
     3435 Ocean Park Blvd., Suite 107
18   Santa Monica, CA 90405
     Tel. (310) 471-8181
19   Fax (310) 471-8180
     madams@calreceivers.com
20   *Court-Appointed Receiver*

21

22   I declare under oath and under penalty of perjury that the foregoing is true and correct and that
     this Declaration was executed in Folsom, California, on January 7, 2026.

23

24   //s// Elizabeth Betowski

25   Elizabeth Betowski

                                                                                              4

     Amended Notice of Motion and Moton for Order Permitting Federal Lawsuit etc.